**GOTTLIEB AND GREENSPAN, LLC**
**Michael Gottlieb, Esq. (NJ Attorney ID No.: 07592-2013)**
**169 Ramapo Valley Road, Suite ML3**
**Oakland, NJ 07436**
**Phone Number: (201) 644-0896**
**Fax Number: (201) 465-3065**
*Attorneys for Plaintiff, NJ Pediatric Neuroscience Institute*

| | |
|---|---|
| NJ PEDIATRIC NEUROSCIENCE INSTITUTE,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED HEALTHCARE INSURANCE COMPANY,<br><br>    Defendant. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION:<br>MORRIS COUNTY<br><br>DOCKET NO.:<br><br>            CIVIL ACTION<br><br>    **COMPLAINT** |

Plaintiff NJ Pediatric Neuroscience Institute ("Plaintiff"), by and through its attorneys, Gottlieb and Greenspan, LLC, by way of Complaint against United Healthcare Insurance Company ("Defendant"), alleges as follows:

**THE PARTIES**

1.      Plaintiff is a New Jersey based medical practice with a principal place of business at 131 Madison Ave, Morristown, NJ 07960.

2.      Upon information and belief, Defendant is engaged in administering healthcare plans or policies in the State of New Jersey.

**FACTUAL BACKGROUND**

3.      Plaintiff is a medical practice comprised of physicians that specialize in the surgical treatment of patients with neurological deficits.

4.      On January 4, 2012, Plaintiff entered into an agreement (henceforth referred to as, "the Agreement") with an agent of Defendant known as "Multiplan."

<span style="color:red">**Exhibit 1**</span>

5.      Under the terms of the Agreement, Defendant was obligated to reimburse Plaintiff for services rendered to applicable members at 80% of Plaintiff's charges. (*See*, **Exhibit A**, attached hereto.)

6.      However, as will be discussed further, on numerous occasions, Defendant failed to abide by the terms of the agreement by paying less than 80% of Plaintiff's billed charges even though the Agreement was applicable.

7.      Specifically, on January 4, 2017, two of Plaintiff's physicians performed an emergency surgical procedure, known as a craniectomy, on Kyle H. ("Patient 1"), who was hit in the head at school and developed a skull bone fracture. (*See*, **Exhibit B**, attached hereto.) The treatment, like all of the medical treatment at issue in this matter, took place in Morristown Memorial Hospital, located in Morristown, New Jersey.

8.      At the time of his treatment, Patient was the beneficiary of a health insurance plan administered by Defendant.

9.      The services rendered to Patient 1 implicated the parties' agreement, and, as a result, Defendant was contractually obligated to pay Plaintiff 80% of its billed charges in connection with the services rendered to Patient.

10.      After treating Patient 1, Plaintiff submitted two Health Insurance Claim Form ("HCFA") medical bills to Defendant, one reflecting the services performed by the primary surgeon, and one reflecting the services performed by the assistant surgeon.

11.      Each of the two HCFAs reflected billed charges in the amount of $106,691.00.

12.      However, the second HCFA denoted modifier AS, indicating that the charges reflected services performed by an assistant surgeon. (*See*, **Exhibit C**, attached hereto.)

2

13.     Per industry protocols, a HCFA with an AS modifier indicates that the true charges for the services are 16% of the amount reflected in the HCFA. Thus, the true charges for the second HCFA were $17,070.56.

14.     Therefore, under the parties' Agreement, Defendant should have issued reimbursement to Plaintiff in the amount of $13,656.45.

15.     However, Defendant issued reimbursement for the assistant surgeon services in the total amount of $535.28. (*See*, **Exhibit D**, attached hereto.)

16.     Accordingly, Defendant underpaid Plaintiff for the assistant surgeon services rendered on January 4, 2017 by $13,121.17.

17.     On February 14, 2017, Plaintiff's physicians performed a subsequent procedure on Patient 1 due to post-surgical fluid that reaccumulated in the affected area. (*See*, **Exhibit E**, attached hereto.)

18.     Thereafter, Plaintiff again submitted two HCFA medical bills to Defendant, one reflecting the services performed by the primary surgeon, and one reflecting the services performed by the assistant surgeon. (*See*, **Exhibit F**, attached hereto.)

19.     Each of the two HCFAs reflected billed charges in the amount of $53,867.00.

20.     With respect to the HCFA reflecting the primary surgical services, Defendant should have reimbursed Plaintiff its contract rate of 80% of billed charges for a total of $43,093.60.

21.     However, Defendant "allowed" payment in the total amount of $15,178.00. (*See*, **Exhibit G**, attached hereto.)

3

22.     Thus, Defendant underpaid Plaintiff for the primary surgical services rendered on February 14, 2017 by a total of $27,915.60.

23.     With respect to the assistant surgeon charges, Defendant should have reimbursed Plaintiff a total of $6,894.98, after applying the contract rate to the 16% assistant surgeon protocol.

24.     However, Defendant "allowed" payment for the assistant surgeon services in the total amount of $3,475.28. (*See*, **Exhibit H**, attached hereto.)

25.     Thus, Defendant underpaid Plaintiff for the assistant surgeon services rendered on February 14, 2017 in the total amount of $3,419.70.

26.     In total, Defendant underpaid Plaintiff for the services rendered to Patient 1 by **$44,456.47**.

27.     On June 12, 2018, one of Plaintiff's physicians performed an emergency cerebral angiogram on Connor N. ("Patient 2"), a ten-year old boy who had suffered a brain hemorrhage. (*See*, **Exhibit I**, attached hereto.)

28.     At the time of her treatment, Patient 2 was the beneficiary of an employer-based health insurance plan for which Defendant served as claims administrator.

29.     After treating Patient 2, Plaintiff submitted a HCFA medical bill to Defendant seeking payment in the amount of $40,000.00. (*See*, **Exhibit J**, attached hereto.)

30.     Therefore, under the parties' Agreement, Defendant should have issued reimbursement to Plaintiff in the amount of $32,000.00.

31.     However, for reasons that remain unclear to Plaintiff, Defendant failed to issue any reimbursement to Plaintiff for the emergency services rendered to Patient 2. (*See*, **Exhibit K**, attached hereto.)

32.     Thus, **$32,000.00** remains outstanding with respect to Plaintiff's treatment of Patient 2.

33.      On or around August 31, 2018, Plaintiff's physicians performed spinal surgery on Ethan R. ("Patient 3"), a 12-year-old boy suffering from scoliosis, among other things. (*See*, **Exhibit L**, attached hereto.)

34.     At the time of his treatment, Patient 3 was the beneficiary of an employer-based health insurance plan for which Defendant served as claims administrator.

35.     Plaintiff subsequently submitted a HCFA medical bill to Defendant for the medical treatment performed on Patient 3 seeking payment in the amount of $71,401.00. (*See*, **Exhibit M**, attached hereto.)

36.     Therefore, under the parties' Agreement, Defendant should have issued reimbursement to Plaintiff in the amount of $57,120.80.

37      However, Defendant "allowed" reimbursement to Plaintiff in the total amount of $20,053.00. (*See*, **Exhibit N**, attached hereto.)

38.     Thus, Defendant underpaid Plaintiff for Plaintiff's treatment of Patient 3 by the total amount of **$37,067.00**.

39.     For each and every claim, Plaintiff submitted multiple internal appeals challenging Defendant's reimbursement as improper under the terms of the parties' Agreement.

40.     However, Defendant failed to issue any additional payment in response to Plaintiff's appeals.

41.     As a result, Plaintiff has been damaged in the amount of $113,523.80.

42.     Plaintiff therefore seeks redress of the unpaid balance due under the parties' Agreement.

## COUNT I

## BREACH OF CONTRACT

43.     Plaintiff repeats, realleges and reaffirms each of the preceding allegations contained in paragraphs 1 through 42 of this Complaint with the same force and effect as though fully set forth herein.

44.     The Agreement is a valid and binding contract between Plaintiff and Defendant.

45.     Defendant breached the agreement by failing to pay Plaintiff the amount due and owing thereunder.

46.     Plaintiff has repeatedly demanded that Defendant abide by the terms of the Agreement and pay Plaintiff the amount due and owing thereunder.

47.     However, Defendant refused and failed to satisfy its obligations pursuant thereto.

48.     As a result, Plaintiff has been damaged in the amount of $113,523.80, representing the balance due under the Agreement.

**WHEREFORE,** Plaintiff, NJ Pediatric Neuroscience Institute, demands:

1.      On the first cause of action against Defendant in the sum of $113,523.80, together with interest thereon at the legal rate;

2.      Costs and disbursements of the instant action, and;

3.      Such other, further and different relief as this court may deem just, proper and equitable.

<div style="margin-left:40%">

GOTTLIEB AND GREENSPAN, LLC
Attorneys for Plaintiff, *NJ Pediatric Neuroscience Institute*

By:  _____
Michael Gottlieb
169 Ramapo Valley Road, Suite ML3
Oakland, New Jersey 07436
(201) 644-0896

</div>

Dated: February 16, 2023

## DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:25-4, Michael Gottlieb, Esq. is hereby designated as trial counsel in the above captioned litigation on behalf of the firm of Gottlieb and Greenspan, LLC.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

## CERTIFICATION PURSUANT TO RULE 1:38-7(b)

I certify that confidential personal identifiers have been redacted from documents now submitted to the court and will be redacted from all documents submitted in the future.

## CERTIFICATION PURSUANT TO RULE 4:5-1

The matter in controversy is not the subject of any other action pending in any other Court. There are no pending arbitration proceedings. No other action or arbitration proceedings are contemplated. No non-party is known who would be subject to joinder because of potential liability.

GOTTLIEB AND GREENSPAN, LLC
Attorneys for Plaintiff, *NJ Pediatric Neuroscience Institute*

By: _____
Michael Gottlieb
169 Ramapo Valley Road, Suite ML3
Oakland, New Jersey 07436
(201) 644-0896

Dated: February 16, 2023

# EXHIBIT A

## MPI PARTICIPATING PROFESSIONAL GROUP AGREEMENT

This Agreement, which is effective as of September 15, 2012 (the "Effective Date"), is entered into by and between MultiPlan, Inc., on behalf of itself and its subsidiaries ("MPI"), and New Jersey Pediatric Neurosurgical Associates, a partnership, professional service corporation, limited liability company or other legally constituted entity of licensed, registered, or certified health care professionals organized to provide health care services ("Group").

In consideration of the promises and the mutual covenants and undertakings set forth in this Agreement, receipt and sufficiency of which is hereby acknowledged, the parties have executed this Agreement through their duly authorized representatives.

| | |
|---|---|
| **Group:** New Jersey Pediatric Neurosurgical Associates | **MultiPlan, Inc.** (on behalf of itself and its subsidiaries): |
| Signature: *Catherine Mazzola MD* | Signature: |
| Print Name: *Catherine Mazzola MD* | Print Name: Michael Ferrante |
| Title: President & CEO | Title: Executive Vice president & COO |
| Date: 9-7-2012 | Date: 10-4-2012 |
| Tax I.D. #: 20-2518910 | |
| National Provider Identifier (NPI): 1558503672 | |

**I.   DEFINITIONS.** For purposes of this Agreement:

1.1   Benefit Program Maximum means an instance in which the cumulative payment by a User has met or exceeded the annual or lifetime benefit maximum (e.g., dollar amount or service count) for a particular type of Covered Service rendered to a Participant in accordance with the terms of the Participant's Benefit Program.

1.2   Billed Charges means the fees for a specified health care service or treatment routinely charged by Group regardless of payment source.

1.3   Clean Claim means a completed HCFA 1500 (or successor form), as appropriate, or other standard billing format containing all information reasonably required by the Client for adjudication.

1.4   Client means an insurance company, employer health plan, Taft-Hartley Fund, or an organization that sponsors Program(s), administers Program(s) on behalf of a User or otherwise provides services to a User regarding such Programs.

1.5   Co-insurance means an amount that the Participant is responsible for paying in accordance with the terms of the Participant's Benefit Program other than a Co-payment or Deductible.

1.6   Contract Rates means the rates of reimbursement to Group for Covered Services, as set forth in Exhibit D.  Additional Contract Rate terms, if any, are also set forth in Exhibit D.

1.7   Co-payment means an expressed dollar amount for a given Covered Service, which is required to be paid by the Participant typically at the time of service under the terms of the Participant's Benefit Program.

1.8   Covered Services means health care treatment and supplies rendered by a Network Provider and provided to a Participant for which a User is responsible for payment pursuant to the terms of a Program.

1.9   Deductible means the amount a Participant is required to pay in accordance with the Participant's Benefit Program before a claim for benefits by the Participant is eligible for reimbursement by a User.

1.10   Network means an arrangement of Network Providers created or maintained by MPI, or one of its subsidiaries, under which such Network Providers have agreed to accept certain Contract Rates for Covered Services provided to Participants.

1.11   Network Provider(s) means a licensed facility or licensed, registered, or certified health care professional that agrees to provide health care services to Participants and has been independently contracted for participation in the Network. Network Providers may be referred to in this Agreement and in the administrative handbook(s) individually as "Network Facility" and "Network Professional" respectively.

1.12 <u>Participant</u> means any individual and/or dependent eligible under a Client's Program that provides access to the Network.

1.13 <u>Participating Professional</u> means a licensed, registered, or certified health care professional (i) who is an employee, member or partner of, or has contracted with, Group; (ii) who MPI has determined, in its sole discretion, satisfies the applicable credentialing criteria; and (iii) is bound to provide Covered Services to Participants within the scope of his or her applicable license, registration, certification, and privileges, and pursuant to this Agreement.

1.14 <u>Program.</u> Unless otherwise specified, the term Benefit Program and *ValuePoint* Program shall be referred to collectively as "Program".

   (a) <u>Benefit Program</u> means any contract, insurance policy, workers' compensation plan, auto medical plan, government program, health benefit plan or other plan or program under which Participants are eligible for benefits.

   (b) <u>*ValuePoint* Program or Discount Card Program</u> means a non-insured business arrangement under which, in exchange for a fee or other consideration paid by Participant directly to Client, and upon presentation of an identification card bearing the *ValuePoint* logo or other MPI authorized name and/or logo, a Participant has the right to reimburse Network Providers directly at the Contract Rate as payment in full for health care services rendered.

1.15 <u>User</u> means any corporation, partnership, labor union, association, program, employer or any other entity responsible for the payment of Covered Services, entitled to access to the Contract Rate under this Agreement. Client may also be a User. For purposes of the *ValuePoint* Program or Discount Card Program, User shall mean an individual.

## II.  TERM AND TERMINATION

2.1 <u>Effective Date; Term.</u> This Agreement will become effective on the Effective Date and will continue in effect for a period of one (1) year ("Initial Term"). Unless otherwise terminated as specified in this Agreement, this Agreement shall renew automatically for consecutive one (1) year terms ("Renewal Term") on each anniversary of the Effective Date ("Renewal Date").

2.2 <u>Discretionary Termination.</u> After the expiration of the Initial Term, this Agreement may be terminated in the sole discretion of either party, by the provision of written notice at least one hundred and eighty (180) days prior to the Renewal Date, such termination to be effective on the Renewal Date.

2.3 <u>Termination for Material Breach.</u>

   (a) This Agreement may be terminated by MPI upon written notice to Group if (i) any action is taken which requires Group to provide MPI with notice under Section 3.8; (ii) in the sole discretion of MPI, Group or any Participating Professional fails to comply with the quality management and/or credentialing/recredentialing program(s) specified in the administrative handbook(s); or (iii) Group or any Participating Professional fails to comply with any applicable state and/or federal law related to the delivery of health care services.

   (b) In the event that one party commits a material breach of this Agreement (the "Breaching Party") other than those specified in Section 2.3(a), this Agreement will terminate upon the provision of at least thirty (30) days written notice to the Breaching Party specifying the material breach. The Breaching Party may cure the breach within such thirty (30) day period, provided however, that failure to cure said breach will result in termination as of the date specified in the notice.

2.4 <u>Network Participation Termination.</u> Either party may terminate this Agreement as to any of the Networks in which Group participates by the provision of at least ninety (90) days prior written notice to the other party. Termination of a Network will not terminate this Agreement as to any other Networks in which Group participates.

2.5 <u>Selection and Termination of Participating Professionals.</u>

   (a) MPI, in its sole discretion, will designate those health care professionals who satisfy the credentialing criteria of MPI as Participating Professionals. MPI reserves the right to re-credential any Participating Professional.

   (b) MPI, in its sole discretion, may terminate any Participating Professional upon at least ninety (90) days written notice.

   (c) In addition to the termination of a Participating Professional as specified in Section 2.5(b), MPI may terminate the participation of any Participating Professional under this Agreement upon written notice to the Participating Professional if Participating Professional (i) engages in any action that requires Group to provide notice to MPI under Section 3.8 with respect to such Participating Professional; (ii) fails to comply with the quality management and/or credentialing/recredentialing program(s) specified in the administrative handbook(s), in the sole discretion of MPI; (iii) ceases to be an employee, member, partner, or contractor of Group; (iv) fails to comply with any

applicable state and/or federal laws related to the delivery of health care services; or (v) fails to comply with any other terms of this Agreement.

(d) Group will provide at least ninety (90) days prior written notice to MPI in the event that any Participating Professional voluntarily disenrolls from the Group and/or from the Network.

(e) Participating Professional may appeal the termination of such Participating Professional by submitting a written request for appeal to MPI within thirty (30) days of the date of the notice of termination in accordance with the then current MPI appeal procedure.

2.6 <u>Appeal of Termination</u>. Group may appeal the termination of this Agreement by MPI by submitting a written request for appeal to MPI within thirty (30) days of the date of the notice of termination in accordance with the then current MPI appeal procedure.

2.7 <u>Effect of Termination; Continuing Obligations</u>.

(a) Upon the termination of this Agreement by either party for any reason, all rights and obligations hereunder shall cease, except (i) those rights and obligations provided in Article VII and Article VIII; and (ii) those rights, obligations, and liabilities incurred prior to the date of termination.

(b) Upon termination of this Agreement for any reason, termination of any Network in which Group participates, or the termination of an individual Participating Professional's status as a Participating Professional under the terms of this Agreement, Group and/or Participating Professional will:

(i) continue to provide health care services to Participants who are receiving treatment on the effective date of termination (1) until the course of treatment is completed; (2) for a period of ninety (90) days or through the current period of active treatment for those Participants undergoing active treatment for a chronic or acute medical condition, whichever time period is shorter; (3) throughout the second and third trimester of pregnancy and/or through postpartum care, if requested by the Participant; or (4) until Group or Participating Professional makes reasonable and medically appropriate arrangements to transfer the Participant to the care of another provider, making such transfer to a Network Provider whenever appropriate (except as specified in subsections (2) and (3) herein);

(ii) accept payment made pursuant to Article V, as payment in full, for Covered Services rendered in accordance with this Section; and

(iii) inform Participants seeking health care services that Group and/or Participating Professional is no longer a Network Provider.

## III.  RIGHTS AND OBLIGATIONS OF GROUP

3.1 <u>Binding Authority</u>.  Group represents that it has been granted the authority in writing to enter into this Agreement and to bind all Participating Professionals to the terms of this Agreement.

3.2 <u>Provision of Health Care Services</u>.  Group and each Participating Professional will render medical and health care services in a manner which assures availability, adequacy, and continuity of care to Participants.  Group and each Participating Professional will remain solely responsible for the quality of health care services provided by Group and each Participating Professional to Participants, and will ensure such services are rendered in accordance with generally accepted medical practice and professionally recognized standards. Nothing contained herein will grant MPI or Client the right to govern the level of care of a patient.  Utilization management decisions will only affect reimbursement of Group for services rendered and will not limit the performance of the services of Group and each Participating Professional or affect professional judgment.

3.3 <u>Non-Discrimination</u>. Neither Group nor any Participating Professional will differentiate or discriminate against Participants in the provision of health care services, and will render such health care services to all Participants in the same manner, in accordance with the same standards, and with the same availability as offered to Group's or Participating Professional's other patients.

3.4 <u>Access</u>. Group and each Participating Professional will use reasonable efforts to accept all Participants for treatment in accordance with all terms and conditions of this Agreement. Group will ensure that medical and health care services are available to Participants 24 hours a day, 7 days a week. Group will provide at least ninety (90) days prior written notice to MPI whenever Group or any Participating Professional (i) closes or limits their respective practice; and (ii) re-opens or removes any limitation on a closed or limited practice.

3.5   <u>Licenses, Certifications and Accreditations</u>.  Group and each Participating Professional: (i) possesses, and will maintain in good standing, all licenses, registrations, certifications, and accreditations required by law to render health care services in the state in which Covered Services are rendered; and (ii) will comply with any applicable local, state and/or federal laws or regulations related to the delivery of health care services.

3.6   <u>Medical and Billing Records</u>.

(a)   Group will prepare and maintain, and cause each Participating Professional to prepare and maintain, as appropriate, pertinent medical and billing information and records for each Participant ("Medical and Billing Records") in accordance with generally accepted medical, accounting, and bookkeeping practices and will maintain such Medical and Billing Records for at least seven years following the furnishing of health care services to Participants.

(b)   Subject to any applicable legal restrictions and upon request by MPI and/or Client, Group or Participating Professional will promptly provide copies of the Medical and Billing Records to MPI and/or Client, for those purposes which MPI and/or Client deem reasonably necessary, including without limitation, quality assurance, medical audit, credentialing or recredentialing, payment adjudication and processing.

(c)   Group and each Participating Professional will comply with all state and federal laws and the requirements specified in the administrative handbook(s) pertaining to the confidentiality of Medical and Billing Records, and will keep confidential, and take all precautions to prevent the unauthorized disclosure of any and all Medical and Billing Records.

3.7   <u>On-Site Review</u>.  Subject to any applicable legal restrictions, and upon at least ten (10) days prior written notice, Group will permit and arrange for MPI and/or Client to conduct an on-site review to validate compliance with the terms of this Agreement by Group and each Participating Professional.  Such on-site reviews shall not unreasonably interfere with Group's business and will be conducted during normal business hours.

3.8   <u>Notice of Actions</u>.  Group will send written notice to MPI within ten (10) days of the following actions against Group, Participating Professional, or any agent and/or employee thereof, even if such action is being appealed: (i) any active investigation by a governmental agency; (ii) any final legal action; (iii) any final action by a regulatory or accrediting entity; (iv) a reduction in, or cancellation of general and/or professional liability insurance; or (v) final action of insolvency.  Any notice required pursuant to this Section will be provided in accordance with the notice requirements specified in Section 9.9 of this Agreement, except that the address and agent to receive notice shall be as follows: Credentialing Coordinator to the Medical Director, MultiPlan, Inc., 1100 Winter Street, Waltham MA 02451.

3.9   <u>Network Participation and Requirements</u>.  MPI may, in its sole discretion, include Group and each Participating Professional as a Network Provider in any or all Network(s).  Group and each Participating Professional acknowledge that certain Programs offered by Clients accessing the Network (i) may not include a network option; or (ii) may cover Covered Services under the Participant's Program at an in-Network or out-of-Network benefit level.  Group and each Participating Professional will comply with any Network specific requirements contained in Exhibit B and/or the administrative handbook(s).

3.10   <u>Utilization Management</u>.  Group and each Participating Professional will participate in and observe the protocols of Client's utilization management program, to the extent such program is consistent with industry standards.

3.11   <u>Administrative Handbook(s)</u>. Group and each Participating Professional will comply with the terms of the administrative handbook(s), including, without limitation, observing the protocols of the quality management and credentialing/recredentialing program(s). MPI may, in its sole discretion, modify the administrative handbook(s) from time to time and post such modifications to the MPI website. Group and each Participating Professional will periodically review the administrative handbook(s) on the MPI website for updates.

3.12   <u>Open Communication</u>.  Neither Group nor any Participating Professional will be prohibited from, or penalized by Client and/or MPI for communicating with patients regarding the appropriate treatment alternatives available to the patient, regardless of benefit coverage limitations.  In addition, neither Client nor MPI will penalize Group or any Participating Professional if Group or Participating Professional, in good faith, reports to state or federal authorities any act or practice by the Client and/or MPI that jeopardizes a patient's health or welfare.

3.13   <u>Exchange of Provider Professional Data</u>.

(a)   Group will submit to MPI such information as MPI may reasonably request (i) to verify the credentials of each professional employee, member, partner, or contractor of Group applying for participation in the Network ("Applicant"), and re-credential each Participating Professional; (ii) for the purpose of complaint resolution; (iii) for the purpose of utilization management; and (iv) for provider listings.

(b) Subject to applicable state and federal laws governing the confidentiality of peer review proceedings, Group and each Applicant and Participating Professional hereby consent to MPI permitting the inspection by Clients, or independent credentialing or accreditation entities, and their respective officers, directors, employees, medical credentialing decisions of MPI with respect to such Applicant or Participating Professional, and all documents that may be material to an evaluation of the qualifications and competence of the Applicant or Participating Professional.

(c) Group will indemnify and hold MPI and its respective directors, officers, agents, employees and representatives, harmless from any and all liability, loss, damage, claim or expense of any kind, including costs and reasonable attorneys' fees, which result from any act or omission by Group or any Participating Professional concerning its representations, duties, and obligations under this Section 3.13.

3.14   Maintenance of Practice Information.

(a) Group will provide to MPI each practice location and tax identification number utilized by Group and will promptly inform MPI of (i) any change in the ownership of Group; (ii) the addition of a professional employee, member, partner, or contractor to Group; (iii) the departure of any Participating Professional from the Group; (iv) the refusal of any Participating Professional to continue to be a Participating Professional; and (v) any change in practice locations, telephone numbers, billing address or tax identification number. Failure to provide each practice location and tax identification number may result in a delay or error in the payment of claims for Covered Services rendered to Participants.

(b) All sites at which Participating Professionals practice that are affiliated with Group shall be considered in-Network sites under this Agreement. If a Participating Professional also practices independently of the Group and has not contracted with MPI directly with respect to that independent site, services rendered by Participating Professional at that site shall be considered out-of-Network sites. Participating Professional shall use different tax identification numbers to distinguish between in-Network and out-of-Network sites.

3.15   Subcontracting.   In the event that Group delegates or subcontracts any of its rights, duties or obligations under this Agreement, Group shall ensure that any such subcontracted arrangement will be subject to the terms of this Agreement, including but not limited to the credentialing requirements specified in this Agreement.

## IV.   RIGHTS AND OBLIGATIONS OF MPI

4.1   Limitations.   MPI's duties are limited to those specifically set forth herein. MPI does not determine benefits eligibility or availability for Participants and does not exercise any discretion or control as to Program assets, with respect to policy, payment, interpretation, practices, or procedures. MPI is not the administrator, insurer, underwriter, or guarantor of Programs, and MPI is not liable for the payment of services under Programs.

4.2   Licenses, Registrations, and Certifications.   MPI will comply with all laws and regulations governing its performance under this Agreement, including, but not limited to, obtaining and maintaining in effect all applicable licenses, registrations, and certifications necessary for that purpose.

4.3   Client Agreements.   MPI agrees that it has entered into agreements with Clients that specify that the right to access the Network, including access to the Contract Rates, shall be subject to the terms of this Agreement.

4.4   Client Listing.   MPI will post to the MPI website a list of the Clients that have purchased the Network ("Client Listing").

4.5   Identification.   MPI will require Clients to furnish Participants with a means of identifying themselves to Group as covered under a Program with access to the Network, such as (i) an MPI phone number identifier; (ii) written notification by Client of MPI affiliation at time of identification card; (iii) an MPI authorized name and/or logo on an benefits verification; (iv) an MPI authorized name and/or logo on the Explanation of Benefits; or (v) other means acceptable to MPI and Group.

4.6   Direction.   MPI will require Clients to provide a mechanism encouraging direction to Network Providers, which may include, but is not limited to, the availability of Network Provider listings or financial incentives that provide Participants or Users with savings when health care services are obtained from Network Providers.

4.7   Use of Contract Rates.   MPI will require Clients and its Users to use the Contract Rates agreed to in this Agreement solely for Covered Services rendered to Participants covered under a Program which utilizes the Network.

## V.   PAYMENT AND BILLING

5.1   <u>Submission of Claims</u>. Group will submit claims for payment within ninety (90) days of furnishing health care services at Group's Billed Charges for such health care services. Claims received after this time period may be denied for payment by Client or User, and Group shall not bill Client, User, MPI or Participant for such denied claims. Group will follow the claims submission procedures contained in the administrative handbook(s). A Clean Claim shall be deemed to have been received by the Client: (i) on the date that such Clean Claim is transmitted to the Client if transmitted by electronic means; or (ii) five (5) calendar days following the deposit of such Clean Claim in the U.S. Mail, first class postage prepaid and addressed to the Client at such address set forth on the Participant's identification card. Upon request, Group shall furnish to Client or MPI, all information reasonably required to verify the health care services provided by Group and the charges for such services.

5.2   <u>Payment for Covered Services</u>.

(a) Except as set forth in Section 5.3 and 5.4(b) herein, for those Clients subject to state or federal law with regard to timely payment of claims, Client shall pay or arrange for User to pay Group the Contract Rate for Covered Services per the requirements of such state or federal law, and shall be subject to any interest and/or penalties under such law.

(b) Except as set forth in Section 5.3 and 5.4(b) herein, for those Clients that are not subject to the state or federal law with regard to timely payment of claims, Client will pay or arrange for User to pay Group the Contract Rate for Covered Services within thirty (30) business days of receipt of a Clean Claim and in accordance with the terms of this Agreement. In the event that a Clean Claim is not paid within thirty (30) business days from the date of receipt of such Clean Claim, Group has the right not to honor the Contract Rate. A Clean Claim shall be deemed to have been paid by the Client: (i) on the date that payment is transmitted to the Group if transmitted by electronic means; or (ii) on the date payment is deposited by Client or User in the U.S. Mail, first class and postage prepaid, addressed to Group.

(c) Any payments due by Client under this Agreement shall be reduced by any applicable Co-payments, Deductibles, and/or Co-insurance, if any, specified in the Participant's Benefit Program and/or any service for which the Participant's Benefit Program does not provide coverage. Payment by Client or User shall be subject to Exhibit D, the administrative handbook(s), and industry standard coding and bundling rules, if any.

5.3   <u>Disputed Claims</u>.

(a) <u>Pre Payment Disputed Claims</u>. Client shall have the right, within thirty (30) business days of Client's receipt of a claim and prior to payment of said claim, to provide Group with written notification that a claim is not a Clean Claim containing all complete and accurate information required for adjudication or if Client has some other stated dispute with the claim. Client shall pay or arrange for User to pay Group at the Contract Rate(s) for Covered Services for all portions of the claim not in dispute. Group shall provide the complete and accurate information requested within thirty (30) business days of Client's request, and Client shall pay or arrange for User to pay for Covered Services within thirty (30) business days of receipt of the additional and/or corrected information.

(b) <u>Post Payment Disputed Claims</u>. Group may challenge payment to Group within one hundred and eighty (180) days following Group's receipt of such payment from Client, otherwise such payment shall be deemed final.

(c) <u>Claims Dispute Resolution; Client</u>. Any disputes that may arise under this Agreement related to the payment of a claim by Client or User shall be referred directly to the respective Client or User for resolution.

5.4   <u>Billing of Participants</u>.

(a) Group will bill or collect from a Participant all Co-payments, if any, as specified in the Participant's Benefit Program for Covered Services. Following the receipt of an explanation of benefits form from Client, Group will bill or collect from a Participant: (i) the Deductible or Co-insurance, if any, as specified in the Participant's Benefit Program; (ii) payment for health care services or supplies at the Contract Rate once the Participant has reached the Benefit Program Maximum, if applicable, and/or (iii) payment for services, other than Covered Services, for which the Participant's Benefit Program does not provide coverage.

(b) *ValuePoint* Program Participants and Discount Card Program Participants shall be responsible for payment of the Contract Rates directly to Group.

(c) Except as specified in Sections 5.4(a) and (b), neither Group nor any Participating Professional will bill or require any Participant to tender any payment with respect to Covered Services. Furthermore, neither Group nor any Participating Professional will bill or collect from the Participant (i) the difference between the Contract Rate agreed to in this Agreement and the Group's Billed Charges, or (ii) for any amounts not paid to Group due to Group's failure to file a timely claim or appeal, or due to the application of claim coding and bundling rules.

5.5   Coordination of Benefits.   Except as otherwise required by the Participant's Program, if Client is other than primary under the coordination of benefits rules, Group will accept from Client as payment in full for Covered Services, the amount of the Participant's out-of-pocket costs under the primary plan (i.e., Co-payment, Deductible, and/or Co-insurance, if any) to the extent applicable under the Participant's Program.   Group will cooperate fully with MPI and/or Client in providing information related to proper coordination of benefits.

## VI.   LIABILITY INSURANCE

6.1   Group Insurance. Group will maintain: (i) professional liability insurance at minimum levels of at least $1,000,000 per occurrence and $3,000,000 in the aggregate; and (ii) comprehensive general liability insurance at minimum levels of at least $1,000,000 per occurrence and $2,000,000 in the aggregate.   If the form of insurance described above is "claims made," appropriate tail coverage shall be purchased to insure against claims made after the expiration of such insurance relating to acts or omissions occurring during the term of this Agreement.

6.2   Participating Professional Insurance. Group will maintain, or ensure that each Participating Professional maintains: (i) professional liability insurance at minimum levels of $1,000,000 per occurrence and $3,000,000 in the aggregate for each individual Participating Professional; and (ii) comprehensive general liability insurance at minimum levels of at least $1,000,000 per occurrence and $2,000,000 in the aggregate to cover each individual Participating Professional.   If the form of insurance described above is "claims made," appropriate tail coverage shall be purchased to insure against claims made after the expiration of such insurance relating to acts or omissions occurring during the term of this Agreement.

## VII.   CONFIDENTIAL INFORMATION; TRADEMARKS; ADVERTISING AND PUBLICITY

7.1   Confidential Information.   All information and materials provided by MPI or Client to Group or any Participating Professional will remain proprietary to MPI or Client respectively.   Neither Group nor any Participating Professional will disclose any of such information or materials or use them except as may be required to carry out its respective obligations under this Agreement.

7.2   Trademarks, Advertising and Publicity.   Except as set forth herein, MPI, Clients, and Group or Participating Professional will not use the other's name, symbols, trademarks, or service marks, presently existing or later established, in advertising or promotional materials or otherwise without their prior written consent and will cease any such usage immediately upon written notice or upon termination of this Agreement, whichever is sooner.   MPI and/or Client may use the name of Group or Participating Professional as MPI and/or Client may deem reasonably necessary in carrying out the terms of this Agreement, including but not limited to, (i) the distribution of an announcement by MPI and/or Client to the media that Group or Participating Professional participates in the Network, and (ii) the creation and/or distribution of provider directories and other promotional materials.

## VIII.   RESOLUTION OF DISPUTES BETWEEN THE PARTIES

8.1   Dispute Resolution.   In the event that Group has a question or grievance regarding its rights or obligations under this Agreement or cannot resolve a dispute with a Client as specified in Section 5.3 herein, Group shall either:

(a)   Call MPI's Service Operations Department, or

(b)   Provide MPI with written notice specifying the nature of the dispute.   Such notice to MPI shall be in writing and delivered by certified mail/return receipt requested, or by overnight delivery, to:

> MultiPlan, Inc.
> Service Operations Department
> 1100 Winter Street
> Waltham, MA 02451

Within thirty (30) days of receipt of such notice, the parties will assign the appropriate level of management and staff members who will initiate discussions to seek resolution of the dispute, consistent with the terms of this Agreement.   If the parties are unable to reach resolution within the initial thirty (30) day period, then designees of senior management from each party will have an additional thirty (30) days to resolve the dispute.   This time period may be extended by mutual agreement of the parties.   The parties, as mutually agreed, may include a mediator in such discussions.   Neither party shall institute any legal action or proceeding until expiration of such agreed upon time periods.

## IX. GENERAL PROVISIONS

9.1 <u>Entire Agreement; Captions</u>. This Agreement, together with all Exhibits attached hereto, constitutes the entire agreement between Group and MPI, and will supersede any prior oral or written agreements between the parties. The captions contained in this Agreement are for the convenience of the reader only, and will not be used in the interpretation of this Agreement.

9.2 <u>Amendments</u>. Group, Participating Professional, and MPI will comply with any and all of the amendments contained in Exhibit A. Unless otherwise required by this Agreement, this Agreement may be modified or amended as follows:

(a) upon at least thirty (30) days prior written notice from MPI to Group. Such amendment by MPI shall be effective as of the effective date specified in the notice ("Amendment Effective Date") unless Group gives written notice to MPI, within fifteen (15) days from the receipt of such notice, rejecting the proposed amendment. If Group rejects the proposed amendment, this Agreement will terminate on the Amendment Effective Date.

(b) upon written agreement executed by both parties.

9.3 <u>Governing Law; Severability; Venue; Waiver</u>. This Agreement shall be construed and governed in accordance with Federal laws and regulations, as well as the laws of the state in which health care services are rendered hereunder. The finding by a court of competent jurisdiction that any provision herein is void shall not void any other valid provision of this Agreement. Venue of any dispute litigated between the parties shall be in Federal court in the state and county of residence of the defendant. Waiver of breach of any provision of this Agreement will not be deemed a waiver of any other breach of the same or a different provision.

9.4 <u>Coordinating Provisions-State/Federal Laws and Accreditation Standards</u>. This Agreement is subject to any requirements or prohibitions of relevant state and federal laws and regulations. Each party shall comply with all applicable state and federal statutes and regulations relating to this Agreement. In addition, Group, Participating Professional, and MPI will comply with the following information contained in Exhibit C: (i) coordinating provisions-State/Federal laws; (ii) national accreditation standards, including without limitation, the National Committee for Quality Assurance ("NCQA") and URAC; and/or (iii) geographic exceptions approved by MPI.

9.5 <u>Assignment</u>. No assignment of this Agreement will be made by any party without the express written approval of the duly authorized representative of the other party; provided however, that:

(a) MPI may assign any or all of its rights and obligations hereunder, without prior written approval of Group, to an entity that directly or indirectly controls, or is controlled by, or is under common control with MPI.

(b) This Agreement may be automatically assigned without prior written approval of Group (and with no further action being required by either MPI or any of the individual Assignment Entities, as that term is defined herein) to one or more of the following individual entities: Central States, Southeast and Southwest Areas Health and Welfare Fund; and Connecticut General Life Insurance Company ("Assignment Entity/Entities"). Notwithstanding the issuance by MPI of one or more of such assignments to an Assignment Entity, MPI may retain its rights and obligations hereunder.

(i) In the event that MPI assigns this Agreement as specified in this Section 9.5(b), each of the Assignment Entities to which MPI issues an assignment will be deemed to hold independent, but identical contracts with Group. As to each Assignment Entity to which MPI issues an assignment, Group acknowledges and agrees that all references to the Network will be deemed references to that Assignment Entity's provider network.

(ii) Subsequent to any assignment of this Agreement to an Assignment Entity, Group may terminate such Assignment Entity's Agreement with Group by providing ninety (90) days prior written notice to the Assignment Entity.

9.6 <u>Third Party Beneficiaries</u>. Nothing contained in this Agreement will be construed to make MPI or Group, and their respective directors, officers, employees, agents, and representatives liable to persons or entities not parties hereto in situations in which they would not otherwise be subject to liability, except Clients, Users and Participants..

9.7 <u>Independent Contractors</u>. Each party, including its officers, directors, employees and agents, acts as an independent contractor. Neither party has express or implied authority to assume or create any obligation on behalf of the other. Each party solely is responsible for its own actions or omissions, and those of its officers, directors, employees and agents, arising in connection with obligations created under this Agreement, including the rendering of professional advice and/or treatment by Group or Participating Professional.

9.8     <u>Precedence of Exhibits</u>.  In the event of any conflict between the terms and conditions specified in this Agreement and the terms and conditions specified in the Exhibits to this Agreement, the following order of precedence will govern the applicable terms and conditions agreed upon by the parties: (i) Exhibit C (Coordinating Provisions-State/Federal Laws and Accreditation Standards); (ii) Exhibit A (Amendments); (iii) Exhibit B (Network Participation Requirements); and (iv) the base Agreement.

9.9     <u>Notices</u>.  Unless otherwise specified in this Agreement, any notice required or permitted to be given pursuant to the terms and provisions of this Agreement will be in writing and must either be mailed (postage prepaid), facsimile, or e-mailed to the recipient at the address(es) listed below.  Any notice under this Agreement shall be deemed to have been given when deposited in the mail, postage prepaid, if mailed or when receipt acknowledged, if faxed or e-mailed.  The following address(es) or agent to receive notice may be changed by the provision of notice pursuant to this Section.

**To MPI:**
    Attn:  Office of the President & CEO
    MultiPlan, Inc.
    115 Fifth Avenue
    New York, NY 10003-1004

    With a copy to:
    Attn:  Regional Director
    MultiPlan, Inc.
    115 Fifth Avenue
    New York, NY 10003-1004

**To Group: NJPNA**
    Attn:  Catherine Mazzola, MD
    New Jersey Pediatric Neurosurgical Associates
    131 Madison Avenue, Ste 140
    Morristown, NJ 07960

9.10     <u>Force Majeure</u>.  Neither party will be liable for or be deemed to have breached any of its obligations under this Agreement (other than an obligation to pay money) if that party's failure to perform under the terms of this Agreement is due to any of the following:  failure or delay in performance by the other party to this Agreement or anyone acting for or under such other party; any strikes, lockouts, acts of God or the elements, insurrection, riots, wars, natural disasters, fires, explosions, epidemics, quarantines, earthquakes, storms, floods, any shortages of energy, fuel, or any utility (e.g., electrical, natural gas, etc.) failure or disturbance however caused; any governmental action not the fault of the nonperforming party or similar condition or circumstance that is not caused by the nonperforming party.

9.11     <u>Limitation of Damages</u>.  Neither party shall be liable for consequential, exemplary, or punitive damages.  Any dispute between the parties is personal to the respective parties.  Each party waives any right to bring a claim in any forum as a class action and agrees that it shall not voluntarily serve as a class representative or member in litigation or arbitration adverse to the other.

EXHIBIT A
## AMENDMENTS TO THE MPI PARTICIPATING PROFESSIONAL GROUP AGREEMENT

The terms and conditions specified in the MPI Participating Professional Group Agreement are further subject to the amendments set forth herein:

1. Delete Section 2.1 in its entirety and replace with the following:

   2.1   <u>Effective Date; Term</u>.  This Agreement will become effective on the Effective Date and will continue in effect unless otherwise terminated as specified in this Agreement.

2. Delete Section 2.2 in its entirety and replace with the following:

   2.2   <u>Discretionary Termination</u>.  This Agreement may be terminated <u>at any time</u>, in the sole discretion of either party, by the provision of written notice at least <u>ninety</u> (90) days prior to the <u>termination date specified in the notice</u>. <u>Termination shall be effective on the first day of the month following the notice period.</u>

**EXHIBIT B**
**NETWORK PARTICIPATION REQUIREMENTS**

I.   **NETWORK ACCESS.**  The terms of this Agreement shall include Network Access for the Complementary Network.

II.  **COMPLEMENTARY NETWORK PARTICIPATION REQUIREMENTS.**  Complementary Network access, including access to Complementary Network Contract Rates, is available only to Clients that have contracted with MPI to utilize the Complementary Network in conjunction with Clients' Benefit Programs either as an extended network or when the Benefit Program does not utilize another network as primary.  Complementary Benefit Programs must provide a mechanism encouraging direction of Participants to Network Providers which may, include, but is not limited to, the availability of Network Provider listings or financial incentives that provide Participants or Users with savings when health care services are obtained from Network Providers.  Such access shall be indicated on Explanation of Benefits forms (EOBs) pertaining to claims paid at the Complementary Network Contract Rates, and is usually indicated by an MPI Complementary Network authorized name and/or logo on Participants identification.  Complementary Benefit Programs may pay for Covered Services.

**EXHIBIT C**

**COORDINATING PROVISIONS-STATE/FEDERAL LAW, ACCREDITATION STANDARDS AND GEOGRAPHIC EXCEPTIONS**

**NEW JERSEY**

## I.    INTRODUCTION:

1.    <u>Scope</u>.    To the extent of any conflict between the Agreement and this State Law Coordinating Provisions ("SLCP") Exhibit, this SLCP Exhibit shall supersede, govern and control to the extent required by federal and/or state law and to the extent that MPI, Network Provider and/or Client are subject to such federal or state law.

## II.    DEFINITION:

1.    Depending upon the specific form of the Agreement, the following terms may be utilized in the Agreement and are intended to be defined as provided for in the Agreement:

      (i)    Billed Charges may be referred to as Regular Billing Rates;
      (ii)    Client may be referred to as Payor;
      (iii)    Contract Rates may be referred to as Preferred Payment Rates;
      (iv)    Covered Services may be referred to as Covered Care;
      (v)    Network Provider may be referred to as Preferred Provider;
      (vi)    Participant may be referred to as Covered Individual; and
      (vii)    Program or Benefit Program may be referred to as Contract.

2.    For purposes of this Exhibit C, the term Network Provider is inclusive of Participating Professional and all Network Providers.

## III.    FEDERAL LAW COORDINATING PROVISIONS:

Federal Employees Health Benefits ("FEHB").    As applicable, this Agreement is subject to the terms of the laws governing FEHB.

    <u>Federal Employees Health Benefits ("FEHB") Plan</u>.    The parties agree that any and all claims or disputes relating to such benefits under a FEHB Plan will be governed exclusively by the terms of such federal government contract and federal law, whether or not such terms and laws are specified in this SLCP Exhibit or elsewhere in this Agreement.

## IV.    STATE LAW COORDINATING PROVISIONS: NEW JERSEY

For any Agreement involving the delivery of health care services in the State of New Jersey, the provisions noted below shall apply. Where the term Client is used Client shall mean only those Clients that are subject to the specific law(s) cited below:

1.    As required by N.J.A.C. 11:24B-5.2 (a)(1), this Agreement and any amendments hereto are subject to the prior approval of the New Jersey Department of Banking and Insurance ("DOBI") and may not be effectuated without such approval. Notwithstanding the preceding, the following types of amendments do not require prior approval of DOBI:
      (i) amendments that are of a clerical nature;
      (ii) amendments that alter numbers, be they dollar amounts, enrollment amounts or the like, without altering methodologies from which the numbers were derived; and
      (iii) amendments that involve the substitution of one set of variable text for another set of variable text, if both sets of variable text were previously approved by DOBI for this Agreement.

2.    As required by N.J.A.C. 11:24B-5.2 (a)(2), any provision of this Agreement that conflict with applicable federal or state laws are hereby amended to conform to such applicable federal or state law.

3.    As required by N.J.A.C. 11:24B-5.2 (a)(3), MPI shall provide Network Provider with a minimum of thirty (30) calendar days notice of any amendment to this Agreement. Notwithstanding the preceding, such notice is not required in the event the amendment is required due to a change in applicable federal or state laws or regulations or such

amendment does not constitute a material change. For purposes of this provision a material change is a change that substantially impacts the rights or obligations of Network Provider.

4. As required by N.J.A.C. 11:24B-5.2 (a)(7)(5), Network Provider may rely upon the written or oral authorization for Covered Services if made by Client or MPI. Covered Services shall not be retroactively denied as not medically necessary except in cases of material misrepresentation of the facts or fraud to Client or MPI.

5. As required by N.J.A.C. 11:24B-5.2 (a) (9), this Agreement is governed by New Jersey law.

6. As required by N.J.A.C. 11:24-5.2 (a)(17), Network Provider shall not be terminated or otherwise penalized because of complaints or appeals that Network Provider files on Network Provider's behalf, or on behalf of Participants, or for otherwise acting as an advocate for Participants in seeking appropriate, medically necessary Covered Services.

7. As required by N.J.A.C. 11:24B-5.2 (a)(20), Network Provider may submit and seek resolution of a complaint or grievance to MPI for review and resolution, if applicable. Such resolution shall not exceed thirty (30) calendar days. In the event Network Provider is not satisfied with the resolution of the complaint or grievance, Network Provider may submit the complaint or grievance to the New Jersey Department of Health and Senior Services, New Jersey Department of Banking and Insurance or the New Jersey Department of Human Services

8. As required by N.J.A.C. 11:24B-5.3, in the event MPI terminates this Agreement, MPI shall provide Network Provider with notice, specifying the reason(s) for such termination. Network Provider may, in writing, request a hearing to appeal the termination, except if the termination (1) occurs on the Renewal Date; or (2) is due to the Network Provider's breach or alleged fraud; or (3) in the opinion of MPI, the Network Provider poses and imminent danger to Participant(s), or the public health, safety, or welfare.

9. As required by N.J.A.C. 11:24A-4.9, in the event Network Provider requests a hearing pursuant to N.J.A.C. 11:24B-5.3, Network Provider shall request such hearing, in writing, within thirty (30) days of the date of the notice of termination. MPI shall hold such hearing within thirty (30) days following receipt of a written request for a hearing by the terminated Network Provider before a panel appointed by MPI. Such panel shall consist of at least three (3) people, one of which shall be a clinical peer in the same or substantially similar discipline and specialty as Network Provider requesting the hearing. MPI shall render a decision in writing within thirty (30) days of the close of the hearing unless MPI provides notice to Network Provider of a need for an extension of time to render its determination. The written determination notice shall set forth the relevant contract provisions and the facts upon which MPI and Network Provider have relied at the hearing and shall state whether Network Provider is terminated or reinstated and shall include MPI's reasons for such determination. In the event Network Provider is reinstated, MPI shall state the impact of the reinstatement upon the terms of the duration of the Agreement.

10. As required by N.J.A.C. 11:24B-5.3 (f), in the event this Agreement is terminated, Network Provider, if a physician, shall:

(i) continue to provide health care services for up to four (4) months following the effective date of such termination in cases where it is medically necessary for the Participant to continue treatment with the Network Provider;

(ii) in the case of pregnancy of a Participant, through postpartum evaluation of the Participant, up to six (6) months after delivery;

(iii) in the case of post-operative care, up to six months following the effective date of the termination;

(iv) in the case of oncological treatment, up to one (1) year following the effective date of the termination; or

(v) in the case of psychiatric treatment, up to one year following the effective date of termination.

11. As required by the Department of Banking and Insurance Bulletin No.: 06-16, in the event of an appeal of a claim determination, Client shall accept the Health Care Provider Application to Appeal a Claims Determination form and shall post such form on its website.

12. As required by N.J.S.A. § 45:1-10.1, in the event of a claim in which the Participant has assigned his /her benefits to Network Provider, the Network Provider shall submit the claim for payment within 180 days of furnishing health care services.

13. As required by N.J.A.C. 11:22-1.5(a), a Clean Claim is received on the date of actual receipt by the Client.

14. As required by N.J.S.A. §17B:27-44.2(d)(1), Client shall within thirty (30) calendar days of receipt of a Clean Claim, pay or arrange for User to pay Facility for Covered Services, as full compensation, the Contract Rate in accordance with the terms of this Agreement and the administrative handbook(s), in order to obtain the benefit of the Contract Rate.

15. As required by N.J.A.C. 11:24B-5.2(a)(19)(ii), in the event a Clean Claim is not timely paid to Network Provider, Client or User, as applicable, shall be responsible for remitting the interest payment required by New Jersey laws and regulations to Network Provider. In no event shall Network Provider be required to request payment of such interest from Client or User, as applicable, as a condition of receiving such interest payment.

16. As required by N.J.S.A §17B:27-44.2(d)(10), with the exception of claims that were submitted fraudulently or submitted by Network Provider that have a pattern of inappropriate billing or claims that were subject to coordination of benefits, no Client or User, as applicable, shall seek reimbursement for overpayment of a claim previously paid later than 18 months after the date the first payment on the claim was made. No Client or User, as applicable, shall seek more than one (1) reimbursement for overpayment of a particular claim. At the time the reimbursement request is submitted to the Network Provider, the Client or User, as applicable, shall provide written documentation that identifies the error made by the Client or User, as applicable, in the processing or payment of the claim that justifies the reimbursement request. No Client or User, as applicable, shall base a reimbursement request for a particular claim on extrapolation of other claims, except under the following circumstances:

(i) in judicial or quasi-judicial proceedings, including arbitration;

(ii) in administrative proceedings;

(iii) in which relevant records required to be maintained by the Network Provider have been improperly altered or reconstructed, or a material number of the relevant records are otherwise unavailable; or

(iv) in which there is clear evidence of fraud by the Network Provider and the Client or User, as applicable, has investigated the claim in accordance with its fraud prevention plan and referred the claim, together with supporting documentation, to the Office of the Insurance Fraud Prosecutor in the Department of Law and Public Safety.

## V. ACCREDITATION STANDARDS COORDINATING PROVISIONS:

There are no Accreditation Standards Coordinating Provisions at this time.

## VI. GEOGRAPHIC EXCEPTIONS COORDINATING PROVISIONS:

There are no Geographic Exceptions Coordinating Provisions at this time.

**EXHIBIT D**
**CONTRACT RATES**
**MPI PARTICIPATING PROFESSIONAL GROUP AGREEMENT**

## I.  BILLING & PAYMENT

1.1  <u>Code Updates</u>.  MPI will, on an annual basis and without prior notice, add any newly assigned CPT or HCPCS codes, change any existing CPT or HCPCS codes, and/or delete any obsolete CPT or HCPCS codes in accordance with industry standards.

1.2  <u>Charge Master Cap</u>.

(i)  <u>Charge Master Notice</u>.  As of December 1st of each calendar year, Group will provide to MPI, written notice specifying whether there has been a change in the Group's charge master ("Charge Master Notice"). In the event that there is an increase in the Group's charge master, such Charge Master Notice will include the average annual increase in Group's overall charge master for the current year as compared to the previous year.

(ii)  <u>Percentage Contract Rate Adjustment</u>.  If in any calendar year, the average increase in the Group's overall charge master (Actual Percentage Increase) is greater than five (5%) percent (the "Charge Master Cap"), any Contract Rate specified in this Agreement as a percentage of Group's Billed Charges shall be adjusted according to the following formula:

(1+ lower of the Charge Master Cap or the Actual Percentage Increase) divided by
(1+ Actual Percentage Increase) multiplied by the original Contract Rate

(iii)  <u>Cumulative Adjustments</u>.  In each successive year, adjustments of the Contract Rate shall be cumulative.  Group shall be responsible for reporting to MPI annually any Actual Percentage Increase in its charge master.

(iv)  <u>Charge Master Review</u>.  Upon fifteen (15) days prior written notice to the Group by MPI, MPI may review the supporting documentation utilized by Group with regard to the information provided by Group in the Charge Master Notice ("Charge Master Review").  Group agrees to cooperate fully during such Charge Master Review. Based on the findings from such Charge Master Review, MPI may increase any Contract Rate per the Charge Master Cap provision specified herein.

## II.  CONTRACT RATES

2.1  <u>Contract Rates -- Percentage of Billed Charges</u>.  Except as otherwise specified herein, the Contract Rate for Covered Services rendered to Participants shall be equal to **eighty (80%) percent** of Group's Billed Charges, less any Co-payments, Deductibles, and Co-insurance, if any, as specified in the Participant's Benefit Program.

## III. CONTRACT RATES FOR WORKERS' COMPENSATION AND AUTO MEDICAL PROGRAM

3.1  <u>Contract Rates for Workers' Compensation Programs</u>.  Unless otherwise required by law, the Contract Rate for workers' compensation Programs shall be equal to the lesser of (i) eighty five (85%) percent of the fee under the state or federal workers' compensation fee schedule, as applicable, or (ii) the Contract Rate(s) set forth in Article II of this Exhibit D, less any Co-payments, Deductibles, and Co-insurance, if any, as specified in the Participant's workers' compensation Program.

3.2  <u>Contract Rates for Auto Medical Programs</u>.  Unless otherwise required by law, the Contract Rate for auto medical Programs shall be equal to the lesser of (i) ninety five (95%) percent of the fee under the state auto medical fee schedule, or (ii) the Contract Rate(s) set forth in Article II of this Exhibit D; less any Co-payment, Deductible, and/or Co-insurance, if any, specified in the Participant's auto medical Program.

# EXHIBIT B

## MORRISTOWN MEDICAL CENTER

### REPORT OF OPERATION

**NAME:** ▨▨▨▨▨▨ KYLE                    **MEDICAL RECORD #:**A01758496

**DATE:** 01/04/2017

**SURGEON:** Catherine A Mazzola, M.D.

**ASSISTANT:** Thomas Sernas, P.A.-C

**ANESTHESIOLOGIST:**

PREOPERATIVE DIAGNOSIS:
Closed head injury with right temporal skull fracture and large right
epidural hematoma.

POSTOPERATIVE DIAGNOSIS:
Closed head injury with right temporal skull fracture and large right
epidural hematoma.

PROCEDURES:
1. Craniotomy and evacuation of right temporoparietal epidural
   hematoma.
2. Cranioplasty of fractured bone.

ANESTHESIA:
General.

INDICATIONS FOR SURGERY:
Kyle ▨▨▨▨▨ is a 17-year-old boy who was reportedly hit in the head
with a medicine ball at school. He developed a right temporal skull
bone fracture. He developed an acute right temporoparietal epidural
hematoma. He most likely lost consciousness, had a seizure, fell
back and hit the back of his head. He had a lucid interval in which
he became combative at Huntington Medical Center. He was emergently
intubated and transported by Air 1 to Morristown Medical Center. An
emergency craniotomy was done as a life-saving procedure without the
consent of his parents.

DESCRIPTION OF PROCEDURE:
Kyle was brought directly from the helipad by the Air 1 crew into
OR #20. He was already intubated, sedated and paralyzed. He was
put upon the operating room table and gently rolled to his left side.
The right side of his head was shaved with an electric clipper. A
1000 drape was placed down over his face. His head was scrubbed with
Betadine 3 times, painted with Betadine 3 times and then I scrubbed.

### REPORT OF OPERATION

### MORRISTOWN MEMORIAL HOSPITAL
#### Page 2
#### REPORT OF OPERATION

**NAME:** ▊▊▊▊ KYLE

Tom Sernas and I scrubbed. We were gowned and gloved with sterile technique. We came back into the room. The blue towels were stapled down around the planned incision. A down sheet and a craniotomy drape were placed down over the operative site. The incision was made with a 15-blade scalpel carried down through the skin and subcutaneous tissue with a needle-tip Bovie. A large trauma flap was made. The temporalis was retracted anteriorly with the trauma flap. A large craniotomy was then done in case of brain swelling. Two bur holes were made with a Midas Rex with an M8 drill bit and then using the Midas Rex with B1 footplate, the craniotomy was made and then elevated and handed to the scrub nurse. Of note, the craniotomy was in 2 pieces because of the right temporal fracture extending up from the temporal base into the higher right parietal and temporal bones.

A cranioplasty was done on those 2 bone fragments to hold the bone together so the fragmentation would heal nicely.

The cranioplasty was done with titanium Synthes miniplates and screws.

There was a large thick epidural hematoma which measured approximately 12 x 10 cm. The epidural was about 2 to 2.5 cm thick. The epidural was evacuated and removed. There was a large torn dural artery in the inferior anterior temporal area. This artery was carefully bipolared and coagulated. Once this was done, there was no more bleeding. Hemostasis was triple checked and controlled with Bovie electric cautery, bipolar electrocoagulation, Gelfoam with thrombin application, some Surgiflo application with cottonoid application and irrigation. After the bleeding was controlled and the epidural was evacuated, there were approximately 6 dural tacking stitches placed through the dura, tacking the dura to the bone with 4-0 Nurolon. The dura was opened posteriorly. There was no subdural blood clot, and the brain elevated itself nicely. An ICP monitor was placed under the dura and tunneled out posteriorly. DuraGen was then placed down over the ICP monitor and the dural closure. The bone was then put back into position with multiple titanium CranioFix plates. The bone was held in position with titanium plates and screws. The area was then irrigated with a copious amount of bacitracin irrigation solution. The temporalis fascia was closed with approximately eight 3-0 Vicryl sutures. The galea was closed with about thirty 3-0 Vicryl pop-off sutures. The skin was closed with 3-0 Monocryl. Dermabond was placed over the entire skin incision. Once this was done, the laceration in the occipital area

#### REPORT OF OPERATION

01/04/2017  5:48PM  (GMT-05:00)

MORRISTOWN MEMORIAL HOSPITAL
Page 3
REPORT OF OPERATION

NAME: ██████ KYLE

was closed with 3-0 Monocryl. This laceration in the occipital area
was irrigated out and closed and was relatively superficial.

Once the Dermabond was completely dry, some 4 x 4's were put down
along the areas of the incision. The ICP wire was carefully
protected. The head was wrapped with a Kerlix and taped to his head.
The ICP monitoring wire was also taped to the Kerlix and then the
patient was extubated at the end of surgery and transported to the
surgical ICU.

DICTATED BY: CATHERINE A MAZZOLA, M.D.

DD: 01/04/2017 17:12:35  DT: 01/04/2017 17:41:43
CAM/MedQUL/Job#/Int# 244139/726381004  PHYS. ID: 13550

REPORT OF OPERATION

# EXHIBIT C

**HEALTH INSURANCE CLAIM FORM**
APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 09/19

UNITED HEALTH CARE
PO BOX 740800
ATLANTA, GA 30374

CARRIER

1

| PICA | | | | | | | PICA |

1. ☐ MEDICARE (Medicare#)  ☐ MEDICAID (Medicaid#)  ☐ TRICARE (ID#/DoD#)  ☐ CHAMPVA (Member ID#)  ☑ GROUP HEALTH PLAN (ID#)  ☐ FECA BLK LUNG (ID#)  ☐ OTHER (ID#)

1a. INSURED'S I.D. NUMBER: 809639558 (For Program in Item 1)

2. PATIENT'S NAME (Last Name, First Name, Middle Initial): KYLE

3. PATIENT'S BIRTH DATE  SEX: M ☑  F ☐

4. INSURED'S NAME (Last Name, First Name, Middle Initial): SAME

5. PATIENT'S ADDRESS (No., Street)
STATE: NJ

6. PATIENT RELATIONSHIP TO INSURED: Self ☐  Spouse ☐  Child ☐  Other ☐

7. INSURED'S ADDRESS (No., Street): SAME
CITY  STATE

ZIP CODE  TELEPHONE (Include Area Code)

8. RESERVED FOR NUCC USE

ZIP CODE  TELEPHONE (Include Area Code) ( )

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER: 91698

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (Current or Previous)  ☐ YES  ☑ NO

a. INSURED'S DATE OF BIRTH  SEX: M ☑  F ☐

b. RESERVED FOR NUCC USE

b. AUTO ACCIDENT?  ☐ YES  ☑ NO  PLACE (State)

b. OTHER CLAIM ID (Designated by NUCC)

c. RESERVED FOR NUCC USE

c. OTHER ACCIDENT?  ☐ YES  ☑ NO

c. INSURANCE PLAN NAME OR PROGRAM NAME: UNITED HEALTH CARE

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. CLAIM CODES (Designated by NUCC)

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?  ☐ YES  ☑ NO  If yes, complete items 9, 9a, and 9d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.
SIGNED: SIGNATURE ON FILE  DATE: 01 04 2017

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.
SIGNED: SIGNATURE ON FILE

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)  QUAL.

15. OTHER DATE  QUAL.  MM DD YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION  FROM  TO

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE: DR ALAN RUSHTON MD
17b. NPI

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES  FROM 01 04 2017  TO

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)

20. OUTSIDE LAB?  ☐ YES  ☐ NO  $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY Relate A-L to service line below (24E)  ICD Ind. |

A. S06 4X2A  B. S02 0XXA  C. R40 2330  D.
E.  F.  G.  H.
I.  J.  K.  L.

22. RESUBMISSION CODE  ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE | | | | | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID QUAL. | J. RENDERING PROVIDER ID. # |
| From MM DD YY | | | To MM DD YY | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 01 04 2017 | | 01 04 2017 | 21 | Y | 62141 | AS | B | 54562 00 | 1 | | NPI | 1548339013 |
| 2 | 01 04 2017 | | 01 04 2017 | 21 | Y | 61314 | AS 51 | ABC | 52129 00 | 1 | | NPI | 1548339013 |
| 3 | | | | | | | | | | | | NPI | |
| 4 | | | | | | | | | | | | NPI | |
| 5 | | | | | | | | | | | | NPI | |
| 6 | | | | | | | | | | | | NPI | |

25. FEDERAL TAX I.D. NUMBER: 202518910  SSN ☐ EIN ☑

26. PATIENT'S ACCOUNT NO.: 069481

27. ACCEPT ASSIGNMENT?  ☑ YES  ☐ NO

28. TOTAL CHARGE: $ 106691 00

29. AMOUNT PAID: $ 0 00

30. Rsvd for NUCC Use

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
THOMAS SERNAS PA
SIGNED  DATE: 05 15 2018

32. SERVICE FACILITY LOCATION INFORMATION
MORRISTOWN MEMORIAL HOSPITAL
100 MADISON AVENUE
MORRISTOWN NJ 07960-7360
a. 1558503672

33. BILLING PROVIDER INFO & PH # 973 3269000
NJ PEDIATRIC NEUROSCIENCE INSTITUTE
131 MADISON AVE 3RD FLOOR
MORRISTOWN NJ 07960-7360
a. 1558503672

NUCC Instruction Manual available at: www.nucc.org  PLEASE PRINT OR TYPE  APPROVED OMB-0938-1197  FORM 1500 (09-19)

# EXHIBIT D

075UTOPPR1020004-00125-02

0D-172"02*000003-PM-17075-120"C07ASCJPMCTOPS

United HealthCare Services, Inc.
GREENSBORO SERVICE CENTER
PO BOX 740800
ATLANTA GA 30374-0800
PHONE: 1-877-842-3210

STD - PRA

◆ Bristol-Myers Squibb Company

# PROVIDER
# REMITTANCE ADVICE

NEW JERSEY PEDIATRIC NEUROSCIE
THOMAS SERNAS PA
131 MADISON AVE FL 3
MORRISTOWN NJ 07960

| | |
|---|---|
| CHECK DATE: | 03/16/17 |
| TIN: | 202518910 |
| NPI: | 1558503672 |
| PAYEE NAME: | NEW JERSEY PEDIATRIC NEUROSCIE |
| CHECK NUMBER: | PH 20009214 |
| CHECK AMOUNT: | $1,013.28 |
| GROUP NUMBER: | 191698 |
| GROUP NAME: | BRISTOL MYERS SQUIBB |

*(handwritten)* Pt. Kyle H▓▓▓
Dr. Tom
Dos. 1/4/17

**PATIENT: KYLE ▓▓▓▓▓▓ (CH)**

| | |
|---|---|
| SUBSCRIBER ID: | A 809639558 |
| CLAIM DATE: | 01/04/17-01/04/17 |
| REND PROV ID: | 1548339013 |

| | |
|---|---|
| SUBSCRIBER NAME: | ▓▓▓▓▓▓ |
| DATE RECEIVED: | 02/07/17 |
| REND PROV: | T. SERNAS PA |

| | |
|---|---|
| CLAIM NUMBER: | 9895225703 0080143549 |
| PRODUCT: | CHOYC+ |

| PATIENT CONTROL NUMBER | PATIENT ID | AUTH/REF NUMBER | DRG | DRG WEIGHT | CLAIM CHARGE AMOUNT | CLM ADJ AMT | GRP CD | CLM ADJ RSN CD | CLAIM PAYMENT AMOUNT | PATIENT RESPONSIBILITY |
|---|---|---|---|---|---|---|---|---|---|---|
| 069481-01 | | | | | $52,129.00 | | | | $535.28 | |

| LINE CTRL# | DATES OF SERVICE | SUB PROD/ SVC/ MOD | ADJ PROD/ SVC | MOD | REV | UNITS | ADJ QTY | CHARGE | AMOUNT ALLOWED | ADJ AMOUNT | GRP CD | CLM ADJ RSN CD | PAYMENT AMOUNT | REMARK/ NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 106950 | 01/04/17 - 01/04/17 | 61814 | | AS/ 51 | | 1 | | $52,129.00 | $535.28 | $6,155.72 | CO | 45 | $535.28 | IT, KX |
| | | | | | | | | | | $45,438.00 | OA | 94 | | |
| CLAIM# 9895225703 0080143549 | | | | | | | SUBTOTAL | $52,129.00 | $535.28 | $51,593.72 | | | $535.28 | HI |

WE RECEIVED THE REQUESTED INFORMATION ON 02/07/17 AND HAVE PROCESSED CLAIM NUMBER 6315595061 0079571965.
PAYMENT OF BENEFITS HAS BEEN MADE IN ACCORDANCE WITH THE TERMS OF THE MANAGED CARE SYSTEM.

| | |
|---|---|
| SUBSCRIBER ID: | ▓▓▓▓ |
| CLAIM DATE: | ▓▓▓▓ |
| REND PROV ID: | ▓▓▓▓ |



| | |
|---|---|
| SUBSCRIBER NAME: | ▓▓▓▓ |
| DATE RECEIVED: | ▓▓▓▓ |
| REND PROV: | |



| | |
|---|---|
| CLAIM NUMBER: | |
| PRODUCT: | ▓▓▓▓ |



| PATIENT CONTROL NUMBER | PATIENT ID | AUTH/REF NUMBER | DRG | DRG WEIGHT | CLAIM CHARGE AMOUNT | CLM ADJ AMT | GRP CD | CLM ADJ RSN CD | CLAIM PAYMENT AMOUNT | PATIENT RESPONSIBILITY |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

| LINE CTRL# | DATES OF SERVICE | SUB PROD/ SVC/ MOD | ADJ PROD/ SVC | MOD | REV | UNITS | ADJ QTY | CHARGE | AMOUNT ALLOWED | ADJ AMOUNT | GRP CD | CLM ADJ RSN CD | PAYMENT AMOUNT | REMARK/ NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 1 | | | | | CO | 45 | | IT |
| CLAIM# | | | | | | | SUBTOTAL | | | | | | | |

PAYMENT OF BENEFITS HAS BEEN MADE IN ACCORDANCE WITH THE TERMS OF THE MANAGED CARE SYSTEM.

# EXHIBIT E

## MORRISTOWN MEDICAL CENTER

### REPORT OF OPERATION

**NAME:** ▓▓▓▓▓ KYLE                    **MEDICAL RECORD #:** A01758496

**DATE:** 02/14/2017

**SURGEON:** Catherine A Mazzola, M.D.

**ASSISTANT:** Tatiana O. Huk-Sikorskyj, RN, APN-C

**ANESTHESIOLOGIST:** Arkadiy Abkin, M.D.

PREOPERATIVE DIAGNOSIS:
Chronic right epidural hematoma.

POSTOPERATIVE DIAGNOSIS:
Chronic right epidural hematoma.

PROCEDURES:
1. Right temporal bur hole for evacuation of chronic subdural hematoma with placement of Jackson-Pratt #7 drain.
2. Intraoperative Stealth.

ANESTHESIA:
General.

BLOOD LOSS:
50 mL.

PREOP IV ANTIBIOTICS:
Include Ancef.

PREOPERATIVE INDICATIONS FOR SURGERY:
Kyle ▓▓▓▓▓ is a 17-year-old boy who is neurologically intact. He was hit in the head in January of 2017. He sustained a right temporal fracture with a laceration of the middle meningeal artery. He sustained an acute epidural hematoma and became comatose. He was Medevaced by helicopter to Morristown Medical Center. Craniotomy was done and he had evacuation of an epidural hematoma. He had a postop CT scan done on postop day 1 and postop day 3 showing a nice evacuation of epidural hematoma. There was a little bit of pneumocephalus. Approximately 2-3 weeks after surgery he had a postop MRI showing fluid that reaccumulated in the area. The dural tacking sutures at the end of the craniotomy flap held, however, underneath the craniotomy flap had accumulated some fluid. The decision was made after discussion with the parents to admit the child

### REPORT OF OPERATION

**MORRISTOWN MEMORIAL HOSPITAL**
**Page 2**
**REPORT OF OPERATION**

NAME: ▓▓▓▓ KYLE

to the emergency room and to do a burr hole drainage of the chronic epidural hematoma.   An informed consent was obtained from his parents.

DESCRIPTION OF PROCEDURE:
He was taken to the OR.   A preop time-out was done in the OR and he received 1 g of Ancef IV prior to skin incision.   His head was put in Mayfield pins and the Mayfield head holder was attached securely to the OR table.

The Stealth arc was then attached to his head and a facial tracer recognition program was done to register his preoperative CT scan to real-time imaging.   Once his facial tracer program was done and he was registered, we were able to mark an incision in the right temporal area for the burr hole.

The head and the right side of neck were scrubbed with Betadine 3 times.   I dried in between each scrub, and then painted his head with Betadine 3 times.   While the Betadine dried, Tatiana and I scrubbed.

Tatiana and I were gowned and gloved, and then with sterile technique we put blue towels down around the operative site.   His incisions were marked.   A down sheet and then a craniotomy drape were put down upon the operative area.

The Stealth arc was put into position and again he was registered using the Stealth normal probe.

Once this was done, the posterior part of the right parietal incision was carefully opened with a 15-blade scalpel right over the old bur hole cover.   The bur hole cover was removed and a dog bone was put in position.

An incision was then made in the right temporal area.   A single bur hole was made in the right temporal bone.   The chronic epidural hematoma was aspirated.   A Jackson-Pratt drain was put in through the bur hole in the epidural space and then tunneled out posteriorly. Both incisions were irrigated with bacitracin irrigation solution and closed in 3 layers, with 2 layers of 3-0 Vicryl, 1 layer of 3-0 Monocryl, and then Dermabond on the right temporal incision and bacitracin on the right parietal incision.
There were no intraoperative complications.   Total blood loss was 50 mL from the chronic epidural hematoma.   There was no acute active

**REPORT OF OPERATION**

MORRISTOWN MEMORIAL HOSPITAL
Page 3
REPORT OF OPERATION

NAME: ███████ KYLE

bleeding.  At the end of surgery, I did put a Kerlix head wrap on
him and then stockinette.  His Jackson-Pratt was carefully safety
pinned to his gown.


DICTATED BY:  CATHERINE A MAZZOLA, M.D.



DD: 02/14/2017 11:45:02  DT: 02/14/2017 12:19:21
CAM/MedQUC/Job#/Int# 351314/731311191  PHYS. ID: 13550


cc:  Allen Rushton, M.D.
     1100 Westcott Drive
     Suite G3
     Flemington, N.J. 08822










REPORT OF OPERATION

# EXHIBIT F

UNITED HEALTH CARE
PO BOX 740800
ATLANTA, GA 30374

# HEALTH INSURANCE CLAIM FORM

**APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 09/19**

| | | |
|---|---|---|
| **PICA** | | **CARRIER** |

**1. MEDICARE** (Medicare#) **MEDICAID** (Medicaid#) **TRICARE** (ID#/DoD#) **CHAMPVA** (Member ID#) **GROUP HEALTH PLAN** (ID#) **FECA BLK LUNG** (ID#) **OTHER** (ID#)  
**1a. INSURED'S I.D. NUMBER** (For Program in Item 1): 809639558

**2. PATIENT'S NAME (Last Name, First Name, Middle Initial):** KYLE  
**3. PATIENT'S BIRTH DATE** ___ SEX: M  X  
**4. INSURED'S NAME (Last Name, First Name, Middle Initial):** SAME

**5. PATIENT'S ADDRESS (No., Street):**  
**6. PATIENT RELATIONSHIP TO INSURED:** Self  Spouse  Child  Other  
**7. INSURED'S ADDRESS (No., Street):** SAME

**CITY:** **STATE:** NJ  
**8. RESERVED FOR NUCC USE**  
**CITY:** **STATE:**

**ZIP CODE:** **TELEPHONE (Include Area Code):**  
**ZIP CODE:** **TELEPHONE (Include Area Code): ( )**

**9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial):**  
**10. IS PATIENT'S CONDITION RELATED TO:**  
**11. INSURED'S POLICY GROUP OR FECA NUMBER:** 191698

**a. OTHER INSURED'S POLICY OR GROUP NUMBER:**  
**a. EMPLOYMENT? (Current or Previous)** YES  NO X  
**a. INSURED'S DATE OF BIRTH** ___ SEX: M  X  F

**b. RESERVED FOR NUCC USE**  
**b. AUTO ACCIDENT?** YES  NO X  **PLACE (State)**  
**b. OTHER CLAIM ID (Designated by NUCC):**

**c. RESERVED FOR NUCC USE**  
**c. OTHER ACCIDENT?** YES  NO X  
**c. INSURANCE PLAN NAME OR PROGRAM NAME:** UNITED HEALTH CARE

**d. INSURANCE PLAN NAME OR PROGRAM NAME:**  
**10d. CLAIM CODES (Designated by NUCC):**  
**d. IS THERE ANOTHER HEALTH BENEFIT PLAN?** YES X  NO  *If yes, complete items 9, 9a, and 9d.*

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**  
**12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.  
SIGNED: SIGNATURE ON FILE  DATE: 02 14 2017

**13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize payment of medical benefits to the undersigned physician or supplier for services described below.  
SIGNED: SIGNATURE ON FILE

**14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)** QUAL.  
**15. OTHER DATE** QUAL. MM DD YY  
**16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION** FROM ___ TO ___

**17. NAME OF REFERRING PROVIDER OR OTHER SOURCE:** DR ALAN RUSHTON MD  
**17b. NPI**  
**18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES** FROM 02 15 2017 TO ___

**19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC):**  
**20. OUTSIDE LAB?** YES  NO  **$ CHARGES**

**21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY** Relate A-L to service line below (24E)  ICD Ind.  
A. S06.4X9S  B.  C.  D.  
E.  F.  G.  H.  
I.  J.  K.  L.  

**22. RESUBMISSION CODE:**  ORIGINAL REF. NO.  
**23. PRIOR AUTHORIZATION NUMBER:**

**24. A. DATE(S) OF SERVICE**

| | A. DATE(S) OF SERVICE From / To | | | | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES CPT/HCPCS / MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID QUAL | J. RENDERING PROVIDER ID # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 02142017 | 02142017 | | | 21 | Y | 61154 / 79 | | 43441 00 | 1 | | NPI | |
| 2 | 02142017 | 02142017 | | | 21 | Y | 61781 / 79 | | | 1 | | NPI | 1295792380 |
| 3 | | | | | | | | | 10426 00 | 1 | | NPI | 1295792380 |
| 4 | | | | | | | | | | | | NPI | |
| 5 | | | | | | | | | | | | NPI | |
| 6 | | | | | | | | | | | | NPI | |

**25. FEDERAL TAX I.D. NUMBER:** 202518910  SSN  EIN  
**26. PATIENT'S ACCOUNT NO.:** 069676  
**27. ACCEPT ASSIGNMENT?** YES X  NO  
**28. TOTAL CHARGE:** $ 53867 00  
**29. AMOUNT PAID:** $ 0 00  
**30. Rsvd for NUCC Use**

**31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS** (I certify that the statements on the reverse apply to this bill and are made a part thereof.)  
CATHERINE A MAZZOLA M  
SIGNED: DATE: 05 15 2018

**32. SERVICE FACILITY LOCATION INFORMATION:**  
MORRISTOWN MEMORIAL HOSPITAL  
100 MADISON AVENUE  
MORRISTOWN NJ 07960-7360  
a.1558503672

**33. BILLING PROVIDER INFO & PH #** 973 3269000  
NJ PEDIATRIC NEUROSCIENCE INSTITUTE  
131 MADISON AVE 3RD FLOOR  
MORRISTOWN NJ 07960-7360  
a.1558503672

**NUCC Instruction Manual available at: www.nucc.org**  **PLEASE PRINT OR TYPE**  **APPROVED OMB-0938-1197 FORM 1500 (09-19)**

UNITED HEALTH CARE
PO BOX 740800
ATLANTA, GA 30374

1

## HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 09/19

| PICA | | | | | | | | | PICA | |
|---|---|---|---|---|---|---|---|---|---|---|

**1. MEDICARE** (Medicare#) **MEDICAID** (Medicaid#) **TRICARE** (ID#/DoD#) **CHAMPVA** (Member ID#) **GROUP HEALTH PLAN** (ID#) **FECA BLK LUNG** (ID#) **OTHER** (ID#)

**1a. INSURED'S I.D. NUMBER** (For Program in Item 1)
809639558

**2. PATIENT'S NAME (Last Name, First Name, Middle Initial)**
KYLE

**3. PATIENT'S BIRTH DATE** MM DD YY   **SEX** M X F

**4. INSURED'S NAME (Last Name, First Name, Middle Initial)**
SAME

**5. PATIENT'S ADDRESS (No., Street)**
CITY                           STATE NJ
ZIP CODE        TELEPHONE (Include Area Code)

**6. PATIENT RELATIONSHIP TO INSURED**
Self  Spouse  Child  Other

**7. INSURED'S ADDRESS (No., Street)**
SAME
CITY                           STATE
ZIP CODE        TELEPHONE (Include Area Code) ( )

**8. RESERVED FOR NUCC USE**

**9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)**

**10. IS PATIENT'S CONDITION RELATED TO:**

**11. INSURED'S POLICY GROUP OR FECA NUMBER**
L91698

**a. OTHER INSURED'S POLICY OR GROUP NUMBER**

**a. EMPLOYMENT? (Current or Previous)** YES NO X

**a. INSURED'S DATE OF BIRTH** MM DD YY   **SEX** M K F

**b. RESERVED FOR NUCC USE**

**b. AUTO ACCIDENT?** YES NO X   PLACE (State)

**b. OTHER CLAIM ID (Designated by NUCC)**

**c. RESERVED FOR NUCC USE**

**c. OTHER ACCIDENT?** YES NO X

**c. INSURANCE PLAN NAME OR PROGRAM NAME**
UNITED HEALTH CARE

**d. INSURANCE PLAN NAME OR PROGRAM NAME**

**10d. CLAIM CODES (Designated by NUCC)**

**d. IS THERE ANOTHER HEALTH BENEFIT PLAN?** YES NO X   If yes, complete items 9, 9a, and 9d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.

**12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.
SIGNED   SIGNATURE ON FILE   DATE 02 14 2017

**13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize payment of medical benefits to the undersigned physician or supplier for services described below.
SIGNED   SIGNATURE ON FILE

**14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)** MM DD YY   QUAL.

**15. OTHER DATE** MM DD YY   QUAL.

**16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION** MM DD YY FROM   TO

**17. NAME OF REFERRING PROVIDER OR OTHER SOURCE**
DN ALAN RUSHTON MD
17b. NPI

**18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES** MM DD YY FROM 02 13 2017   TO

**19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)**

**20. OUTSIDE LAB?** YES NO   $ CHARGES

**21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY** Relate A-L to service line below (24E)   ICD Ind. 0
A. S06 4X9S   B.   C.   D.
E.   F.   G.   H.
I.   J.   K.   L.

**22. RESUBMISSION CODE   ORIGINAL REF. NO.**

**23. PRIOR AUTHORIZATION NUMBER**

| 24. A. DATE(S) OF SERVICE From MM DD YY To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID QUAL | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 02142017 02142017 | 21 | Y | G1154 | 79 AS | A | 43441 00 | | | NPI | 1457613457 |
| 2 | 02142017 02142017 | 21 | Y | G1781 | 79 AS | A | 10426 00 | | | NPI | 1457613457 |
| 3 | | | | | | | | | | NPI | |
| 4 | | | | | | | | | | NPI | |
| 5 | | | | | | | | | | NPI | |
| 6 | | | | | | | | | | NPI | |

**25. FEDERAL TAX I.D. NUMBER** SSN EIN X
202518910

**26. PATIENT'S ACCOUNT NO.**
069678

**27. ACCEPT ASSIGNMENT?** (For govt. claims, see back) YES NO

**28. TOTAL CHARGE** $ 53867 00

**29. AMOUNT PAID** $ 0 00

**30. Rsvd for NUCC Use**

**31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS** (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
TATIANA SIKORSKYJ AP
SIGNED   05 15 2018   DATE

**32. SERVICE FACILITY LOCATION INFORMATION**
MORRISTOWN MEMORIAL HOSPITAL
100 MADISON AVENUE
MORRISTOWN NJ 07960-7360
a1558503672

**33. BILLING PROVIDER INFO & PH #** 373 3269000
NJ PEDIATRIC NEUROSCIENCE INSTITUTE
131 MADISON AVE 3RD FLOOR
MORRISTOWN NJ 07960-7360
a1558503672

NUCC Instruction Manual available at: www.nucc.org   PLEASE PRINT OR TYPE   APPROVED OMB-0938-1197 FORM 1500 (09-19)

**EXHIBIT G**

061UTOPPR1080002-00904-02                        0B-1347*02*000003-PM-17061-120*C07ASOJPMCTOPS

United HealthCare Services, Inc.
GREENSBORO SERVICE CENTER
PO BOX 740800
ATLANTA GA 30374-0800
PHONE: 1-877-842-3210

STD - PRA

&#10048; Bristol-Myers Squibb Company



# PROVIDER
# REMITTANCE ADVICE

NEW JERSEY PEDIATRIC NEUROSCIE
CATHERINE A MAZZOLA MD
131 MADISON AVE FL 8
MORRISTOWN NJ 07960

*Kyle H▓▓▓▓▓▓*
*DOS 2/14/17*
*Dr. Mazzola*

| | |
|---|---|
| CHECK DATE: | 03/02/17 |
| TIN: | 202518910 |
| NPI: | 1558503672 |
| PAYEE NAME: | NEW JERSEY PEDIATRIC NEUROSCIE |
| CHECK NUMBER: | PH 19637754 |
| CHECK AMOUNT: | $10,251.01 |
| GROUP NUMBER: | 191698 |
| GROUP NAME: | BRISTOL MYERS SQUIBB |

## PATIENT: KYLE ▓▓▓▓▓▓ (CH)

| | | | |
|---|---|---|---|
| SUBSCRIBER ID: | A 809639558 | SUBSCRIBER NAME: ▓▓▓▓▓▓ | CLAIM NUMBER: 6366655409 0079983797 |
| CLAIM DATE: | 02/14/17-02/14/17 | DATE RECEIVED: 02/16/17 | PRODUCT: CHOYC+ |
| REND PROV ID: | 1295792380 | REND PROV: C. A MAZZOLA | |

| PATIENT CONTROL NUMBER | PATIENT ID | AUTH/REF NUMBER | DRG | DRG WEIGHT | CLAIM CHARGE AMOUNT | CLM ADJ AMT | GRP CD | CLM ADJ RSN CD | CLAIM PAYMENT AMOUNT | PATIENT RESPONSIBILITY |
|---|---|---|---|---|---|---|---|---|---|---|
| 069676-01 | | | | | $53,867.00 | | | | $10,251.01 | $43,615.99 |

### SERVICE LINE DETAIL(S)

| LINE CTRL# | DATES OF SERVICE | SUB PROD/ SVC/ MOD | ADJ PROD/ SVC | MOD | REV | UNITS | ADJ QTY | CHARGE | AMOUNT ALLOWED | ADJ AMOUNT | GRP CD | CLM ADJ RSN CD | PAYMENT AMOUNT | REMARK/ NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 107081 | 02/14/17 - 02/14/17 | 61154 | 79 | | | | 1 | $43,441.00 | $9,478.00 | $533.70 | PR | 1 | $5,261.01 | 29 |
| | | | | | | | | | | $2,683.29 | PR | 2 | | |
| | | | | | | | | | | $33,963.00 | PR | 45 | | |
| 107082 | 02/14/17 - 02/14/17 | 61781 | | | | | 1 | $10,426.00 | $5,700.00 | $1,710.00 | PR | 2 | $3,990.00 | 29 |
| | | | | | | | | | | $4,726.00 | PR | 45 | | |
| CLAIM# 6366655409 0079983797 | | | | | | | SUBTOTAL | $53,867.00 | $15,178.00 | $43,615.99 | | | $10,251.01 | UG |

PAYMENT OF BENEFITS HAS BEEN MADE IN ACCORDANCE WITH THE TERMS OF THE MANAGED CARE SYSTEM.

| | |
|---|---|
| TOTAL PAYABLE TO PROVIDER | $10,251.01 |

## NOTES

PR1     PATIENT RESPONSIBILITY - DEDUCTIBLE AMOUNT

PR2     PATIENT RESPONSIBILITY - COINSURANCE AMOUNT

PR45    PATIENT RESPONSIBILITY - CHARGE EXCEEDS FEE SCHEDULE/MAXIMUM ALLOWABLE OR CONTRACTED/LEGISLATED FEE ARRANGEMENT.

29      YOUR PLAN COVERS THE ELIGIBLE EXPENSE AMOUNT REIMBURSABLE UNDER YOUR PLAN FOR COVERED OUT-OF-NETWORK HEALTH SERVICES. THE ELIGIBLE AMOUNT IS BASED ON A DATABASE OF COMPETITIVE FEES FOR SIMILAR SERVICES OR SUPPLIES IN YOUR AREA. BENEFITS ARE NOT AVAILABLE FOR THAT PORTION OF THE CHARGE THAT EXCEEDS THE ELIGIBLE AMOUNT DETERMINED FOR THIS SERVICE.

UG      YOUR NETWORK PHYSICIAN OR HEALTH CARE PROVIDER HAS AGREED TO THE PLAN DISCOUNT. THE DISCOUNT SHOWN IS YOUR SAVINGS FOR USING A NETWORK PHYSICIAN OR HEALTH CARE PROVIDER. YOU HAVE NOT MET YOUR DEDUCTIBLE AND OWE THE AMOUNT SHOWN.

THE MEMBER, PROVIDER, OR AN AUTHORIZED REPRESENTATIVE MAY REQUEST RECONSIDERATION OR APPEAL THE DECISION BY SUBMITTING COMMENTS, DOCUMENTS OR OTHER INFORMATION TO UNITEDHEALTHCARE. NETWORK PROVIDERS SHOULD REFER TO THE ADMINISTRATIVE GUIDE FOR CLAIM RECONSIDERATION OR APPEAL INFORMATION. IF YOU ARE A NETWORK PROVIDER APPEALING A CLINICAL OR COVERAGE DETERMINATION ON BEHALF OF A MEMBER, OR A NON-NETWORK PROVIDER APPEALING A DECISION ON BEHALF OF A MEMBER, FOLLOW THE PROCESS FOR APPEALS IN THE MEMBER'S BENEFIT PLAN DOCUMENT. DECISIONS ON APPEALS MADE ON BEHALF OF MEMBERS WILL BE COMPLETED IN 30 DAYS OF SUBMISSION OR WITHIN THE

# EXHIBIT H

3C-14114*02*000009-PM-17096-120*C07ASOJPMCTOPS

United HealthCare Services, Inc.
GREENSBORO SERVICE CENTER
PO BOX 740800
ATLANTA GA 30374-0800
PHONE: 1-877-842-3210

STD - PRA

♣ Bristol-Myers Squibb Company

# PROVIDER
# REMITTANCE ADVICE

NEW JERSEY PEDIATRIC NEUROSCIE
CATHERINE A MAZZOLA MD
131 MADISON AVE FL 3
MORRISTOWN NJ 07960

*(handwritten)* Pt: Kyle H̶a̶─
DOS: 2/14/2017
Prov: Sikorskyj

| | |
|---|---|
| CHECK DATE: | 04/06/17 |
| TIN: | 202516910 |
| NPI: | 1295792380 |
| PAYEE NAME: | NEW JERSEY PEDIATRIC NEUROSCIE |
| CHECK NUMBER: | PH 20514261 |
| CHECK AMOUNT: | $2,432.70 |
| GROUP NUMBER: | 191698 |
| GROUP NAME: | BRISTOL MYERS SQUIBB |

## PATIENT: KYLE ▓▓▓▓▓▓ (CH)

| | | |
|---|---|---|
| SUBSCRIBER ID: | A 809639558 | |
| CLAIM DATE: | 01/04/17-01/04/17 | |
| REND PROV ID: | 1295792380 | |
| SUBSCRIBER NAME: | ▓▓▓▓▓ | |
| DATE RECEIVED: | 03/22/17 | |
| REND PROV: | C. A MAZZOLA | |
| CLAIM NUMBER: | 6431697010 0080434071 | |
| PRODUCT: | CHOYC+ | |

| PATIENT CONTROL NUMBER | PATIENT ID | AUTH/REF NUMBER | DRG | DRG WEIGHT | CLAIM CHARGE AMOUNT | CLM ADJ AMT | GRP CD | CLM ADJ RSN CD | CLAIM PAYMENT AMOUNT | PATIENT RESPONSIBILITY |
|---|---|---|---|---|---|---|---|---|---|---|
| ▓▓▓▓ | | | | | | | | | ▓▓▓▓ | |

| LINE CTRL# | DATES OF SERVICE | SUB PROD/ SVC/ MOD | ADJ PROD/ SVC | MOD | REV | UNITS | ADJ QTY | CHARGE | AMOUNT ALLOWED | ADJ AMOUNT | GRP CD | CLM ADJ RSN CD | PAYMENT AMOUNT | REMARK/ NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 1 | ▓▓▓▓ | | ▓▓▓▓▓ | | | | |
| CLAIM# 6431697010 0080434071 | | | | | | | | SUBTOTAL | $54,562.00 | | | | | |

PAYMENT OF BENEFITS HAS BEEN MADE IN ACCORDANCE WITH THE TERMS OF THE MANAGED CARE SYSTEM.

| | | |
|---|---|---|
| SUBSCRIBER ID: | A 809639558 | |
| CLAIM DATE: | 02/14/17-02/14/17 | |
| REND PROV ID: | 1295792380 | |
| SUBSCRIBER NAME: | ▓▓▓▓▓ | |
| DATE RECEIVED: | 03/23/17 | |
| REND PROV: | C. A MAZZOLA | |
| CLAIM NUMBER: | 6431697011 0080464302 | |
| PRODUCT: | CHOYC+ | |

| PATIENT CONTROL NUMBER | PATIENT ID | AUTH/REF NUMBER | DRG | DRG WEIGHT | CLAIM CHARGE AMOUNT | CLM ADJ AMT | GRP CD | CLM ADJ RSN CD | CLAIM PAYMENT AMOUNT | PATIENT RESPONSIBILITY |
|---|---|---|---|---|---|---|---|---|---|---|
| 069676 | | | | | $43,441.00 | | | | $2,432.70 | $1,042.58 |

| LINE CTRL# | DATES OF SERVICE | SUB PROD/ SVC/ MOD | ADJ PROD/ SVC | MOD | REV | UNITS | ADJ QTY | CHARGE | AMOUNT ALLOWED | ADJ AMOUNT | GRP CD | CLM ADJ RSN CD | PAYMENT AMOUNT | REMARK/ NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 001 | 02/14/17 - 02/14/17 | | 61154 | 79/ AS | | 1 | | $43,441.00 | $3,475.28 | $39,965.72 | CO | 45 | $2,432.70 | IT |
| | | | | | | | | | | $1,042.58 | PR | 2 | | |
| CLAIM# 6431697011 0080464302 | | | | | | | | SUBTOTAL | $43,441.00 | $3,475.28 | $41,008.30 | | | $2,432.70 | |

PAYMENT OF BENEFITS HAS BEEN MADE IN ACCORDANCE WITH THE TERMS OF THE MANAGED CARE SYSTEM.

NOTES
| | | TOTAL PAYABLE TO PROVIDER | $2,432.70 |
|---|---|---|---|

CO45     CONTRACTUAL OBLIGATIONS - CHARGE EXCEEDS FEE SCHEDULE/MAXIMUM ALLOWABLE OR
CONTRACTED/LEGISLATED FEE ARRANGEMENT.

STD - PRA-202516910-5400000000037179976

Page 3 of 4

# EXHIBIT I

Fax Server            7/4/2018 6:39:06 AM  PAGE   8/011   Fax Server

MORRISTOWN MEDICAL CENTER
Operative Report

Patient:           CONNOR
Med Rec No:        A01391704
Date of Birth:

DATE:  06/12/2018

SURGEON: Luke D., Tomycz, MD

ASSISTANT:  None

ANESTHESIOLOGIST:

PREOPERATIVE DIAGNOSIS:
Large right frontal parietal hemorrhage.

POSTOPERATIVE DIAGNOSIS:
Large right frontal parietal hemorrhage.

PROCEDURE:
Diagnostic cerebral angiography.

ANESTHESIA:
General endotracheal.

POSITION:
Supine.

ESTIMATED BLOOD LOSS:
Minimal.

PREOPERATIVE MEDICATIONS:
None.

BRIEF HISTORY:
Connor is a 10-year-old who had a spontaneous right frontal parietal
hemorrhage which was decompressed urgently. We feel that this is most likely
due to an AVM rupture given his age, and the fact that the bleed was
spontaneous.  MR, as well as CTA, however, did not reveal an obvious nidus.
Today we are taking him for cerebral angiogram to better characterize what we
think is likely an AVM.

OPERATIVE DETAIL:
Patient was brought to the angio suite. He was already intubated.  He was
sedated by the anesthesiology team and paralyzed.  Using a micropuncture kit,
after performing a time-out, after several attempts on the right side, I was
unable to gain access so I held some pressure and then made a small nick
incision on the left side using an x-ray for localization, and then gained
access with a 5-French micropuncture kit into the femoral artery using the
typical Seldinger technique with a microwire and a 5-French sheath.  Once I
had my sheath in place, I then went up with an angled-tapered catheter and
angled Glidewire.  I first catheterized the right side, and did selective
catheterization for right ICA.  I could see the craniectomy defect.  However,

CONFIDENTIAL DOCUMENT. THIS HARDCOPY IS NOT FOR DISTRIBUTION OR EDITING.

Fax Server        7/4/2018 6:39:06 AM  PAGE  9/011   Fax Server

MORRISTOWN MEDICAL CENTER
Operative Report

Patient:  CONNOR
Med Rec No:     A01391704
Date of Birth:

I did not see any clear obvious AVM nidus. There was perhaps 1 vein that
appeared to fill a little bit on the early side. There was no definitive
evidence at this time of a fistula or AVM. I also catheterized selectively
the right external carotid artery and did an angiogram looking at the head.
There is no evidence of AV fistula. I then did an angiogram of the left
common carotid artery. I did AP and lateral views of the head, as well as
oblique views. There is no evidence of AVM, aneurysm, or other malformation.
Finally, I catheterized the left vertebral artery and did AP and lateral views
of the head. There was no obvious early venous drainage or signs of fistula.
At this point, I removed the catheter and I also removed the sheath and held
pressure for 10 minutes, and the patient was transferred back to the ICU with
order to do neuro checks.

LOCATION:
Morristown Biplane Angiosuite.


DICTATED BY: LUKE D., TOMYCZ, MD


DD: 06/14/2018 10:52:15  DT: 06/14/2018 11:31:14
LDT/MedQUZ/Job#/Int# 413202/793678764  PHYS. ID: 23612

Signed, Luke D Tomycz, MD
07/03/2018 11:30:00

CONFIDENTIAL DOCUMENT. THIS HARDCOPY IS NOT FOR DISTRIBUTION OR EDITING.
*Operative Report - Page 2/2
Job pchart-2016.ahsys.orgprod0000000598965 (20180/04 06:01:46)  Page 8 Doc# 4
07/04/2018  6:44AM (GMT-04:00)

# EXHIBIT J

UMR
PO BOX 450
PUEBLO, CO 81002

CARRIER  1

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 09/19

☐☐☐ PICA                                                                 PICA ☐☐☐

| 1. | MEDICARE | MEDICAID | TRICARE | CHAMPVA | GROUP HEALTH PLAN | FECA BLKLUNG | OTHER | 1a. INSURED'S I.D. NUMBER | (For Program in Item 1) |
|---|---|---|---|---|---|---|---|---|---|
| | (Medicare#) | (Medicaid#) | (ID#/DoD#) | (Member ID#) | (ID#) | (ID#) | (ID#) | Y18687163 | |

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)
CONNOR

3. PATIENT'S BIRTH DATE  MM DD YY  SEX  M☒ F☐

4. INSURED'S NAME (Last Name, First Name, Middle Initial)
SAME

5. PATIENT'S ADDRESS (No., Street)

6. PATIENT RELATIONSHIP TO INSURED
Self☒ Spouse☐ Child☐ Other☐

7. INSURED'S ADDRESS (No., Street)
SAME

CITY                    STATE
NJ

8. RESERVED FOR NUCC USE

CITY                    STATE

ZIP CODE            TELEPHONE (Include Area Code)

ZIP CODE            TELEPHONE (Include Area Code)
(     )

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (Current or Previous)
YES☐ NO☒

a. INSURED'S DATE OF BIRTH  MM DD YY  SEX  M☒ F☐

b. RESERVED FOR NUCC USE

b. AUTO ACCIDENT?   PLACE (State)
YES☐ NO☒

b. OTHER CLAIM ID (Designated by NUCC)

c. RESERVED FOR NUCC USE

c. OTHER ACCIDENT?
YES☐ NO☒

c. INSURANCE PLAN NAME OR PROGRAM NAME
UMR

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. CLAIM CODES (Designated by NUCC)

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?
YES☐ NO☒  If yes, complete items 9, 9a, and 9d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.
SIGNED  SIGNATURE ON FILE      DATE  06 12 2018

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.
SIGNED  SIGNATURE ON FILE

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)  MM DD YY  QUAL.

15. OTHER DATE  QUAL.  MM DD YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION
FROM  MM DD YY   TO  MM DD YY

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE
DN GERARD FRITZ MD

17b. NPI

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES
FROM 06 03 2018   TO  MM DD YY

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)

20. OUTSIDE LAB?  YES☐ NO☒  $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY  Relate A-L to service line below (24E)  ICD Ind. 0
A. R58      B. Q27 30      C.      D.
E.      F.      G.      H.

22. RESUBMISSION CODE      ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE | | B. | C. | D. PROCEDURES, SERVICES, OR SUPPLIES | | E. | F. | G. | H. | I. | J. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| From MM DD YY | To MM DD YY | PLACE OF SERVICE | EMG | CPT/HCPCS | MODIFIER | DIAGNOSIS POINTER | $ CHARGES | DAYS OR UNITS | EPSDT Famjy Plan | ID. QUAL | RENDERING PROVIDER ID. # |
| 1 | 06 12 2018 | 06 12 2018 | 21 | Y | 16223 | | AB | 20000 00 | 1 | | NPI | 1134276959 |
| 2 | 06 12 2018 | 06 12 2018 | 21 | Y | 16226 | | AB | 20000 00 | 1 | | NPI | 1134276959 |
| 3 | | | | | | | | | | | NPI | |
| 4 | | | | | | | | | | | NPI | |
| 5 | | | | | | | | | | | NPI | |
| 6 | | | | | | | | | | | NPI | |

25. FEDERAL TAX I.D. NUMBER  SSN EIN
202518910  ☒

26. PATIENT'S ACCOUNT NO.
072893

27. ACCEPT ASSIGNMENT?
(For govt. claims, see back)
YES☒ NO☐

28. TOTAL CHARGE
$ 40000 00

29. AMOUNT PAID
$ 0 00

30. Rsvd for NUCC Use

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS
(I certify that the statements on the reverse apply to this bill and are made a part thereof.)
LUKE TOMYCZ MD
SIGNED      DATE  04 17 2020

32. SERVICE FACILITY LOCATION INFORMATION
MORRISTOWN MEMORIAL HOSPITAL
100 MADISON AVENUE
MORRISTOWN NJ 07960-7360
a1558503672

33. BILLING PROVIDER INFO & PH #  973 3269000
NJ PEDIATRIC NEUROSCIENCE INSTITUTE
131 MADISON AVE 3RD FLOOR
MORRISTOWN NJ 07960-7360
a1558503672

NUCC Instruction Manual available at: www.nucc.org      PLEASE PRINT OR TYPE      APPROVED OMB-0938-1197 FORM 1500 (09-19)

PATIENT AND INSURED INFORMATION

PHYSICIAN OR SUPPLIER INFORMATION

# EXHIBIT K

Remittance Advice for Period Ending 09-12-18

UHR
PO BOX 30541  SALT LAKE CITY  UT 84130
UNITEDHEALTHCARE CHOICE PLUS
FELLOWSHIP SENIOR LIVING, INC.

NJ PEDIATRIC NEUROSCIENCE INST
151 MADISON AVE STE 3
MORRISTOWN NJ 07960

1-877-233-1800

Federal ID No. 20-2518910

Visit our web-site at
www.umr.com
to obtain eligibility, benefit, and
claim information on behalf of your
patients 24 hours/day, 7 days/week.

| Dates From/To | Service Code | Charged Amount | Allowed Amount | Deductible | Copay | Coinsurance | Discount Managed Care Adjust | Ineligible | Withheld | OC | ANSI Code | Paid | Patient Responsibility |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | ALAINA | | | | | CONNOR | | ID# Y18687163 | | | | | |
| | | | | | | | | | | | | | .00 |
| | | | | | | | | | | | | | .00 |
| EMPLOYEE: | | | | | | | | | | | | | |
| ACCOUNT NUMBER: 072893 | | | | | | | | | | | | | |
| 061218 362235 | | 20000.00 | | | | | .00 | 20000.00- | .00 01 | | | .00 | |
| | | | | | | | | CES EDITED CLAIM PROVIDER RESP | | | 234 | | |
| 061218 362236 | | 20000.00 | .00 | .00 | .00 | .00 | .00 | 20000.00- | .00 01 | | | .00 | .00 |
| | | | | | | | | CES EDITED CLAIM PROVIDER RESP | | | 234 | | |
| TOTAL | | 40000.00 | .00 | .00 | .00 | .00 | .00 | 40000.00- | .00 | | | .00 | .00 |

Pt Connor N
Pr. Dr. Tomycz
Dos, 6/12/18

| SUB TOTAL | | 40000.00 | .00 | .00 | .00 | .00 | .00 | 40000.00- | .00 | | | .00 | .00 |
| PROVIDER TOTAL | | 40000.00 | .00 | .00 | .00 | .00 | .00 | 40000.00- | .00 | | | .00 | .00 |

C8465  1203976697    8255049438



# EXHIBIT L

Ethen (MR # A42443555) Printed by Tatiana O Huk Sikorskyj, APN [THUK0001] at 9/4/18 12...

| Catherine A Mazzola, MD | Physician | Addendum | Neurosurgery | Op Note | Date of Service: 8/31/2018 10:48 AM |

### OPERATIVE REPORT          Morristown Medical Center

Name: **ETHEN**

DOB: ▬▬▬▬ M

Patient Type: O

Admission Date: 08/31/2018

CSN/Account #:  108250563

MRN:  A42443555

Location:  AOR

Attending Physician:
Catherine Mazzola, M.D.

DICTATED BY:  Catherine Mazzola, M.D.

Surgeon:  Catherine Mazzola, M.D.

Assistant: Thomas J Sernas, PA

Anesthesiologist:  Cindy H Chen, MD

Date of Procedure:

PREOPERATIVE DIAGNOSES:
1. Intraspinal, extradural lipoma.
2. Syringomyelia.
3. Scoliosis.

POSTOPERATIVE DIAGNOSES :
1. Intraspinal, extradural lipoma.
2. Syringomyelia.
3. Scoliosis.

SURGERY :
1. Osteoplastic laminotomies and resection of intraspinal, extradural lipoma.
2. Intraoperative microscope.
3. Thoracic laminar fusion with osteoplastic reconstruction at T6, T7 and T8
4. Intraoperative spinal cord monitoring.

ANESTHESIA:  General.

INDICATIONS FOR SURGERY:  Ethan ▬▬▬ is a 12-year-old male who was diagnosed with scoliosis and syringomyelia. He had a syrinx of the spinal cord which went from C5 all the way down to T5. Below the terminal aspect of the syrinx at T5 there was a large epidural lipoma measuring approximately 8–10 mm in greatest thickness in the canal. The lipomatous changes over the dura

Ethen (MR # A42443555) Printed by Tatiana O Huk Sikorskyj, APN [THUK0001] at 9/4/18 12...

started at T5 and went all the way down to T8–T . Below T  there was a normal amount of epidural fat.

The MRI was reviewed with the neuroradiologist and the findings were discussed with the parents. Osteoplastic thoracic laminotomies and resection of the mass over the dura was recommended.   e also recommended microscope and intraoperative monitoring. An informed consent was o tained from Ethan s parents prior to surgery. All the risks of surgery were explained including wound infection, poor healing, CSF leak, CSF infection, paralysis, weakness,  owel and  ladder dysfunction, sensation changes. An informed consent was o  tained from his parents prior to surgery. I saw them in my office and on the morning of the surgery.   e reviewed all the plans for surgery and risks of surgery at  oth times. Once we had gone over his H and P and consent, he was  rought to the room. A time–out was done and he did receive IV anti iotics prior to skin incision.

DESCRIPTION OF PROCEDURE :  Once he was orally intu ated and he had 2 large– ore peripheral IVs and a Foley, he was placed pron  e on the OR ta  le with 2  elly rolls. All areas of pressure were well padded.

The thoracolum ar area was draped off with 4 plastic drapes. The spinous processes were marked from T1 to L5. An intraoperative x–ray was o  tained to document L1. Once we w  ere happy with our levels as marked, the area was scru   ed 4 times with a Betadine scru  . I dried in  etween each scru  and then painted 3 times with Betadine. Once the Betadine was dried Tom and I scru   ed.   e were gowned and gloved with sterile techni ue.

The operative area was draped off with  lue towels which were stapled to the skin. The incision was carefully marked. A down sheet and Io an sticky drape and 2 split sheets were used to drape the operative area. The incision was made with a 15  la  de scalpel, carried down through the skin and su cutaneous tissue with a needle–tip Bovie. The lamina of T5, T6, T7, T8 and T  were exposed. They were dissected out laterally using the flat tip on the Bovie. Retractors were put into the incision. Two cere ellar retractors and a Gelpi were used. Hemostasis was o  tained using the Bovie, the  ipolar and Surgiflo application. Osteoplastic laminotomies were done at T5, T6, T7, T8 and T  using the Midas Rex, 1st with an M8 drill  it and then with a B1 drill  it with  a footplate. The laminae were elevated.

THE OPERATING MICROSCOPE  AS USED FOR THE RESECTION OF THE MASS. There was a large fatty mass which was in the spinal canal. A few specimens were o  tained for permanent section. However, this did not appear to  e tumorous at all. This did not appear to  e cancerous, this mass appeared  red to  e lipomatosis. The lipomatous mass was evacuated using  ipolar electrocoagulation and the CUSA aspirator.

Once the mass was resected in its entirety the epidural lateral venous plexus was  ipolared. The exiting nerve roots on the left were identified.

Once hemostasis had  een o  tained and the decompression was done, we checked the level a ove and  elow with a dental instrument and it seemed to  e free and under no pressure.

The lamina were put  ack down in place. An osteoplastic reconstruction of the posterior elements was done. Laminar plates were put down  at T6, T7 and T8 on the right and on the left in the following manner. Dog  one–shaped Synthes titanium microplates were placed on either side of the lamina and anchored to the lamina with titanium microscrews. There were a total of 6 plates placed and  12 screws. Once the lamina had  een repositioned, a little  it of Gelfoam was put down over the empty space  elow the lamina of T8 and then some  one chips were put down over that. The area was then irrigated with  acitracin irrigation solution.

Hemosta sis was triple checked. 20 cc of lidocaine were in ected into the su  cutaneous tissue for local anesthesia. The fascia was closed with multiple 2–0 Vicryl pop–offs dyed suture. Once the fascia was closed, the su  cutaneous tissue was closed with 3–0 Vicr  yl undyed pop–off sutures. The

**EXHIBIT M**

UNITED HEALTH CARE
PO BOX 740800
ATLANTA, GA 30374

**HEALTH INSURANCE CLAIM FORM**
APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 09/19

PICA | | | | | | PICA

| 1. MEDICARE | MEDICAID | TRICARE | CHAMPVA | GROUP HEALTH PLAN | FECA BLK LUNG | OTHER | 1a. INSURED'S I.D. NUMBER (For Program in Item 1) |
|---|---|---|---|---|---|---|---|
| (Medicare#) | (Medicaid#) | (ID#/DoD#) | (Member ID#) | (ID#) | (ID#) | ☒ (ID#) | 942288813 |

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)
ETHEN

3. PATIENT'S BIRTH DATE — SEX  M☒ F

4. INSURED'S NAME (Last Name, First Name, Middle Initial)
SAME

5. PATIENT'S ADDRESS (No., Street)

6. PATIENT RELATIONSHIP TO INSURED
Self☐ Spouse☐ Child☐ Other☐

7. INSURED'S ADDRESS (No., Street)
SAME

CITY — NJ — STATE

8. RESERVED FOR NUCC USE

CITY — STATE

ZIP CODE — TELEPHONE (Include Area Code)

ZIP CODE — TELEPHONE (Include Area Code) ( )

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (Current or Previous) YES☐ NO☒

a. INSURED'S DATE OF BIRTH — SEX  M☒ F☐

b. RESERVED FOR NUCC USE

b. AUTO ACCIDENT? YES☐ NO☒ PLACE (State)

b. OTHER CLAIM ID (Designated by NUCC)

c. RESERVED FOR NUCC USE

c. OTHER ACCIDENT? YES☐ NO☒

c. INSURANCE PLAN NAME OR PROGRAM NAME
UNITED HEALTH CARE

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. CLAIM CODES (Designated by NUCC)

d. IS THERE ANOTHER HEALTH BENEFIT PLAN? YES☐ NO☒ If yes, complete items 9, 9a, and 9d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.
SIGNED  SIGNATURE ON FILE  DATE 08 31 2018

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.
SIGNED  SIGNATURE ON FILE

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP) QUAL.

15. OTHER DATE QUAL. MM DD YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION FROM — TO

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE
DN MARK RIEGER MD  17b. NPI

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES FROM 08 31 2018 — TO

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)

20. OUTSIDE LAB? YES☐ NO☐ $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY Relate A-L to service line below (24E)  ICD Ind.
A. D33 4  B. G95 0  C. M41 9  D.
E.  F.  G.  H.

22. RESUBMISSION CODE — ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. | A. DATE(S) OF SERVICE From MM DD YY To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS / MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID QUAL | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 08 31 2018  08 31 2018 | 21 | | 63276 | ABC | 56000 00 | 1 | | NPI | 1295792380 |
| 2 | 08 31 2018  08 31 2018 | 21 | | 63295  59 | ABC | 11151 00 | 1 | | NPI | 1295792380 |
| 3 | 08 31 2018  08 31 2018 | 21 | | 69990 | ABC | 4250 00 | 1 | | NPI | 1295792380 |
| 4 | | | | | | | | | NPI | |
| 5 | | | | | | | | | NPI | |
| 6 | | | | | | | | | NPI | |

25. FEDERAL TAX I.D. NUMBER  SSN EIN
202518910  ☒

26. PATIENT'S ACCOUNT NO.
073383

27. ACCEPT ASSIGNMENT? YES☒ NO☐

28. TOTAL CHARGE $ 71401 00

29. AMOUNT PAID $ 0 00

30. Rsvd for NUCC Use

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
CATHERINE A MAZZOLA M
SIGNED  06 03 2021  DATE

32. SERVICE FACILITY LOCATION INFORMATION
MORRISTOWN MEMORIAL HOSPITAL
100 MADISON AVENUE
MORRISTOWN NJ 07960-7360
a.1558503672

33. BILLING PROVIDER INFO & PH # 973 3269000
NJ PEDIATRIC NEUROSCIENCE INSTITUTE
131 MADISON AVE 3RD FLOOR
MORRISTOWN NJ 07960-7360
a.1558503672

NUCC Instruction Manual available at: www.nucc.org  PLEASE PRINT OR TYPE  APPROVED OMB-0938-1197 FORM 1500 (09-19)

**EXHIBIT N**

313UTOPPR1008002-04866-02

6B-7067*02*000003-PM-1831S-120*C07ASOBOATOPS

UnitedHealthcare Service LLC
GREENSBORO SERVICE CENTER
P.O. BOX 740800
ATLANTA GA 30374-0800
PHONE: 1-877-842-3210

STD - PRA

 UnitedHealthcare

## PROVIDER
## REMITTANCE ADVICE

NEW JERSEY PEDIATRIC NEUROSCIE
CATHERINE MAZZOLA MD
131 MADISON AVE FL 3
MORRISTOWN NJ 07980

| | |
|---|---|
| CHECK DATE: | 11/09/18 |
| TIN: | 202518910 |
| PAYEE NAME: | NEW JERSEY PEDIATRIC NEUROSCIE |
| CHECK NUMBER: | PG 91747801 |
| CHECK AMOUNT: | $2,800.00 |
| GROUP NUMBER: | 197944 |
| GROUP NAME: | PORT AUTHORITY TRANS-HUDSON-PA |

*Pt. Ethan R___*
*Pr. Dr. Mazzola*
*Dos. 8/31/18*

## PATIENT: ETHEN ___ (CH)

| | | |
|---|---|---|
| SUBSCRIBER ID: | A 942288818 | SUBSCRIBER NAME: ___ | CLAIM NUMBER: | 7435665134 0076189449 |
| CLAIM DATE: | 08/31/18-08/31/18 | DATE RECEIVED: 10/24/18 | PRODUCT: | CHOYC+ |
| REND PROV ID: | | REND PROV: C. MAZZOLA MD | | |

| PATIENT CONTROL NUMBER | PATIENT ID | AUTH/REF NUMBER | DRG | DRG WEIGHT | CLAIM CHARGE AMOUNT | CLM ADJ AMT | GRP CD | CLM ADJ RSN CD | CLAIM PAYMENT AMOUNT | PATIENT RESPONSIBILITY |
|---|---|---|---|---|---|---|---|---|---|---|
| 076663 | | | | | $71,401.00 | | | | $2,800.00 | $51,348.00 |

### SERVICE LINE DETAIL(S)

| LINE CTRL# | DATES OF SERVICE | SUB PROD/ SVC/ MOD | ADJ PROD/ SVC | MOD | REV | UNITS | ADJ QTY | CHARGE | AMOUNT ALLOWED | ADJ AMOUNT | GRP CD | CLM RSN CD | PAYMENT AMOUNT | REMARK/ NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 001 | 08/31/18 - 08/31/18 | | 63276 | | | 1 | | $56,000.00 | $13,458.00 | $42,547.00 | PR | 45 | $13,458.00 | 29 |
| 002 | 08/31/18 - 08/31/18 | | 63295 | 59 | | 1 | | $11,151.00 | $2,800.00 | $8,351.00 | PR | 45 | $2,800.00 | 29 |
| 003 | 08/31/18 - 08/31/18 | | 69990 | | | 1 | | $4,250.00 | $3,800.00 | $450.00 | PR | 45 | $3,800.00 | 29 |
| | 08/31/18 - 08/31/18 | | 632760 | | | -1 | | $0.00 | | | | | -$17,258.00 | E5 |
| CLAIM# 7435665134 0076189449 | | | | | | | SUBTOTAL | $71,401.00 | $20,058.00 | $51,348.00 | | | $2,800.00 | |

PAYMENT OF BENEFITS HAS BEEN MADE IN ACCORDANCE WITH THE TERMS OF THE MANAGED CARE SYSTEM.

| | |
|---|---|
| TOTAL PAYABLE TO PROVIDER | $2,800.00 |

NOTES

**PR45**   PATIENT RESPONSIBILITY - CHARGE EXCEEDS FEE SCHEDULE/MAXIMUM ALLOWABLE OR CONTRACTED/LEGISLATED FEE ARRANGEMENT.

**29**   YOUR PLAN COVERS THE ELIGIBLE EXPENSE AMOUNT REIMBURSABLE UNDER YOUR PLAN FOR COVERED OUT-OF-NETWORK HEALTH SERVICES. THE ELIGIBLE AMOUNT IS BASED ON A DATABASE OF COMPETITIVE FEES FOR SIMILAR SERVICES OR SUPPLIES IN YOUR AREA. BENEFITS ARE NOT AVAILABLE FOR THAT PORTION OF THE CHARGE THAT EXCEEDS THE ELIGIBLE AMOUNT DETERMINED FOR THIS SERVICE.

**E5**   ADDITIONAL CHARGES AND/OR CORRECTED BILLING HAS BEEN CONSIDERED.

THE MEMBER, PROVIDER, OR AN AUTHORIZED REPRESENTATIVE MAY REQUEST RECONSIDERATION OR APPEAL THE DECISION BY SUBMITTING COMMENTS, DOCUMENTS OR OTHER INFORMATION TO UNITEDHEALTHCARE.  NETWORK PROVIDERS SHOULD REFER TO THE ADMINISTRATIVE GUIDE FOR CLAIM RECONSIDERATION OR APPEAL INFORMATION.  IF YOU ARE A NETWORK PROVIDER APPEALING A CLINICAL OR COVERAGE DETERMINATION ON BEHALF OF A MEMBER, OR A NON-NETWORK PROVIDER APPEALING A DECISION ON BEHALF OF A MEMBER, FOLLOW THE PROCESS FOR APPEALS IN THE MEMBER'S BENEFIT PLAN DOCUMENT.  DECISIONS ON APPEALS MADE ON BEHALF OF MEMBERS WILL BE COMPLETED IN 30 DAYS OF SUBMISSION OR WITHIN THE TIMEFRAME REQUIRED BY LAW.

UnitedHealthcare is improving service to you by adopting electronic payments & statements (EPS) as a standard way to pay claims. EPS will dramatically reduce the time and effort your organization spends on administering paper checks and explanation of benefits.  Get a head start and enroll today by

# Civil Case Information Statement

**Case Details: MORRIS | Civil Part Docket# L-000283-23**

**Case Caption:** NJ PEDIATRIC NEUROSC IENCE INS  VS
UNITED HEALTHC

**Case Initiation Date:** 02/16/2023

**Attorney Name:** MICHAEL GOTTLIEB

**Firm Name:** GOTTLIEB AND GREENSPAN LLC

**Address:** 169 RAMAPO VALLEY RD STE ML3
OAKLAND NJ 07436

**Phone:** 2016440890

**Name of Party:** PLAINTIFF : NJ Pediatric Neuroscience Inst

**Name of Defendant's Primary Insurance Company**
(if known): Unknown

**Case Type:** CONTRACT/COMMERCIAL TRANSACTION

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 6 JURORS

**Is this a professional malpractice case?** NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same
transaction or occurrence)?** NO

**Does this case involve claims related to COVID-19?** NO

**Are sexual abuse claims alleged by: NJ Pediatric Neuroscience
Inst?** NO

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE**

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** YES

**If yes, is that relationship:** Business

**Does the statute governing this case provide for payment of fees by the losing party?** NO

**Use this space to alert the court to any special case characteristics that may warrant individual
management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
**If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
**If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** NO  **Title 59?** NO  **Consumer Fraud?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the
court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

02/16/2023
Dated

/s/ MICHAEL GOTTLIEB
Signed

```
MORRIS COUNTY SUPERIOR COURT
PO BOX 910
MORRISTOWN        NJ 07963


                            TRACK ASSIGNMENT NOTICE

COURT TELEPHONE NO. (862) 397-5700
COURT HOURS  8:30 AM - 4:30 PM


                    DATE:   FEBRUARY 16, 2023
                    RE:     NJ PEDIATRIC NEUROSC IENCE INS  VS UNITED HEALTHC
                    DOCKET: MRS L -000283 23


     THE ABOVE CASE HAS BEEN ASSIGNED TO:  TRACK 2.


     DISCOVERY IS   300 DAYS AND RUNS FROM THE FIRST ANSWER OR 90 DAYS
FROM SERVICE ON THE FIRST DEFENDANT, WHICHEVER COMES FIRST.


     THE PRETRIAL JUDGE ASSIGNED IS:  HON DAVID H. IRONSON


      IF YOU HAVE ANY QUESTIONS, CONTACT TEAM      001
AT:  (862) 397-5700 EXT 75351.


     IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A
 CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.
     PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE
WITH  R.4:5A-2.
                    ATTENTION:
                         ATT: MICHAEL GOTTLIEB
                         GOTTLIEB AND GREENSPAN LLC
                         169 RAMAPO VALLEY RD
                         STE ML3
                         OAKLAND         NJ 07436


ECOURTS
```



SUPERIOR COURT OF NEW JERSEY
LAW DIVISION:
MORRIS COUNTY

**Plaintiff**
NJ PEDIATRIC NEUROSCIENCE INSTITUTE

vs

**Defendant**
UNITED HEALTHCARE INSURANCE COMPANY

DOCKET NO.  MRS-L-000283-23

**AFFIDAVIT OF SERVICE**
(for use by Private Service)

Cost of Service pursuant to R4:4-30

$ _____

Person to be served:  UNITED HEALTHCARE INSURANCE
CO. C/O CT CORPORATION SYSTEM, REGISTERED AGENT
Address:
820 BEAR TAVERN ROAD
TRENTON NJ 08628

Attorney:
GOTTLIEB & GREENSPAN
169 RAMAPO VALLEY ROAD SUITE ML3
OAKLAND NJ 07436
Papers Served:
SUMMONS & COMPLAINT CIVIL CASE INFORMATION STATEMENT
TRACK ASSIGNMENT NOTICE EXHIBITS

Service Data:

Served Successfully ✓    Not Served _____   Date: 2-21-03   Time: 9:46 am   Attempts: _____

_____ Delivered a copy to him/her personally

_____ Left a copy with a competent household
member over 14 years of age residing therein at place of abode.

✓ Left a copy with a person authorized to accept
service, e.g. managing agent, registered agent, etc.

Name of Person Served and relationship/title

_Gabriella Marius_

PERSON IN CHARGE AT THE OFFICE
OF THE REGISTERED AGENT OF
THE CORPORATION.

Description of Person Accepting Service:
Age: 36  Height: 5'9  Weight: 180  Hair: Black  Sex: Female  Race: Black

Non-Served:

( ) Defendant is unknown at the address furnished by the attorney
( ) All reasonable inquiries suggest defendant moved to an undetermined address
( ) No such street in municipality
( ) No response on:_____ Date _____ Time
_____ Date _____ Time
_____ Date _____ Time
( ) Other:_____   Comments or Remarks_____

Subscribed and Sworn to me this
21st day of Feb. 2023

_____
Notary Signature

KATARZYNA AMER
Notary Public, State of New Jersey
My Commission Expires 08/03/2027

I, AZIZA AMER _____ , was at
time of service a competent adult not having a direct
interest in the litigation. I declare under penalty
of perjury that the foregoing is true and correct.

_____ 2-21-03
Signature of Process Server    Date

DGR LEGAL, INC.
1359 Littleton Road, Morris Plains, NJ 07950-3000
(973) 403-1700  Fax (973) 403-9222

Work Order No.   624589

File No.   MRS-L-000283-23

**SUMMONS**

Attorney(s) Gottlieb and Greenspan, LLC

Office Address  169 Ramapo Valley Road, Suite ML3

Town, State, Zip Code  Oakland, NJ 07436

Telephone Number  201-644-0896

Attorney(s) for Plaintiff  Michael Gottlieb

NJ PEDIATRIC NEUROSCIENCE

INSTITUTE

        Plaintiff(s)

vs.

UNITED HEALTHCARE

INSURANCE COMPANY

        Defendant(s)

**Superior Court of
New Jersey**

Morris    ▼ County

Civil       Division

Docket No: MRS-L-000283-23

**CIVIL ACTION
SUMMONS**

From The State of New Jersey To The Defendant(s) Named Above:

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov/forms/10153_deptyclerklawref.pdf.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov/forms/10153_deptyclerklawref.pdf.

*Michelle M. Smith*

Clerk of the Superior Court

DATED:  02/17/2023

Name of Defendant to Be Served:  United Healthcare Insurance Co./CT Corporation System

Address of Defendant to Be Served:  820 Bear Tavern Road, West Trenton, NJ 08628

Revised 11/17/2014, CN 10792-English (Appendix XII-A)

**GOTTLIEB AND GREENSPAN, LLC**
**Michael Gottlieb, Esq. (NJ Attorney ID No.: 07592-2013)**
**169 Ramapo Valley Road, Suite ML3**
**Oakland, NJ 07436**
**Phone Number: (201) 644-0896**
**Fax Number: (201) 465-3065**
*Attorneys for Plaintiff, NJ Pediatric Neuroscience Institute*

| | |
|---|---|
| NJ PEDIATRIC NEUROSCIENCE INSTITUTE,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED HEALTHCARE INSURANCE COMPANY and MULTIPLAN, INC.,<br><br>    Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION:<br>MORRIS COUNTY<br><br>DOCKET NO.: MRS-L-000283-23<br><br>CIVIL ACTION<br><br>**AMENDED COMPLAINT** |

Plaintiff NJ Pediatric Neuroscience Institute ("Plaintiff"), by and through its attorneys, Gottlieb and Greenspan, LLC, by way of Amended Complaint against Defendant United Healthcare Insurance Company ("Defendant United") and Defendant Multiplan, Inc. ("Defendant MultiPlan") (collectively, "Defendants"), alleges as follows:

## THE PARTIES

1.      Plaintiff is a New Jersey based medical practice with a principal place of business at 131 Madison Ave, Morristown, NJ 07960.

2.      Upon information and belief, Defendant United is engaged in administering healthcare plans or policies in the State of New Jersey.

3.      Upon information and belief, Defendant Multiplan is a medical provider network that, among other things, furnishes contracts that establish payment rates between its insurance company clients and out-of-network medical providers.

## FACTUAL BACKGROUND

4.      Plaintiff is a medical practice comprised of physicians that specialize in the surgical treatment of patients with neurological deficits.

5.      On January 4, 2012, Plaintiff entered into an agreement (henceforth referred to as, "the Agreement") with Defendant Multiplan. (*See*, **Exhibit A**, attached hereto.)

6.      Under the terms of the Agreement, Defendant Multiplan agreed that it had entered into agreements with its clients requiring its clients to use the contract rates of the Agreement for covered services rendered to applicable participants. *Id.*

7.      At all relevant times, Defendant United was a client of Defendant Multiplan thus implicating the Agreement.

8.      The contract rate set forth in the Agreement was 80% of Plaintiff's billed charges. *Id.*

9.      However, as will be discussed further, on numerous occasions, Defendants failed to abide by the terms of the Agreement by paying less than 80% of Plaintiff's billed charges even though the Agreement was applicable.

10.     Specifically, on January 4, 2017, two of Plaintiff's physicians performed an emergency surgical procedure, known as a craniectomy, on Kyle H. ("Patient 1"), who was hit in the head at school and developed a skull bone fracture. (*See*, **Exhibit B**, attached hereto.)

11.     The treatment, like all the medical treatment at issue in this matter, took place in Morristown Memorial Hospital, located in Morristown, New Jersey.

12.     At the time of his treatment, Patient 1 was the beneficiary of a health insurance plan administered by Defendant United.

13.     The services rendered to Patient 1 implicated the parties' agreement, and, as a result, Defendants were contractually obligated to pay Plaintiff 80% of its billed charges in connection with the services rendered to Patient 1.

14.     After treating Patient 1, Plaintiff submitted two Health Insurance Claim Form ("HCFA") medical bills to Defendant United, one reflecting the services performed by the primary surgeon, and one reflecting the services performed by the assistant surgeon.

15.     Each of the two HCFAs reflected billed charges in the amount of $106,691.00.

16.     However, the second HCFA denoted modifier AS, indicating that the charges reflected services performed by an assistant surgeon. (*See*, **Exhibit C**, attached hereto.)

17.     Per industry protocols, a HCFA with an AS modifier indicates that the true charges for the services are 16% of the amount reflected in the HCFA. Thus, the true charges for the second HCFA were $17,070.56.

18.     Therefore, under the parties' Agreement, Defendant United should have issued reimbursement to Plaintiff in the amount of $13,656.45.

19.     However, Defendant United issued reimbursement for the assistant surgeon services in the total amount of $535.28. (*See*, **Exhibit D**, attached hereto.)

20.     Accordingly, Defendant United underpaid Plaintiff for the assistant surgeon services rendered on January 4, 2017 by $13,121.17.

21.     On February 14, 2017, Plaintiff's physicians performed a subsequent procedure on Patient 1 due to post-surgical fluid that reaccumulated in the affected area. (*See*, **Exhibit E**, attached hereto.)

22.      Thereafter, Plaintiff again submitted two HCFA medical bills to Defendant United, one reflecting the services performed by the primary surgeon, and one reflecting the services performed by the assistant surgeon. (*See*, **Exhibit F**, attached hereto.)

23.      Each of the two HCFAs reflected billed charges in the amount of $53,867.00.

24.      With respect to the HCFA reflecting the primary surgical services, Defendant United should have reimbursed Plaintiff its contract rate of 80% of billed charges for a total of $43,093.60.

25.      However, Defendant United "allowed" payment in the total amount of $15,178.00. (*See*, **Exhibit G**, attached hereto.)

26.      Thus, Defendant United underpaid Plaintiff for the primary surgical services rendered on February 14, 2017 by a total of $27,915.60.

27.      With respect to the assistant surgeon charges, Defendant United should have reimbursed Plaintiff a total of $6,894.98, after applying the contract rate to the 16% assistant surgeon protocol.

28.      However, Defendant United's "allowed" payment for the assistant surgeon services totaled $3,475.28. (*See*, **Exhibit H**, attached hereto.)

29.      Thus, Defendant United underpaid Plaintiff for the assistant surgeon services rendered on February 14, 2017 in the total amount of $3,419.70.

30.      In total, Defendant United underpaid Plaintiff for the services rendered to Patient 1 by **$44,456.47**.

31.     On June 12, 2018, one of Plaintiff's physicians performed an emergency cerebral angiogram on Connor N. ("Patient 2"), a ten-year old boy who had suffered a brain hemorrhage. (*See*, **Exhibit I**, attached hereto.)

32.     At the time of her treatment, Patient 2 was the beneficiary of an employer-based health insurance plan for which Defendant United served as claims administrator.

33.     After treating Patient 2, Plaintiff submitted a HCFA medical bill to Defendant United seeking payment in the amount of $40,000.00. (*See*, **Exhibit J**, attached hereto.)

34.     Therefore, under the parties' Agreement, Defendant United should have issued reimbursement to Plaintiff in the amount of $32,000.00.

35.     However, for reasons that remain unclear to Plaintiff, Defendant United failed to issue any reimbursement to Plaintiff for the emergency services rendered to Patient 2. (*See*, **Exhibit K**, attached hereto.)

36.     Thus, **$32,000.00** remains outstanding with respect to Plaintiff's treatment of Patient 2.

37.     On or around August 31, 2018, Plaintiff's physicians performed spinal surgery on Ethan R. ("Patient 3"), a 12-year-old boy suffering from scoliosis, among other things. (*See*, **Exhibit L**, attached hereto.)

38.     At the time of his treatment, Patient 3 was the beneficiary of an employer-based health insurance plan for which Defendant United served as claims administrator.

39.     Plaintiff subsequently submitted a HCFA medical bill to Defendant United for the medical treatment performed on Patient 3 seeking payment in the amount of $71,401.00. (*See*, **Exhibit M**, attached hereto.)

40.     Therefore, under the parties' Agreement, Defendant United should have issued reimbursement to Plaintiff in the amount of $57,120.80.

41.     However, Defendant United "allowed" reimbursement to Plaintiff in the total amount of $20,053.00. (*See*, **Exhibit N**, attached hereto.)

42.     Thus, Defendants underpaid Plaintiff for Plaintiff's treatment of Patient 3 by the total amount of **$37,067.00**.

43.     For each and every claim, Plaintiff submitted multiple internal appeals challenging Defendants' reimbursement as improper under the terms of the parties' Agreement.

44.     However, Defendants' failed to issue any additional payment in response to Plaintiff's appeals.

45.     As a result, Plaintiff has been damaged in the amount of $113,523.80.

46.     Plaintiff therefore seeks redress of the unpaid balance due under the parties' Agreement.

## COUNT I

### BREACH OF CONTRACT

47.     Plaintiff repeats, realleges and reaffirms each of the preceding allegations contained in paragraphs 1 through 46 of this Amended Complaint with the same force and effect as though fully set forth herein.

48.     The Agreement is a valid and binding contract between Plaintiff and Defendants.

45.     Defendants breached the agreement by failing to pay Plaintiff the amount due and owing thereunder.

46.     Plaintiff has repeatedly demanded that Defendants abide by the terms of

6

the Agreement and pay Plaintiff the amount due and owing thereunder.

47.    However, Defendants refused and failed to satisfy their obligations pursuant thereto.

48.    As a result, Plaintiff has been damaged in the amount of $113,523.80, representing the balance due under the Agreement.


**WHEREFORE,** Plaintiff, NJ Pediatric Neuroscience Institute, demands:

1.    On the first cause of action against Defendants in the sum of $113,523.80, together with interest thereon at the legal rate;

2.    Costs and disbursements of the instant action, and;

3.    Such other, further and different relief as this court may deem just, proper and equitable.


GOTTLIEB AND GREENSPAN, LLC
Attorneys for Plaintiff, *NJ Pediatric Neuroscience Institute*

By:    _____
Michael Gottlieb
169 Ramapo Valley Road, Suite ML3
Oakland, New Jersey 07436
(201) 644-0896


Dated: March 21, 2023

## DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:25-4, Michael Gottlieb, Esq. is hereby designated as trial counsel in the above captioned litigation on behalf of the firm of Gottlieb and Greenspan, LLC.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

## CERTIFICATION PURSUANT TO RULE 1:38-7(b)

I certify that confidential personal identifiers have been redacted from documents now submitted to the court and will be redacted from all documents submitted in the future.

## CERTIFICATION PURSUANT TO RULE 4:5-1

The matter in controversy is not the subject of any other action pending in any other Court. There are no pending arbitration proceedings. No other action or arbitration proceedings are contemplated. No non-party is known who would be subject to joinder because of potential liability.

GOTTLIEB AND GREENSPAN, LLC
Attorneys for Plaintiff, *NJ Pediatric Neuroscience Institute*

By: _____
Michael Gottlieb
169 Ramapo Valley Road, Suite ML3
Oakland, New Jersey 07436
(201) 644-0896

Dated: March 21, 2023

8

# EXHIBIT A

## MPI PARTICIPATING PROFESSIONAL GROUP AGREEMENT

This Agreement, which is effective as of <u>September 15, 2012</u> (the "Effective Date"), is entered into by and between MultiPlan, Inc., on behalf of itself and its subsidiaries ("MPI"), *and New Jersey Pediatric Neurosurgical Associates, a partnership,* professional service corporation, limited liability company or other legally constituted entity of licensed, registered, or certified health care professionals organized to provide health care services ("Group").

In consideration of the promises and the mutual covenants and undertakings set forth in this Agreement, receipt and sufficiency of which is hereby acknowledged, the parties have executed this Agreement through their duly authorized representatives.

| Group: New Jersey Pediatric Neurosurgical Associates | MultiPlan, Inc. (on behalf of itself and its subsidiaries): |
|---|---|
| Signature: *Catherine Mazzola MD* | Signature: |
| Print Name: *Catherine Mazzola MD* | Print Name: Michael Ferrante |
| Title: President & CEO | Title: Executive Vice president & COO |
| Date: 9-7-2012 | Date: 10-4-2012 |
| Tax I.D. #: 20-2518910 | |
| National Provider Identifier (NPI): 1558503672 | |

I.  **DEFINITIONS.** For purposes of this Agreement:

1.1  <u>Benefit Program Maximum</u> means an instance in which the cumulative payment by a User has met or exceeded the annual or lifetime benefit maximum (e.g., dollar amount or service count) for a particular type of Covered Service rendered to a Participant in accordance with the terms of the Participant's Benefit Program.

1.2  <u>Billed Charges</u> means the fees for a specified health care service or treatment routinely charged by Group regardless of payment source.

1.3  <u>Clean Claim</u> means a completed HCFA 1500 (or successor form), as appropriate, or other standard billing format containing all information reasonably required by the Client for adjudication.

1.4  <u>Client</u> means an insurance company, employer health plan, Taft-Hartley Fund, or an organization that sponsors Program(s), administers Program(s) on behalf of a User or otherwise provides services to a User regarding such Programs.

1.5  <u>Co-insurance</u> means an amount that the Participant is responsible for paying in accordance with the terms of the Participant's Benefit Program other than a Co-payment or Deductible.

1.6  <u>Contract Rates</u> means the rates of reimbursement to Group for Covered Services, as set forth in Exhibit D. Additional Contract Rate terms, if any, are also set forth in Exhibit D.

1.7  <u>Co-payment</u> means an expressed dollar amount for a given Covered Service, which is required to be paid by the Participant typically at the time of service under the terms of the Participant's Benefit Program.

1.8  <u>Covered Services</u> means health care treatment and supplies rendered by a Network Provider and provided to a Participant for which a User is responsible for payment pursuant to the terms of a Program.

1.9  <u>Deductible</u> means the amount a Participant is required to pay in accordance with the Participant's Benefit Program before a claim for benefits by the Participant is eligible for reimbursement by a User.

1.10  <u>Network</u> means an arrangement of Network Providers created or maintained by MPI, or one of its subsidiaries, under which such Network Providers have agreed to accept certain Contract Rates for Covered Services provided to Participants.

1.11  <u>Network Provider(s)</u> means a licensed facility or licensed, registered, or certified health care professional that agrees to provide health care services to Participants and has been independently contracted for participation in the Network. Network Providers may be referred to in this Agreement and in the administrative handbook(s) individually as "Network Facility" and "Network Professional" respectively.

1.12 <u>Participant</u> means any individual and/or dependent eligible under a Client's Program that provides access to the Network.

1.13 <u>Participating Professional</u> means a licensed, registered, or certified health care professional (i) who is an employee, member or partner of, or has contracted with, Group; (ii) who MPI has determined, in its sole discretion, satisfies the applicable credentialing criteria; and (iii) is bound to provide Covered Services to Participants within the scope of his or her applicable license, registration, certification, and privileges, and pursuant to this Agreement.

1.14 <u>Program</u>. Unless otherwise specified, the term Benefit Program and *ValuePoint* Program shall be referred to collectively as "Program".

   (a) <u>Benefit Program</u> means any contract, insurance policy, workers' compensation plan, auto medical plan, government program, health benefit plan or other plan or program under which Participants are eligible for benefits.

   (b) <u>*ValuePoint* Program or Discount Card Program</u> means a non-insured business arrangement under which, in exchange for a fee or other consideration paid by Participant directly to Client, and upon presentation of an identification card bearing the *ValuePoint* logo or other MPI authorized name and/or logo, a Participant has the right to reimburse Network Providers directly at the Contract Rate as payment in full for health care services rendered.

1.15 <u>User</u> means any corporation, partnership, labor union, association, program, employer or any other entity responsible for the payment of Covered Services, entitled to access to the Contract Rate under this Agreement. Client may also be a User. For purposes of the *ValuePoint* Program or Discount Card Program, User shall mean an individual.

## II. TERM AND TERMINATION

2.1 <u>Effective Date; Term</u>. This Agreement will become effective on the Effective Date and will continue in effect for a period of one (1) year ("Initial Term"). Unless otherwise terminated as specified in this Agreement, this Agreement shall renew automatically for consecutive one (1) year terms ("Renewal Term") on each anniversary of the Effective Date ("Renewal Date").

2.2 <u>Discretionary Termination</u>. After the expiration of the Initial Term, this Agreement may be terminated in the sole discretion of either party, by the provision of written notice at least one hundred and eighty (180) days prior to the Renewal Date, such termination to be effective on the Renewal Date.

2.3 <u>Termination for Material Breach</u>.

   (a) This Agreement may be terminated by MPI upon written notice to Group if (i) any action is taken which requires Group to provide MPI with notice under Section 3.8; (ii) in the sole discretion of MPI, Group or any Participating Professional fails to comply with the quality management and/or credentialing/recredentialing program(s) specified in the administrative handbook(s); or (iii) Group or any Participating Professional fails to comply with any applicable state and/or federal law related to the delivery of health care services.

   (b) In the event that one party commits a material breach of this Agreement (the "Breaching Party") other than those specified in Section 2.3(a), this Agreement will terminate upon the provision of at least thirty (30) days written notice to the Breaching Party specifying the material breach. The Breaching Party may cure the breach within such thirty (30) day period, provided however, that failure to cure said breach will result in termination as of the date specified in the notice.

2.4 <u>Network Participation Termination</u>. Either party may terminate this Agreement as to any of the Networks in which Group participates by the provision of at least ninety (90) days prior written notice to the other party. Termination of a Network will not terminate this Agreement as to any other Networks in which Group participates.

2.5 <u>Selection and Termination of Participating Professionals</u>.

   (a) MPI, in its sole discretion, will designate those health care professionals who satisfy the credentialing criteria of MPI as Participating Professionals. MPI reserves the right to re-credential any Participating Professional.

   (b) MPI, in its sole discretion, may terminate any Participating Professional upon at least ninety (90) days written notice.

   (c) In addition to the termination of a Participating Professional as specified in Section 2.5(b), MPI may terminate the participation of any Participating Professional under this Agreement upon written notice to the Participating Professional if Participating Professional (i) engages in any action that requires Group to provide notice to MPI under Section 3.8 with respect to such Participating Professional; (ii) fails to comply with the quality management and/or credentialing/recredentialing program(s) specified in the administrative handbook(s), in the sole discretion of MPI; (iii) ceases to be an employee, member, partner, or contractor of Group; (iv) fails to comply with any

applicable state and/or federal laws related to the delivery of health care services; or (v) fails to comply with any other terms of this Agreement.

(d) Group will provide at least ninety (90) days prior written notice to MPI in the event that any Participating Professional voluntarily disenrolls from the Group and/or from the Network.

(e) Participating Professional may appeal the termination of such Participating Professional by submitting a written request for appeal to MPI within thirty (30) days of the date of the notice of termination in accordance with the then current MPI appeal procedure.

2.6 Appeal of Termination. Group may appeal the termination of this Agreement by MPI by submitting a written request for appeal to MPI within thirty (30) days of the date of the notice of termination in accordance with the then current MPI appeal procedure.

2.7 Effect of Termination; Continuing Obligations.

(a) Upon the termination of this Agreement by either party for any reason, all rights and obligations hereunder shall cease, except (i) those rights and obligations provided in Article VII and Article VIII; and (ii) those rights, obligations, and liabilities incurred prior to the date of termination.

(b) Upon termination of this Agreement for any reason, termination of any Network in which Group participates, or the termination of an individual Participating Professional's status as a Participating Professional under the terms of this Agreement, Group and/or Participating Professional will:

(i) continue to provide health care services to Participants who are receiving treatment on the effective date of termination (1) until the course of treatment is completed; (2) for a period of ninety (90) days or through the current period of active treatment for those Participants undergoing active treatment for a chronic or acute medical condition, whichever time period is shorter; (3) throughout the second and third trimester of pregnancy and/or through postpartum care, if requested by the Participant; or (4) until Group or Participating Professional makes reasonable and medically appropriate arrangements to transfer the Participant to the care of another provider, making such transfer to a Network Provider whenever appropriate (except as specified in subsections (2) and (3) herein);

(ii) accept payment made pursuant to Article V, as payment in full, for Covered Services rendered in accordance with this Section; and

(iii) inform Participants seeking health care services that Group and/or Participating Professional is no longer a Network Provider.

## III.   RIGHTS AND OBLIGATIONS OF GROUP

3.1 Binding Authority. Group represents that it has been granted the authority in writing to enter into this Agreement and to bind all Participating Professionals to the terms of this Agreement.

3.2 Provision of Health Care Services. Group and each Participating Professional will render medical and health care services in a manner which assures availability, adequacy, and continuity of care to Participants. Group and each Participating Professional will remain solely responsible for the quality of health care services provided by Group and each Participating Professional to Participants, and will ensure such services are rendered in accordance with generally accepted medical practice and professionally recognized standards. Nothing contained herein will grant MPI or Client the right to govern the level of care of a patient. Utilization management decisions will only affect reimbursement of Group for services rendered and will not limit the performance of the services of Group and each Participating Professional or affect professional judgment.

3.3 Non-Discrimination. Neither Group nor any Participating Professional will differentiate or discriminate against Participants in the provision of health care services, and will render such health care services to all Participants in the same manner, in accordance with the same standards, and with the same availability as offered to Group's or Participating Professional's other patients.

3.4 Access. Group and each Participating Professional will use reasonable efforts to accept all Participants for treatment in accordance with all terms and conditions of this Agreement. Group will ensure that medical and health care services are available to Participants 24 hours a day, 7 days a week. Group will provide at least ninety (90) days prior written notice to MPI whenever Group or any Participating Professional (i) closes or limits their respective practice; and (ii) re-opens or removes any limitation on a closed or limited practice.

3.5 <u>Licenses, Certifications and Accreditations</u>. Group and each Participating Professional: (i) possesses, and will maintain in good standing, all licenses, registrations, certifications, and accreditations required by law to render health care services in the state in which Covered Services are rendered; and (ii) will comply with any applicable local, state and/or federal laws or regulations related to the delivery of health care services.

3.6 <u>Medical and Billing Records</u>.

  (a) Group will prepare and maintain, and cause each Participating Professional to prepare and maintain, as appropriate, pertinent medical and billing information and records for each Participant ("Medical and Billing Records") in accordance with generally accepted medical, accounting, and bookkeeping practices and will maintain such Medical and Billing Records for at least seven years following the furnishing of health care services to Participants.

  (b) Subject to any applicable legal restrictions and upon request by MPI and/or Client, Group or Participating Professional will promptly provide copies of the Medical and Billing Records to MPI and/or Client, for those purposes which MPI and/or Client deem reasonably necessary, including without limitation, quality assurance, medical audit, credentialing or recredentialing, payment adjudication and processing.

  (c) Group and each Participating Professional will comply with all state and federal laws and the requirements specified in the administrative handbook(s) pertaining to the confidentiality of Medical and Billing Records, and will keep confidential, and take all precautions to prevent the unauthorized disclosure of any and all Medical and Billing Records.

3.7 <u>On-Site Review</u>. Subject to any applicable legal restrictions, and upon at least ten (10) days prior written notice, Group will permit and arrange for MPI and/or Client to conduct an on-site review to validate compliance with the terms of this Agreement by Group and each Participating Professional. Such on-site reviews shall not unreasonably interfere with Group's business and will be conducted during normal business hours.

3.8 <u>Notice of Actions</u>. Group will send written notice to MPI within ten (10) days of the following actions against Group, Participating Professional, or any agent and/or employee thereof, even if such action is being appealed: (i) any active investigation by a governmental agency; (ii) any final legal action; (iii) any final action by a regulatory or accrediting entity; (iv) a reduction in, or cancellation of general and/or professional liability insurance; or (v) final action of insolvency. Any notice required pursuant to this Section will be provided in accordance with the notice requirements specified in Section 9.9 of this Agreement, except that the address and agent to receive notice shall be as follows: Credentialing Coordinator to the Medical Director, MultiPlan, Inc., 1100 Winter Street, Waltham MA 02451.

3.9 <u>Network Participation and Requirements</u>. MPI may, in its sole discretion, include Group and each Participating Professional as a Network Provider in any or all Network(s). Group and each Participating Professional acknowledge that certain Programs offered by Clients accessing the Network (i) may not include a network option; or (ii) may cover Covered Services under the Participant's Program at an in-Network or out-of-Network benefit level. Group and each Participating Professional will comply with any Network specific requirements contained in Exhibit B and/or the administrative handbook(s).

3.10 <u>Utilization Management</u>. Group and each Participating Professional will participate in and observe the protocols of Client's utilization management program, to the extent such program is consistent with industry standards.

3.11 <u>Administrative Handbook(s)</u>. Group and each Participating Professional will comply with the terms of the administrative handbook(s), including, without limitation, observing the protocols of the quality management and credentialing/recredentialing program(s). MPI may, in its sole discretion, modify the administrative handbook(s) from time to time and post such modifications to the MPI website. Group and each Participating Professional will periodically review the administrative handbook(s) on the MPI website for updates.

3.12 <u>Open Communication</u>. Neither Group nor any Participating Professional will be prohibited from, or penalized by Client and/or MPI for communicating with patients regarding the appropriate treatment alternatives available to the patient, regardless of benefit coverage limitations. In addition, neither Client nor MPI will penalize Group or any Participating Professional if Group or Participating Professional, in good faith, reports to state or federal authorities any act or practice by the Client and/or MPI that jeopardizes a patient's health or welfare.

3.13 <u>Exchange of Provider Professional Data</u>.

  (a) Group will submit to MPI such information as MPI may reasonably request (i) to verify the credentials of each professional employee, member, partner, or contractor of Group applying for participation in the Network ("Applicant"), and re-credential each Participating Professional; (ii) for the purpose of complaint resolution; (iii) for the purpose of utilization management; and (iv) for provider listings.

(b) Subject to applicable state and federal laws governing the confidentiality of peer review proceedings, Group and each Applicant and Participating Professional hereby consent to MPI permitting the inspection by Clients, or independent credentialing or accreditation entities, and their respective officers, directors, employees, medical directors, agents and representatives, of the contents of their respective application, credentialing file, the credentialing decisions of MPI with respect to such Applicant or Participating Professional, and all documents that may be material to an evaluation of the qualifications and competence of the Applicant or Participating Professional.

(c) Group will indemnify and hold MPI and its respective directors, officers, agents, employees and representatives, harmless from any and all liability, loss, damage, claim or expense of any kind, including costs and reasonable attorneys' fees, which result from any act or omission by Group or any Participating Professional concerning its representations, duties, and obligations under this Section 3.13.

3.14   Maintenance of Practice Information.

(a) Group will provide to MPI each practice location and tax identification number utilized by Group and will promptly inform MPI of (i) any change in the ownership of Group; (ii) the addition of a professional employee, member, partner, or contractor to Group; (iii) the departure of any Participating Professional from the Group; (iv) the refusal of any Participating Professional to continue to be a Participating Professional; and (v) any change in practice locations, telephone numbers, billing address or tax identification number. Failure to provide each practice location and tax identification number may result in a delay or error in the payment of claims for Covered Services rendered to Participants.

(b) All sites at which Participating Professionals practice that are affiliated with Group shall be considered in-Network sites under this Agreement. If a Participating Professional also practices independently of the Group and has not contracted with MPI directly with respect to that independent site, services rendered by Participating Professional at that site shall be considered out-of-Network sites. Participating Professional shall use different tax identification numbers to distinguish between in-Network and out-of-Network sites.

3.15   Subcontracting.   In the event that Group delegates or subcontracts any of its rights, duties or obligations under this Agreement, Group shall ensure that any such subcontracted arrangement will be subject to the terms of this Agreement, including but not limited to the credentialing requirements specified in this Agreement.

## IV.   RIGHTS AND OBLIGATIONS OF MPI

4.1   Limitations.   MPI's duties are limited to those specifically set forth herein. MPI does not determine benefits eligibility or availability for Participants and does not exercise any discretion or control as to Program assets, with respect to policy, payment, interpretation, practices, or procedures. MPI is not the administrator, insurer, underwriter, or guarantor of Programs, and MPI is not liable for the payment of services under Programs.

4.2   Licenses, Registrations, and Certifications.   MPI will comply with all laws and regulations governing its performance under this Agreement, including, but not limited to, obtaining and maintaining in effect all applicable licenses, registrations, and certifications necessary for that purpose.

4.3   Client Agreements.   MPI agrees that it has entered into agreements with Clients that specify that the right to access the Network, including access to the Contract Rates, shall be subject to the terms of this Agreement.

4.4   Client Listing.   MPI will post to the MPI website a list of the Clients that have purchased the Network ("Client Listing").

4.5   Identification.   MPI will require Clients to furnish Participants with a means of identifying themselves to Group as covered under a Program with access to the Network, such as (i) an MPI phone number identifier; (ii) written notification by Client of MPI affiliation at time of identification card; (iii) an MPI authorized name and/or logo on an benefits verification; (iv) an MPI authorized name and/or logo on the Explanation of Benefits; or (v) other means acceptable to MPI and Group.

4.6   Direction.   MPI will require Clients to provide a mechanism encouraging direction to Network Providers, which may include, but is not limited to, the availability of Network Provider listings or financial incentives that provide Participants or Users with savings when health care services are obtained from Network Providers.

4.7   Use of Contract Rates.   MPI will require Clients and its Users to use the Contract Rates agreed to in this Agreement solely for Covered Services rendered to Participants covered under a Program which utilizes the Network.

## V.    PAYMENT AND BILLING

5.1    <u>Submission of Claims</u>.  Group will submit claims for payment within ninety (90) days of furnishing health care services at Group's Billed Charges for such health care services.  Claims received after this time period may be denied for payment by Client or User, and Group shall not bill Client, User, MPI or Participant for such denied claims.  Group will follow the claims submission procedures contained in the administrative handbook(s).  A Clean Claim shall be deemed to have been received by the Client:  (i) on the date that such Clean Claim is transmitted to the Client if transmitted by electronic means; or (ii) five (5) calendar days following the deposit of such Clean Claim in the U.S. Mail, first class postage prepaid and addressed to the Client at such address set forth on the Participant's identification card.  Upon request, Group shall furnish to Client or MPI, all information reasonably required to verify the health care services provided by Group and the charges for such services.

5.2    <u>Payment for Covered Services</u>.

(a)    Except as set forth in Section 5.3 and 5.4(b) herein, for those Clients subject to state or federal law with regard to timely payment of claims, Client shall pay or arrange for User to pay Group the Contract Rate for Covered Services per the requirements of such state or federal law, and shall be subject to any interest and/or penalties under such law.

(b)    Except as set forth in Section 5.3 and 5.4(b) herein, for those Clients that are not subject to the state or federal law with regard to timely payment of claims, Client will pay or arrange for User to pay Group the Contract Rate for Covered Services within thirty (30) business days of receipt of a Clean Claim and in accordance with the terms of this Agreement.  In the event that a Clean Claim is not paid within thirty (30) business days from the date of receipt of such Clean Claim, Group has the right not to honor the Contract Rate.  A Clean Claim shall be deemed to have been paid by the Client:  (i) on the date that payment is transmitted to the Group if transmitted by electronic means; or (ii) on the date payment is deposited by Client or User in the U.S. Mail, first class and postage prepaid, addressed to Group.

(c)    Any payments due by Client under this Agreement shall be reduced by any applicable Co-payments, Deductibles, and/or Co-insurance, if any, specified in the Participant's Benefit Program and/or any service for which the Participant's Benefit Program does not provide coverage.  Payment by Client or User shall be subject to Exhibit D, the administrative handbook(s), and industry standard coding and bundling rules, if any.

5.3    <u>Disputed Claims</u>.

(a)    <u>Pre Payment Disputed Claims</u>.  Client shall have the right, within thirty (30) business days of Client's receipt of a claim and prior to payment of said claim, to provide Group with written notification that a claim is not a Clean Claim containing all complete and accurate information required for adjudication or if Client has some other stated dispute with the claim. Client shall pay or arrange for User to pay Group at the Contract Rate(s) for Covered Services for all portions of the claim not in dispute.  Group shall provide the complete and accurate information requested within thirty (30) business days of Client's request, and Client shall pay or arrange for User to pay for Covered Services within thirty (30) business days of receipt of the additional and/or corrected information.

(b)    <u>Post Payment Disputed Claims</u>.  Group may challenge payment to Group within one hundred and eighty (180) days following Group's receipt of such payment from Client, otherwise such payment shall be deemed final.

(c)    <u>Claims Dispute Resolution; Client</u>. Any disputes that may arise under this Agreement related to the payment of a claim by Client or User shall be referred directly to the respective Client or User for resolution.

5.4    <u>Billing of Participants</u>.

(a)    Group will bill or collect from a Participant all Co-payments, if any, as specified in the Participant's Benefit Program for Covered Services.  Following the receipt of an explanation of benefits form from Client, Group will bill or collect from a Participant: (i) the Deductible or Co-insurance, if any, as specified in the Participant's Benefit Program; (ii) payment for health care services or supplies at the Contract Rate once the Participant has reached the Benefit Program Maximum, if applicable, and/or (iii) payment for services, other than Covered Services, for which the Participant's Benefit Program does not provide coverage.

(b)    *ValuePoint* Program Participants and Discount Card Program Participants shall be responsible for payment of the Contract Rates directly to Group.

(c)    Except as specified in Sections 5.4(a) and (b), neither Group nor any Participating Professional will bill or require any Participant to tender any payment with respect to Covered Services.  Furthermore, neither Group nor any Participating Professional will bill or collect from the Participant (i) the difference between the Contract Rate agreed to in this Agreement and the Group's Billed Charges, or (ii) for any amounts not paid to Group due to Group's failure to file a timely claim or appeal, or due to the application of claim coding and bundling rules.

5.5 <u>Coordination of Benefits</u>. Except as otherwise required by the Participant's Program, if Client is other than primary under the coordination of benefits rules, Group will accept from Client as payment in full for Covered Services, the amount of the Participant's out-of-pocket costs under the primary plan (i.e., Co-payment, Deductible, and/or Co-insurance, if any) to the extent applicable under the Participant's Program. Group will cooperate fully with MPI and/or Client in providing information related to proper coordination of benefits.

## VI. LIABILITY INSURANCE

6.1 <u>Group Insurance</u>. Group will maintain: (i) professional liability insurance at minimum levels of at least $1,000,000 per occurrence and $3,000,000 in the aggregate; and (ii) comprehensive general liability insurance at minimum levels of at least $1,000,000 per occurrence and $2,000,000 in the aggregate. If the form of insurance described above is "claims made," appropriate tail coverage shall be purchased to insure against claims made after the expiration of such insurance relating to acts or omissions occurring during the term of this Agreement.

6.2 <u>Participating Professional Insurance</u>. Group will maintain, or ensure that each Participating Professional maintains: (i) professional liability insurance at minimum levels of $1,000,000 per occurrence and $3,000,000 in the aggregate for each individual Participating Professional; and (ii) comprehensive general liability insurance at minimum levels of at least $1,000,000 per occurrence and $2,000,000 in the aggregate to cover each individual Participating Professional. If the form of insurance described above is "claims made," appropriate tail coverage shall be purchased to insure against claims made after the expiration of such insurance relating to acts or omissions occurring during the term of this Agreement.

## VII. CONFIDENTIAL INFORMATION; TRADEMARKS; ADVERTISING AND PUBLICITY

7.1 <u>Confidential Information</u>. All information and materials provided by MPI or Client to Group or any Participating Professional will remain proprietary to MPI or Client respectively. Neither Group nor any Participating Professional will disclose any of such information or materials or use them except as may be required to carry out its respective obligations under this Agreement.

7.2 <u>Trademarks, Advertising and Publicity</u>. Except as set forth herein, MPI, Clients, and Group or Participating Professional will not use the other's name, symbols, trademarks, or service marks, presently existing or later established, in advertising or promotional materials or otherwise without their prior written consent and will cease any such usage immediately upon written notice or upon termination of this Agreement, whichever is sooner. MPI and/or Client may use the name of Group or Participating Professional as MPI and/or Client may deem reasonably necessary in carrying out the terms of this Agreement, including but not limited to, (i) the distribution of an announcement by MPI and/or Client to the media that Group or Participating Professional participates in the Network, and (ii) the creation and/or distribution of provider directories and other promotional materials.

## VIII. RESOLUTION OF DISPUTES BETWEEN THE PARTIES

8.1 <u>Dispute Resolution</u>. In the event that Group has a question or grievance regarding its rights or obligations under this Agreement or cannot resolve a dispute with a Client as specified in Section 5.3 herein, Group shall either:

(a) Call MPI's Service Operations Department, or

(b) Provide MPI with written notice specifying the nature of the dispute. Such notice to MPI shall be in writing and delivered by certified mail/return receipt requested, or by overnight delivery, to:

> MultiPlan, Inc.
> Service Operations Department
> 1100 Winter Street
> Waltham, MA 02451

Within thirty (30) days of receipt of such notice, the parties will assign the appropriate level of management and staff members who will initiate discussions to seek resolution of the dispute, consistent with the terms of this Agreement. If the parties are unable to reach resolution within the initial thirty (30) day period, then designees of senior management from each party will have an additional thirty (30) days to resolve the dispute. This time period may be extended by mutual agreement of the parties. The parties, as mutually agreed, may include a mediator in such discussions. Neither party shall institute any legal action or proceeding until expiration of such agreed upon time periods.

## IX.   GENERAL PROVISIONS

9.1   <u>Entire Agreement; Captions</u>. This Agreement, together with all Exhibits attached hereto, constitutes the entire agreement between Group and MPI, and will supersede any prior oral or written agreements between the parties. The captions contained in this Agreement are for the convenience of the reader only, and will not be used in the interpretation of this Agreement.

9.2   <u>Amendments</u>. Group, Participating Professional, and MPI will comply with any and all of the amendments contained in Exhibit A. Unless otherwise required by this Agreement, this Agreement may be modified or amended as follows:

(a)   upon at least thirty (30) days prior written notice from MPI to Group. Such amendment by MPI shall be effective as of the effective date specified in the notice ("Amendment Effective Date") unless Group gives written notice to MPI, within fifteen (15) days from the receipt of such notice, rejecting the proposed amendment. If Group rejects the proposed amendment, this Agreement will terminate on the Amendment Effective Date.

(b)   upon written agreement executed by both parties.

9.3   <u>Governing Law; Severability; Venue; Waiver</u>. This Agreement shall be construed and governed in accordance with Federal laws and regulations, as well as the laws of the state in which health care services are rendered hereunder. The finding by a court of competent jurisdiction that any provision herein is void shall not void any other valid provision of this Agreement. Venue of any dispute litigated between the parties shall be in Federal court in the state and county of residence of the defendant. Waiver of breach of any provision of this Agreement will not be deemed a waiver of any other breach of the same or a different provision.

9.4   <u>Coordinating Provisions-State/Federal Laws and Accreditation Standards</u>. This Agreement is subject to any requirements or prohibitions of relevant state and federal laws and regulations. Each party shall comply with all applicable state and federal statutes and regulations relating to this Agreement. In addition, Group, Participating Professional, and MPI will comply with the following information contained in Exhibit C: (i) coordinating provisions-State/Federal laws; (ii) national accreditation standards, including without limitation, the National Committee for Quality Assurance ("NCQA") and URAC; and/or (iii) geographic exceptions approved by MPI.

9.5   <u>Assignment</u>. No assignment of this Agreement will be made by any party without the express written approval of the duly authorized representative of the other party; provided however, that:

(a)   MPI may assign any or all of its rights and obligations hereunder, without prior written approval of Group, to an entity that directly or indirectly controls, or is controlled by, or is under common control with MPI.

(b)   This Agreement may be automatically assigned without prior written approval of Group (and with no further action being required by either MPI or any of the individual Assignment Entities, as that term is defined herein) to one or more of the following individual entities: Central States, Southeast and Southwest Areas Health and Welfare Fund; and Connecticut General Life Insurance Company ("Assignment Entity/Entities"). Notwithstanding the issuance by MPI of one or more of such assignments to an Assignment Entity, MPI may retain its rights and obligations hereunder.

(i)   In the event that MPI assigns this Agreement as specified in this Section 9.5(b), each of the Assignment Entities to which MPI issues an assignment will be deemed to hold independent, but identical contracts with Group. As to each Assignment Entity to which MPI issues an assignment, Group acknowledges and agrees that all references to the Network will be deemed references to that Assignment Entity's provider network.

(ii)   Subsequent to any assignment of this Agreement to an Assignment Entity, Group may terminate such Assignment Entity's Agreement with Group by providing ninety (90) days prior written notice to the Assignment Entity.

9.6   <u>Third Party Beneficiaries</u>. Nothing contained in this Agreement will be construed to make MPI or Group, and their respective directors, officers, employees, agents, and representatives liable to persons or entities not parties hereto in situations in which they would not otherwise be subject to liability, except Clients, Users and Participants..

9.7   <u>Independent Contractors</u>.   Each party, including its officers, directors, employees and agents, acts as an independent contractor. Neither party has express or implied authority to assume or create any obligation on behalf of the other. Each party solely is responsible for its own actions or omissions, and those of its officers, directors, employees and agents, arising in connection with obligations created under this Agreement, including the rendering of professional advice and/or treatment by Group or Participating Professional.

9.8   Precedence of Exhibits.  In the event of any conflict between the terms and conditions specified in this Agreement and the terms and conditions specified in the Exhibits to this Agreement, the following order of precedence will govern the applicable terms and conditions agreed upon by the parties: (i) Exhibit C (Coordinating Provisions-State/Federal Laws and Accreditation Standards); (ii) Exhibit A (Amendments); (iii) Exhibit B (Network Participation Requirements); and (iv) the base Agreement.

9.9   Notices.  Unless otherwise specified in this Agreement, any notice required or permitted to be given pursuant to the terms and provisions of this Agreement will be in writing and must either be mailed (postage prepaid), facsimile, or e-mailed to the recipient at the address(es) listed below.  Any notice under this Agreement shall be deemed to have been given when deposited in the mail, postage prepaid, if mailed or when receipt acknowledged, if faxed or e-mailed.  The following address(es) or agent to receive notice may be changed by the provision of notice pursuant to this Section.

| To MPI: | To Group: NJPNA |
|---|---|
| Attn:  Office of the President & CEO | Attn:  Catherine Mazzola, MD |
| MultiPlan, Inc. | New Jersey Pediatric Neurosurgical Associates |
| 115 Fifth Avenue | 131 Madison Avenue, Ste 140 |
| New York, NY 10003-1004 | Morristown, NJ 07960 |

With a copy to:
    Attn:  Regional Director
    MultiPlan, Inc.
    115 Fifth Avenue
    New York, NY 10003-1004

9.10   Force Majeure.  Neither party will be liable for or be deemed to have breached any of its obligations under this Agreement (other than an obligation to pay money) if that party's failure to perform under the terms of this Agreement is due to any of the following:  failure or delay in performance by the other party to this Agreement or anyone acting for or under such other party; any strikes, lockouts, acts of God or the elements, insurrection, riots, wars, natural disasters, fires, explosions, epidemics, quarantines, earthquakes, storms, floods, any shortages of energy, fuel, or any utility (e.g., electrical, natural gas, etc.) failure or disturbance however caused; any governmental action not the fault of the nonperforming party or similar condition or circumstance that is not caused by the nonperforming party.

9.11   Limitation of Damages.  Neither party shall be liable for consequential, exemplary, or punitive damages.  Any dispute between the parties is personal to the respective parties.  Each party waives any right to bring a claim in any forum as a class action and agrees that it shall not voluntarily serve as a class representative or member in litigation or arbitration adverse to the other.

EXHIBIT A

## AMENDMENTS TO THE MPI PARTICIPATING PROFESSIONAL GROUP AGREEMENT

The terms and conditions specified in the MPI Participating Professional Group Agreement are further subject to the amendments set forth herein:

1. Delete Section 2.1 in its entirety and replace with the following:

    2.1    <u>Effective Date; Term</u>. This Agreement will become effective on the Effective Date and will continue in effect unless otherwise terminated as specified in this Agreement.

2. Delete Section 2.2 in its entirety and replace with the following:

    2.2    <u>Discretionary Termination</u>. <u>This</u> Agreement may be terminated <u>at any time</u>, in the sole discretion of either party, by the provision of written notice at least <u>ninety</u> <u>(90)</u> days prior to the <u>termination date specified in the notice</u>. <u>Termination shall be effective on the first day of the month following the notice period.</u>

**EXHIBIT B**
## NETWORK PARTICIPATION REQUIREMENTS

I.   **NETWORK ACCESS.** The terms of this Agreement shall include Network Access for the Complementary Network.

II.  **COMPLEMENTARY NETWORK PARTICIPATION REQUIREMENTS.** Complementary Network access, including access to Complementary Network Contract Rates, is available only to Clients that have contracted with MPI to utilize the Complementary Network in conjunction with Clients' Benefit Programs either as an extended network or when the Benefit Program does not utilize another network as primary. Complementary Benefit Programs must provide a mechanism encouraging direction of Participants to Network Providers. Complementary Benefit Programs must provide a mechanism Network Provider listings or financial incentives that provide Participants or Users with savings when health care services are obtained from Network Providers. Such access shall be indicated on Explanation of Benefits forms (EOBs) pertaining to claims paid at the Complementary Network Contract Rates, and is usually indicated by an MPI Complementary Network authorized name and/or logo on Participants identification. Complementary Benefit Programs may pay for Covered Services.

## EXHIBIT C
### COORDINATING PROVISIONS-STATE/FEDERAL LAW, ACCREDITATION STANDARDS AND GEOGRAPHIC EXCEPTIONS
### NEW JERSEY

### I.   INTRODUCTION:

1.   _Scope_.   To the extent of any conflict between the Agreement and this State Law Coordinating Provisions ("SLCP") Exhibit, this SLCP Exhibit shall supersede, govern and control to the extent required by federal and/or state law and to the extent that MPI, Network Provider and/or Client are subject to such federal or state law.

### II.   DEFINITION:

1.   Depending upon the specific form of the Agreement, the following terms may be utilized in the Agreement and are intended to be defined as provided for in the Agreement:

    (i)   Billed Charges may be referred to as Regular Billing Rates;
    (ii)   Client may be referred to as Payor;
    (iii)   Contract Rates may be referred to as Preferred Payment Rates;
    (iv)   Covered Services may be referred to as Covered Care;
    (v)   Network Provider may be referred to as Preferred Provider;
    (vi)   Participant may be referred to as Covered Individual; and
    (vii)   Program or Benefit Program may be referred to as Contract.

2.   For purposes of this Exhibit C, the term Network Provider is inclusive of Participating Professional and all Network Providers.

### III.   FEDERAL LAW COORDINATING PROVISIONS:

Federal Employees Health Benefits ("FEHB").   As applicable, this Agreement is subject to the terms of the laws governing FEHB.

    _Federal Employees Health Benefits ("FEHB") Plan_.   The parties agree that any and all claims or disputes relating to such benefits under a FEHB Plan will be governed exclusively by the terms of such federal government contract and federal law, whether or not such terms and laws are specified in this SLCP Exhibit or elsewhere in this Agreement.

### IV.   STATE LAW COORDINATING PROVISIONS: NEW JERSEY

For any Agreement involving the delivery of health care services in the State of New Jersey, the provisions noted below shall apply. Where the term Client is used Client shall mean only those Clients that are subject to the specific law(s) cited below:

1.   As required by N.J.A.C. 11:24B-5.2 (a)(1), this Agreement and any amendments hereto are subject to the prior approval of the New Jersey Department of Banking and Insurance ("DOBI") and may not be effectuated without such approval. Notwithstanding the preceding, the following types of amendments do not require prior approval of DOBI:
    (i) amendments that are of a clerical nature;
    (ii) amendments that alter numbers, be they dollar amounts, enrollment amounts or the like, without altering methodologies from which the numbers were derived; and
    (iii) amendments that involve the substitution of one set of variable text for another set of variable text, if both sets of variable text were previously approved by DOBI for this Agreement.

2.   As required by N.J.A.C. 11:24B-5.2 (a)(2), any provision of this Agreement that conflict with applicable federal or state laws are hereby amended to conform to such applicable federal or state law.

3.   As required by N.J.A.C. 11:24B-5.2 (a)(3), MPI shall provide Network Provider with a minimum of thirty (30) calendar days notice of any amendment to this Agreement. Notwithstanding the preceding, such notice is not required in the event the amendment is required due to a change in applicable federal or state laws or regulations or such

amendment does not constitute a material change.  For purposes of this provision a material change is a change that substantially impacts the rights or obligations of Network Provider.

4.      As required by N.J.A.C. 11:24B-5.2 (a)(7)(5), Network Provider may rely upon the written or oral authorization for Covered Services if made by Client or MPI. Covered Services shall not be retroactively denied as not medically necessary except in cases of material misrepresentation of the facts or fraud to Client or MPI.

5.      As required by N.J.A.C. 11:24B-5.2 (a) (9), this Agreement is governed by New Jersey law.

6.      As required by N.J.A.C. 11:24-5.2 (a)(17), Network Provider shall not be terminated or otherwise penalized because of complaints or appeals that Network Provider files on Network Provider's behalf, or on behalf of Participants, or for otherwise acting as an advocate for Participants in seeking appropriate, medically necessary Covered Services.

7.      As required by N.J.A.C. 11:24B-5.2 (a)(20), Network Provider may submit and seek resolution of a complaint or grievance to MPI for review and resolution, if applicable. Such resolution shall not exceed thirty (30) calendar days. In the event Network Provider is not satisfied with the resolution of the complaint or grievance, Network Provider may submit the complaint or grievance to the New Jersey Department of Health and Senior Services, New Jersey Department of Banking and Insurance or the New Jersey Department of Human Services

8.      As required by N.J.A.C. 11:24B-5.3, in the event MPI terminates this Agreement, MPI shall provide Network Provider with notice, specifying the reason(s) for such termination.  Network Provider may, in writing,  request a hearing to appeal the termination, except if the termination (1) occurs on the Renewal Date; or (2) is due to the Network Provider's breach or alleged fraud; or (3) in the opinion of MPI, the Network Provider poses and imminent danger to Participant(s), or the public health, safety, or welfare.

9.      As required by N.J.A.C. 11:24A-4.9, in the event Network Provider requests a hearing pursuant to N.J.A.C. 11:24B-5.3, Network Provider shall request such hearing, in writing, within thirty (30) days of the date of the notice of termination. MPI shall hold such hearing within thirty (30) days following receipt of a written request for a hearing by the terminated Network Provider before a panel appointed by MPI.  Such panel shall consist of at least three (3) people, one of which shall be a clinical peer in the same or substantially similar discipline and specialty as Network Provider requesting the hearing.  MPI shall render a decision in writing within thirty (30) days of the close of the hearing unless MPI provides notice to Network Provider of a need for an extension of time to render its determination. The written determination notice shall set forth the relevant contract provisions and the facts upon which MPI and Network Provider have relied at the hearing and shall state whether Network Provider is terminated or reinstated and shall include MPI's reasons for such determination. In the event Network Provider is reinstated, MPI shall state the impact of the reinstatement upon the terms of the duration of the Agreement.

10.     As required by N.J.A.C. 11:24B-5.3 (f), in the event this Agreement is terminated, Network Provider, if a physician, shall:

(i) continue to provide health care services for up to four (4) months following the effective date of such termination in cases where it is medically necessary for the Participant to continue treatment with the Network Provider;

(ii) in the case of pregnancy of a Participant, through postpartum evaluation of the Participant, up to six (6) months after delivery;

(iii) in the case of post-operative care, up to six months following the effective date of the termination;

(iv) in the case of oncological treatment, up to one (1) year following the effective date of the termination; or

(v) in the case of psychiatric treatment, up to one year following the effective date of termination.

11.     As required by the Department of Banking and Insurance Bulletin No.: 06-16, in the event of an appeal of a claim determination, Client shall accept the Health Care Provider Application to Appeal a Claims Determination form and shall post such form on its website.

12.     As required by N.J.S.A. § 45:1-10.1, in the event of a claim in which the Participant has assigned his /her benefits to Network Provider, the Network Provider shall submit the claim for payment within 180 days of furnishing health care services.

13.     As required by N.J.A.C. 11:22-1.5(a), a Clean Claim is received on the date of actual receipt by the Client.

14. As required by N.J.S.A. §17B:27-44.2(d)(1), Client shall within thirty (30) calendar days of receipt of a Clean Claim, pay or arrange for User to pay Facility for Covered Services, as full compensation, the Contract Rate in accordance with the terms of this Agreement and the administrative handbook(s), in order to obtain the benefit of the Contract Rate.

15. As required by N.J.A.C. 11:24B-5.2(a)(19)(ii), in the event a Clean Claim is not timely paid to Network Provider, Client or User, as applicable, shall be responsible for remitting the interest payment required by New Jersey laws and regulations to Network Provider. In no event shall Network Provider be required to request payment of such interest from Client or User, as applicable, as a condition of receiving such interest payment.

16. As required by N.J.S.A §17B:27-44.2(d)(10), with the exception of claims that were submitted fraudulently or submitted by Network Provider that have a pattern of inappropriate billing or claims that were subject to coordination of benefits, no Client or User, as applicable, shall seek reimbursement for overpayment of a claim previously paid later than 18 months after the date the first payment on the claim was made. No Client or User, as applicable, shall seek more than one (1) reimbursement for overpayment of a particular claim. At the time the reimbursement request is submitted to the Network Provider, the Client or User, as applicable, shall provide written documentation that identifies the error made by the Client or User, as applicable, in the processing or payment of the claim that justifies the reimbursement request. No Client or User, as applicable, shall base a reimbursement request for a particular claim on extrapolation of other claims, except under the following circumstances:

(i) in judicial or quasi-judicial proceedings, including arbitration;

(ii) in administrative proceedings;

(iii) in which relevant records required to be maintained by the Network Provider have been improperly altered or reconstructed, or a material number of the relevant records are otherwise unavailable; or

(iv) in which there is clear evidence of fraud by the Network Provider and the Client or User, as applicable, has investigated the claim in accordance with its fraud prevention plan and referred the claim, together with supporting documentation, to the Office of the Insurance Fraud Prosecutor in the Department of Law and Public Safety.

## V. ACCREDITATION STANDARDS COORDINATING PROVISIONS:

There are no Accreditation Standards Coordinating Provisions at this time.

## VI. GEOGRAPHIC EXCEPTIONS COORDINATING PROVISIONS:

There are no Geographic Exceptions Coordinating Provisions at this time.

**EXHIBIT D**
**CONTRACT RATES**
**MPI PARTICIPATING PROFESSIONAL GROUP AGREEMENT**

## I. BILLING & PAYMENT

1.1 <u>Code Updates</u>. MPI will, on an annual basis and without prior notice, add any newly assigned CPT or HCPCS codes, change any existing CPT or HCPCS codes, and/or delete any obsolete CPT or HCPCS codes in accordance with industry standards.

1.2 <u>Charge Master Cap</u>.

(i) <u>Charge Master Notice</u>. As of December 1st of each calendar year, Group will provide to MPI, written notice specifying whether there has been a change in the Group's charge master ("Charge Master Notice"). In the event that there is an increase in the Group's charge master, such Charge Master Notice will include the average annual increase in Group's overall charge master for the current year as compared to the previous year.

(ii) <u>Percentage Contract Rate Adjustment</u>. If in any calendar year, the average increase in the Group's overall charge master (Actual Percentage Increase) is greater than five (5%) percent (the "Charge Master Cap"), any Contract Rate specified in this Agreement as a percentage of Group's Billed Charges shall be adjusted according to the following formula:

(1+ lower of the Charge Master Cap or the Actual Percentage Increase) divided by
(1+ Actual Percentage Increase) multiplied by the original Contract Rate

(iii) <u>Cumulative Adjustments</u>. In each successive year, adjustments of the Contract Rate shall be cumulative. Group shall be responsible for reporting to MPI annually any Actual Percentage Increase in its charge master.

(iv) <u>Charge Master Review</u>. Upon fifteen (15) days prior written notice to the Group by MPI, MPI may review the supporting documentation utilized by Group with regard to the information provided by Group in the Charge Master Notice ("Charge Master Review"). Group agrees to cooperate fully during such Charge Master Review. Based on the findings from such Charge Master Review, MPI may increase any Contract Rate per the Charge Master Cap provision specified herein.

## II. CONTRACT RATES

2.1 <u>Contract Rates – Percentage of Billed Charges</u>. Except as otherwise specified herein, the Contract Rate for Covered Services rendered to Participants shall be equal to **eighty (80%) percent** of Group's Billed Charges, less any Co-payments, Deductibles, and Co-insurance, if any, as specified in the Participant's Benefit Program.

## III. CONTRACT RATES FOR WORKERS' COMPENSATION AND AUTO MEDICAL PROGRAM

3.1 <u>Contract Rates for Workers' Compensation Programs</u>. Unless otherwise required by law, the Contract Rate for workers' compensation Programs shall be equal to the lesser of (i) eighty five (85%) percent of the fee under the state or federal workers' compensation fee schedule, as applicable, or (ii) the Contract Rate(s) set forth in Article II of this Exhibit D, less any Co-payments, Deductibles, and Co-insurance, if any, as specified in the Participant's workers' compensation Program.

3.2 <u>Contract Rates for Auto Medical Programs</u>. Unless otherwise required by law, the Contract Rate for auto medical Programs shall be equal to the lesser of (i) ninety five (95%) percent of the fee under the state auto medical fee schedule, or (ii) the Contract Rate(s) set forth in Article II of this Exhibit D; less any Co-payment, Deductible, and/or Co-insurance, if any, specified in the Participant's auto medical Program.

# EXHIBIT B

## MORRISTOWN MEDICAL CENTER

### REPORT OF OPERATION

**NAME:** ▓▓▓▓ KYLE                    **MEDICAL RECORD #:**A01758496

**DATE:** 01/04/2017

**SURGEON:** Catherine A Mazzola, M.D.

**ASSISTANT:** Thomas Sernas, P.A.-C

**ANESTHESIOLOGIST:**

PREOPERATIVE DIAGNOSIS:
Closed head injury with right temporal skull fracture and large right epidural hematoma.

POSTOPERATIVE DIAGNOSIS:
Closed head injury with right temporal skull fracture and large right epidural hematoma.

PROCEDURES:
1. Craniotomy and evacuation of right temporoparietal epidural hematoma.
2. Cranioplasty of fractured bone.

ANESTHESIA:
General.

INDICATIONS FOR SURGERY:
Kyle ▓▓▓▓ is a 17-year-old boy who was reportedly hit in the head with a medicine ball at school. He developed a right temporal skull bone fracture. He developed an acute right temporoparietal epidural hematoma. He most likely lost consciousness, had a seizure, fell back and hit the back of his head. He had a lucid interval in which he became combative at Huntington Medical Center. He was emergently intubated and transported by Air 1 to Morristown Medical Center. An emergency craniotomy was done as a life-saving procedure without the consent of his parents.

DESCRIPTION OF PROCEDURE:
Kyle was brought directly from the helipad by the Air 1 crew into OR #20. He was already intubated, sedated and paralyzed. He was put upon the operating room table and gently rolled to his left side. The right side of his head was shaved with an electric clipper. A 1000 drape was placed down over his face. His head was scrubbed with Betadine 3 times, painted with Betadine 3 times and then I scrubbed.

### REPORT OF OPERATION

**MORRISTOWN MEMORIAL HOSPITAL**
**Page 2**
**REPORT OF OPERATION**

**NAME:** ▬▬▬▬ KYLE

Tom Sernas and I scrubbed. We were gowned and gloved with sterile technique. We came back into the room. The blue towels were stapled down around the planned incision. A down sheet and a craniotomy drape were placed down over the operative site. The incision was made with a 15-blade scalpel carried down through the skin and subcutaneous tissue with a needle-tip Bovie. A large trauma flap was made. The temporalis was retracted anteriorly with the trauma flap. A large craniotomy was then done in case of brain swelling. Two bur holes were made with a Midas Rex with an M8 drill bit and then using the Midas Rex with B1 footplate, the craniotomy was made and then elevated and handed to the scrub nurse. Of note, the craniotomy was in 2 pieces because of the right temporal fracture extending up from the temporal base into the higher right parietal and temporal bones.

A cranioplasty was done on those 2 bone fragments to hold the bone together so the fragmentation would heal nicely.

The cranioplasty was done with titanium Synthes miniplates and screws.

There was a large thick epidural hematoma which measured approximately 12 x 10 cm. The epidural was about 2 to 2.5 cm thick. The epidural was evacuated and removed. There was a large torn dural artery in the inferior anterior temporal area. This artery was carefully bipolared and coagulated. Once this was done, there was no more bleeding. Hemostasis was triple checked and controlled with Bovie electric cautery, bipolar electrocoagulation, Gelfoam with thrombin application, some Surgiflo application with cottonoid application and irrigation. After the bleeding was controlled and the epidural was evacuated, there were approximately 6 dural tacking stitches placed through the dura, tacking the dura to the bone with 4-0 Nurolon. The dura was opened posteriorly. There was no subdural blood clot, and the brain elevated itself nicely. An ICP monitor was placed under the dura and tunneled out posteriorly. DuraGen was then placed down over the ICP monitor and the dural closure. The bone was then put back into position with multiple titanium CranioFix plates. The bone was held in position with titanium plates and screws. The area was then irrigated with a copious amount of bacitracin irrigation solution. The temporalis fascia was closed with approximately eight 3-0 Vicryl sutures. The galea was closed with about thirty 3-0 Vicryl pop-off sutures. The skin was closed with 3-0 Monocryl. Dermabond was placed over the entire skin incision. Once this was done, the laceration in the occipital area

**REPORT OF OPERATION**

**MORRISTOWN MEMORIAL HOSPITAL**
**Page 3**
**REPORT OF OPERATION**

NAME: ██████ KYLE

was closed with 3-0 Monocryl.  This laceration in the occipital area
was irrigated out and closed and was relatively superficial.

Once the Dermabond was completely dry, some 4 x 4's were put down
along the areas of the incision.   The ICP wire was carefully
protected.  The head was wrapped with a Kerlix and taped to his head.
The ICP monitoring wire was also taped to the Kerlix and then the
patient was extubated at the end of surgery and transported to the
surgical ICU.

DICTATED BY:  CATHERINE A MAZZOLA, M.D.

DD: 01/04/2017 17:12:35  DT: 01/04/2017 17:41:43
CAM/MedQUL/Job#/Int# 244139/726381004  PHYS. ID: 13550

**REPORT OF OPERATION**

**EXHIBIT C**

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 09/19

UNITED HEALTH CARE
PO BOX 740800
ATLANTA, GA 30374

**CARRIER** — 1

| PICA | | | | | | | | PICA |

**1. MEDICARE** (Medicare#) ☐  **MEDICAID** (Medicaid#) ☐  **TRICARE** (ID#/DoD#) ☐  **CHAMPVA** (Member ID#) ☐  **GROUP HEALTH PLAN** (ID#) ☐  **FECA BLK LUNG** (ID#) ☐  **OTHER** (ID#) ☒

**1a. INSURED'S I.D. NUMBER** (For Program in Item 1): 809639558

**2. PATIENT'S NAME (Last Name, First Name, Middle Initial):** KYLE

**3. PATIENT'S BIRTH DATE / SEX:** M ☒  F ☐

**4. INSURED'S NAME (Last Name, First Name, Middle Initial):** SAME

**5. PATIENT'S ADDRESS (No., Street):**

**6. PATIENT RELATIONSHIP TO INSURED:** Self ☐  Spouse ☐  Child ☐  Other ☐

**7. INSURED'S ADDRESS (No., Street):** SAME

**STATE:** NJ

**8. RESERVED FOR NUCC USE**

**CITY / STATE**

**ZIP CODE / TELEPHONE (Include Area Code)**

**ZIP CODE / TELEPHONE (Include Area Code):** ( )

**9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial):**

**10. IS PATIENT'S CONDITION RELATED TO:**

**11. INSURED'S POLICY GROUP OR FECA NUMBER:** 91698

**a. OTHER INSURED'S POLICY OR GROUP NUMBER:**

**a. EMPLOYMENT? (Current or Previous):** YES ☐  NO ☒

**a. INSURED'S DATE OF BIRTH / SEX:** M ☒  F ☐

**b. RESERVED FOR NUCC USE:**

**b. AUTO ACCIDENT?** YES ☐  NO ☒  **PLACE (State)**

**b. OTHER CLAIM ID (Designated by NUCC):**

**c. RESERVED FOR NUCC USE:**

**c. OTHER ACCIDENT?** YES ☐  NO ☒

**c. INSURANCE PLAN NAME OR PROGRAM NAME:** UNITED HEALTH CARE

**d. INSURANCE PLAN NAME OR PROGRAM NAME:**

**10d. CLAIM CODES (Designated by NUCC):**

**d. IS THERE ANOTHER HEALTH BENEFIT PLAN?** YES ☐  NO ☒  *If yes, complete items 9, 9a, and 9d.*

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.

**12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.
SIGNED SIGNATURE ON FILE  DATE 01 04 2017

**13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize payment of medical benefits to the undersigned physician or supplier for services described below.
SIGNED SIGNATURE ON FILE

**14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP):** QUAL.

**15. OTHER DATE:** QUAL. MM DD YY

**16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION:** FROM / TO

**17. NAME OF REFERRING PROVIDER OR OTHER SOURCE:** DR ALAN RUSHTON MD    17b. NPI

**18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES:** FROM 01 04 2017  TO

**19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC):**

**20. OUTSIDE LAB?** YES ☐  NO ☐  $ CHARGES

**21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY** Relate A-L to service line below (24E)  ICD Ind.

A. S06 4X2A   B. S02 0XXA   C. R40 2330   D.
E.   F.   G.   H.
I.   J.   K.   L.

**22. RESUBMISSION CODE / ORIGINAL REF. NO.**

**23. PRIOR AUTHORIZATION NUMBER**

| 24. A. DATE(S) OF SERVICE | | | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES | | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| From MM DD YY | To MM DD YY | | | | CPT/HCPCS | MODIFIER | | | | | | |
| 1 | 0104 2017 | 0104 2017 | 21 | Y | 62141 | AS | B | 54562 00 | 1 | | NPI | 1548339013 |
| 2 | 0104 2017 | 0104 2017 | 21 | Y | 61314 | AS 51 | ABC | 52129 00 | 1 | | NPI | 1548339013 |
| 3 | | | | | | | | | | | NPI | |
| 4 | | | | | | | | | | | NPI | |
| 5 | | | | | | | | | | | NPI | |
| 6 | | | | | | | | | | | NPI | |

**25. FEDERAL TAX I.D. NUMBER:** 202518910  SSN ☐ EIN ☒

**26. PATIENT'S ACCOUNT NO.:** 069481

**27. ACCEPT ASSIGNMENT?** YES ☐  NO ☐

**28. TOTAL CHARGE:** $ 106691 00

**29. AMOUNT PAID:** $ 0 00

**30. Rsvd for NUCC Use**

**31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS** (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
THOMAS SERNAS PA
SIGNED 05 15 2018  DATE

**32. SERVICE FACILITY LOCATION INFORMATION:** MORRISTOWN MEMORIAL HOSPITAL 100 MADISON AVENUE MORRISTOWN NJ 07960-7360
a. 1558503672

**33. BILLING PROVIDER INFO & PH #:** 973 3269000
NJ PEDIATRIC NEUROSCIENCE INSTITUTE
131 MADISON AVE 3RD FLOOR
MORRISTOWN NJ 07960-7360
a. 1558503672

NUCC Instruction Manual available at: www.nucc.org   PLEASE PRINT OR TYPE   APPROVED OMB-0938-1197 FORM 1500 (09-19)

# EXHIBIT D

075UTOPPR1020004-00125-02

0D-172*02*000003-PM-17075-120*C07ASOJPMCTOPS

United HealthCare Services, Inc.
GREENSBORO SERVICE CENTER
PO BOX 740800
ATLANTA GA 30374-0800
PHONE: 1-877-842-3210

STD - PRA

◆ Bristol-Myers Squibb Company

# PROVIDER
# REMITTANCE ADVICE

NEW JERSEY PEDIATRIC NEUROSCIE
THOMAS SERNAS PA
131 MADISON AVE FL 3
MORRISTOWN NJ 07960

*(handwritten)* Pt. Kyle H▮▮▮
Pr. Tom
Dos. 1/4/17

| | |
|---|---|
| CHECK DATE: | 03/16/17 |
| TIN: | 202518910 |
| NPI: | 1558503672 |
| PAYEE NAME: | NEW JERSEY PEDIATRIC NEUROSCIE |
| CHECK NUMBER: | PH 20009214 |
| CHECK AMOUNT: | $1,013.28 |
| GROUP NUMBER: | 191698 |
| GROUP NAME: | BRISTOL MYERS SQUIBB |

## PATIENT: KYLE ▮▮▮▮▮ (CH)

| | | |
|---|---|---|
| SUBSCRIBER ID: | A 809639558 | |
| CLAIM DATE: | 01/04/17-01/04/17 | SUBSCRIBER NAME: ▮▮▮▮▮ |
| REND PROV ID: | 1548339013 | DATE RECEIVED: 02/07/17 |
| | | REND PROV: T. SERNAS PA |
| CLAIM NUMBER: | 9895225703 0080143549 |
| PRODUCT: | CHOYC+ |

| PATIENT CONTROL NUMBER | PATIENT ID | AUTH/REF NUMBER | DRG | DRG WEIGHT | CLAIM CHARGE AMOUNT | CLM ADJ AMT | GRP CD | CLM ADJ RSN CD | CLAIM PAYMENT AMOUNT | PATIENT RESPONSIBILITY |
|---|---|---|---|---|---|---|---|---|---|---|
| 069481-01 | | | | | $52,129.00 | | | | $535.28 | |

| LINE CTRL# | DATES OF SERVICE | SUB PROD/ SVC/ MOD | ADJ PROD/ SVC | MOD | REV | UNITS | ADJ QTY | CHARGE | AMOUNT ALLOWED | ADJ AMOUNT | GRP CD | CLM ADJ RSN CD | PAYMENT AMOUNT | REMARK/ NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 106950 | 01/04/17 - 01/04/17 | 61814 | | AS/ 51 | | 1 | | $52,129.00 | $535.28 | $6,155.72 | CO | 45 | $535.28 | IT, KX |
| | | | | | | | | | | $45,438.00 | OA | 94 | | |
| CLAIM# 9895225703 0080143549 | | | | | | SUBTOTAL | | $52,129.00 | $535.28 | $51,593.72 | | | $535.28 | HI |

WE RECEIVED THE REQUESTED INFORMATION ON 02/07/17 AND HAVE PROCESSED CLAIM NUMBER 6315595061 0079571965.
PAYMENT OF BENEFITS HAS BEEN MADE IN ACCORDANCE WITH THE TERMS OF THE MANAGED CARE SYSTEM.

| | | |
|---|---|---|
| SUBSCRIBER ID: | ▮▮▮▮▮ | |
| CLAIM DATE: | ▮▮▮▮▮ | SUBSCRIBER NAME: ▮▮▮▮▮ |
| REND PROV ID: | ▮▮▮▮▮ | DATE RECEIVED: ▮▮▮▮▮ |
| | | REND PROV: |
| CLAIM NUMBER: | ▮▮▮▮▮ |
| PRODUCT: | |

| PATIENT CONTROL NUMBER | PATIENT ID | AUTH/REF NUMBER | DRG | DRG WEIGHT | CLAIM CHARGE AMOUNT | CLM ADJ AMT | GRP CD | CLM ADJ RSN CD | CLAIM PAYMENT AMOUNT | PATIENT RESPONSIBILITY |
|---|---|---|---|---|---|---|---|---|---|---|
| ▮▮ | | | | | | | | | ▮▮ | |

| LINE CTRL# | DATES OF SERVICE | SUB PROD/ SVC/ MOD | ADJ PROD/ SVC | MOD | REV | UNITS | ADJ QTY | CHARGE | AMOUNT ALLOWED | ADJ AMOUNT | GRP CD | CLM ADJ RSN CD | PAYMENT AMOUNT | REMARK/ NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 1 | | | | | CO | 45 | | |
| CLAIM# ▮▮▮▮▮ | | | | | | SUBTOTAL | | | | | | | ▮▮ | IT |

PAYMENT OF BENEFITS HAS BEEN MADE IN ACCORDANCE WITH THE TERMS OF THE MANAGED CARE SYSTEM.

STD - PRA-202518910-5400000000035120515

# EXHIBIT E

## MORRISTOWN MEDICAL CENTER

### REPORT OF OPERATION

**NAME:** ▒▒▒▒ KYLE                              **MEDICAL RECORD #:** A01758496

**DATE:** 02/14/2017

**SURGEON:** Catherine A Mazzola, M.D.

**ASSISTANT:** Tatiana O. Huk-Sikorskyj, RN, APN-C

**ANESTHESIOLOGIST:** Arkadiy Abkin, M.D.

PREOPERATIVE DIAGNOSIS:
Chronic right epidural hematoma.

POSTOPERATIVE DIAGNOSIS:
Chronic right epidural hematoma.

PROCEDURES:
1. Right temporal bur hole for evacuation of chronic subdural hematoma with placement of Jackson-Pratt #7 drain.
2. Intraoperative Stealth.

ANESTHESIA:
General.

BLOOD LOSS:
50 mL.

PREOP IV ANTIBIOTICS:
Include Ancef.

PREOPERATIVE INDICATIONS FOR SURGERY:
Kyle ▒▒▒▒ is a 17-year-old boy who is neurologically intact. He was hit in the head in January of 2017. He sustained a right temporal fracture with a laceration of the middle meningeal artery. He sustained an acute epidural hematoma and became comatose. He was Medevaced by helicopter to Morristown Medical Center. Craniotomy was done and he had evacuation of an epidural hematoma. He had a postop CT scan done on postop day 1 and postop day 3 showing a nice evacuation of epidural hematoma. There was a little bit of pneumocephalus. Approximately 2-3 weeks after surgery he had a postop MRI showing fluid that reaccumulated in the area. The dural tacking sutures at the end of the craniotomy flap held, however, underneath the craniotomy flap had accumulated some fluid. The decision was made after discussion with the parents to admit the child

### REPORT OF OPERATION

## MORRISTOWN MEMORIAL HOSPITAL
### Page 2
### REPORT OF OPERATION

**NAME:** ▓▓▓▓▓ KYLE

to the emergency room and to do a burr hole drainage of the chronic epidural hematoma.   An informed consent was obtained from his parents.

DESCRIPTION OF PROCEDURE:
He was taken to the OR.  A preop time-out was done in the OR and he received 1 g of Ancef IV prior to skin incision.  His head was put in Mayfield pins and the Mayfield head holder was attached securely to the OR table.

The Stealth arc was then attached to his head and a facial tracer recognition program was done to register his preoperative CT scan to real-time imaging.  Once his facial tracer program was done and he was registered, we were able to mark an incision in the right temporal area for the burr hole.

The head and the right side of neck were scrubbed with Betadine 3 times.  I dried in between each scrub, and then painted his head with Betadine 3 times.  While the Betadine dried, Tatiana and I scrubbed.

Tatiana and I were gowned and gloved, and then with sterile technique we put blue towels down around the operative site.  His incisions were marked.  A down sheet and then a craniotomy drape were put down upon the operative area.

The Stealth arc was put into position and again he was registered using the Stealth normal probe.

Once this was done, the posterior part of the right parietal incision was carefully opened with a 15-blade scalpel right over the old bur hole cover.  The bur hole cover was removed and a dog bone was put in position.

An incision was then made in the right temporal area.  A single bur hole was made in the right temporal bone.  The chronic epidural hematoma was aspirated.  A Jackson-Pratt drain was put in through the bur hole in the epidural space and then tunneled out posteriorly. Both incisions were irrigated with bacitracin irrigation solution and closed in 3 layers, with 2 layers of 3-0 Vicryl, 1 layer of 3-0 Monocryl, and then Dermabond on the right temporal incision and bacitracin on the right parietal incision.
There were no intraoperative complications.  Total blood loss was 50 mL from the chronic epidural hematoma.  There was no acute active

### REPORT OF OPERATION

02/14/2017   12:29PM (GMT-05:00)

**MORRISTOWN MEMORIAL HOSPITAL**
**Page 3**
<u>**REPORT OF OPERATION**</u>

**NAME:** ███████ KYLE

bleeding.  At the end of surgery, I did put a Kerlix head wrap on
him and then stockinette.  His Jackson-Pratt was carefully safety
pinned to his gown.


DICTATED BY:  CATHERINE A MAZZOLA, M.D.



DD: 02/14/2017 11:45:02  DT: 02/14/2017 12:19:21
CAM/MedQUC/Job#/Int# 351314/731311191  PHYS. ID: 13550



cc:  Allen Rushton, M.D.
     1100 Westcott Drive
     Suite G3
     Flemington, N.J. 08822

<u>**REPORT OF OPERATION**</u>

# EXHIBIT F

UNITED HEALTH CARE
PO BOX 740800
ATLANTA, GA 30374

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 09/19

☐ PICA

**1. MEDICARE** ☐ (Medicare#)  **MEDICAID** ☐ (Medicaid#)  **TRICARE** ☐ (ID#/DoD#)  **CHAMPVA** ☐ (Member ID#)  **GROUP HEALTH PLAN** ☐ (ID#)  **FECA BLK LUNG** ☐ (ID#)  **OTHER** ☒ (ID#)    **1a. INSURED'S I.D. NUMBER** (For Program in Item 1)  809639558

**2. PATIENT'S NAME (Last Name, First Name, Middle Initial)**  KYLE

**3. PATIENT'S BIRTH DATE** | **SEX** M ☒ F ☐

**4. INSURED'S NAME (Last Name, First Name, Middle Initial)**  SAME

**5. PATIENT'S ADDRESS (No., Street)**

**6. PATIENT RELATIONSHIP TO INSURED**  Self ☐ Spouse ☐ Child ☐ Other ☐

**7. INSURED'S ADDRESS (No., Street)**  SAME

CITY — STATE  NJ

**8. RESERVED FOR NUCC USE**

CITY — STATE

ZIP CODE — **TELEPHONE (Include Area Code)**

ZIP CODE — **TELEPHONE (Include Area Code)** ( )

**9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)**

**10. IS PATIENT'S CONDITION RELATED TO:**

**11. INSURED'S POLICY GROUP OR FECA NUMBER**  191698

**a. OTHER INSURED'S POLICY OR GROUP NUMBER**

**a. EMPLOYMENT? (Current or Previous)** YES ☐ NO ☒

**a. INSURED'S DATE OF BIRTH** | **SEX** M ☒ F ☐

**b. RESERVED FOR NUCC USE**

**b. AUTO ACCIDENT?** YES ☐ NO ☒  **PLACE (State)**

**b. OTHER CLAIM ID (Designated by NUCC)**

**c. RESERVED FOR NUCC USE**

**c. OTHER ACCIDENT?** YES ☐ NO ☒

**c. INSURANCE PLAN NAME OR PROGRAM NAME**  UNITED HEALTH CARE

**d. INSURANCE PLAN NAME OR PROGRAM NAME**

**10d. CLAIM CODES (Designated by NUCC)**

**d. IS THERE ANOTHER HEALTH BENEFIT PLAN?** YES ☒ NO ☐  If yes, complete items 9, 9a, and 9d.

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**
**12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED  SIGNATURE ON FILE   DATE  02 14 2017

**13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED  SIGNATURE ON FILE

**14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)**  QUAL.

**15. OTHER DATE**  QUAL.  MM DD YY

**16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION**  FROM — TO

**17. NAME OF REFERRING PROVIDER OR OTHER SOURCE**  DN ALAN  RUSHTON MD   17b. NPI

**18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES**  FROM 02 13 2017 — TO

**19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)**

**20. OUTSIDE LAB?** YES ☐ NO ☐  $ CHARGES

**21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY.** Relate A-L to service line below (24E)  ICD Ind. 0

A. S06 4X9S  B.  C.  D.
E.  F.  G.  H.
I.  J.  K.  L.

**22. RESUBMISSION CODE**  ORIGINAL REF. NO.

**23. PRIOR AUTHORIZATION NUMBER**

| 24. A. DATE(S) OF SERVICE From | | | To | | | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID QUAL | J. RENDERING PROVIDER ID # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MM | DD | YY | MM | DD | YY | | | | | | | | | | | |
| 02 | 14 | 2017 | 02 | 14 | 2017 | 21 | Y | 61154 | 79 | | 43441 | 00 | 1 | | NPI | |
| 02 | 14 | 2017 | 02 | 14 | 2017 | 21 | Y | 61781 | 79 | | 43441 | 00 | 1 | | NPI | 1295792380 |
| | | | | | | | | | | | 10426 | 00 | 1 | | NPI | 1295792380 |
| | | | | | | | | | | | | | | | NPI | |
| | | | | | | | | | | | | | | | NPI | |
| | | | | | | | | | | | | | | | NPI | |

**25. FEDERAL TAX I.D. NUMBER**  202518910  SSN ☐ EIN ☐

**26. PATIENT'S ACCOUNT NO.**  069676

**27. ACCEPT ASSIGNMENT?** YES ☒ NO ☐

**28. TOTAL CHARGE**  $ 53867 00

**29. AMOUNT PAID**  $ 0 00

**30. Rsvd for NUCC Use**

**31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS** (I certify that the statements on the reverse apply to this bill and are made a part thereof.)

CATHERINE A MAZZOLA M   05 15 2018
SIGNED  DATE

**32. SERVICE FACILITY LOCATION INFORMATION**
MORRISTOWN MEMORIAL HOSPITAL
100 MADISON AVENUE
MORRISTOWN NJ 07960-7360
a.1558503672

**33. BILLING PROVIDER INFO & PH #**  973 269000
NJ PEDIATRIC NEUROSCIENCE INSTITUTE
131 MADISON AVE 3RD FLOOR
MORRISTOWN NJ 07960-7360
a.1558503672

NUCC Instruction Manual available at: www.nucc.org    **PLEASE PRINT OR TYPE**    APPROVED OMB-0938-1197 FORM 1500 (09-19)



UNITED HEALTH CARE
PO BOX 740800
ATLANTA, GA 30374

1

**HEALTH INSURANCE CLAIM FORM**

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 09/19

PICA | | | | | PICA

**CARRIER**

1. MEDICARE ☐ (Medicare#)   MEDICAID ☐ (Medicaid#)   TRICARE ☐ (ID#/DoD#)   CHAMPVA ☐ (Member ID#)   GROUP HEALTH PLAN ☐ (ID#)   FECA BLK LUNG ☐ (ID#)   OTHER ☒ (ID#)

1a. INSURED'S I.D. NUMBER   309639558   (For Program in Item 1)

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)   ▆▆▆▆ KYLE

3. PATIENT'S BIRTH DATE  MM DD YY  ▆▆ ▆▆ ▆▆   SEX  M ☒  F ☐

4. INSURED'S NAME (Last Name, First Name, Middle Initial)   SAME

5. PATIENT'S ADDRESS (No., Street)   ▆▆▆▆
CITY  ▆▆▆▆  STATE  NJ
ZIP CODE  ▆▆▆▆   TELEPHONE (Include Area Code)

6. PATIENT RELATIONSHIP TO INSURED   Self ☐  Spouse ☐  Child ☐  Other ☐

7. INSURED'S ADDRESS (No., Street)   SAME
CITY  STATE
ZIP CODE   TELEPHONE (Include Area Code)  (   )

8. RESERVED FOR NUCC USE

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (Current or Previous)   YES ☐  NO ☒

11. INSURED'S POLICY GROUP OR FECA NUMBER   L91698

b. RESERVED FOR NUCC USE

b. AUTO ACCIDENT?   YES ☐  NO ☒   PLACE (State)

a. INSURED'S DATE OF BIRTH  MM DD YY  ▆▆ ▆▆ ▆▆   SEX  M ☒  F ☐

c. RESERVED FOR NUCC USE

c. OTHER ACCIDENT?   YES ☐  NO ☒

b. OTHER CLAIM ID (Designated by NUCC)

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. CLAIM CODES (Designated by NUCC)

c. INSURANCE PLAN NAME OR PROGRAM NAME   UNITED HEALTH CARE

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?   YES ☐  NO ☒   If yes, complete items 9, 9a, and 9d.

**PATIENT AND INSURED INFORMATION**

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.
SIGNED   SIGNATURE ON FILE   DATE   02 14 2017

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.
SIGNED   SIGNATURE ON FILE

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)  MM DD YY   QUAL.

15. OTHER DATE   QUAL.   MM DD YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION  MM DD YY
FROM   TO

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE   DN ALAN RUSHTON MD   17b. NPI

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES  MM DD YY
FROM   02 13 2017   TO

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)

20. OUTSIDE LAB?   YES ☐  NO ☐   $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY Relate A-L to service line below (24E)   ICD Ind.  |
A. S06 4X9S   B.   C.   D.
E.   F.   G.   H.
I.   J.   K.   L.

22. RESUBMISSION CODE   ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE From MM DD YY | To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID QUAL | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 02142017 | 02142017 | 21 | Y | G1154 | 79 AS | | 43441 00 | | | NPI | 1457613457 |
| 2 | 02142017 | 02142017 | 21 | Y | G1781 | 79 AS | A | 10426 00 | | | NPI | 1457613457 |
| 3 | | | | | | | | | | | NPI | |
| 4 | | | | | | | | | | | NPI | |
| 5 | | | | | | | | | | | NPI | |
| 6 | | | | | | | | | | | NPI | |

**PHYSICIAN OR SUPPLIER INFORMATION**

25. FEDERAL TAX I.D. NUMBER   202518910   SSN ☐ EIN ☒

26. PATIENT'S ACCOUNT NO.   069678

27. ACCEPT ASSIGNMENT? (For govt. claims, see back)   YES ☐  NO ☐

28. TOTAL CHARGE   $ 53867 00

29. AMOUNT PAID   $ 0 00

30. Rsvd for NUCC Use

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
TATIANA SIKORSKYJ AP
SIGNED   05 15 2018   DATE

32. SERVICE FACILITY LOCATION INFORMATION
MORRISTOWN MEMORIAL HOSPITAL
100 MADISON AVENUE
MORRISTOWN NJ 07960-7360
a1558503672

33. BILLING PROVIDER INFO & PH #   973 3769000
NJ PEDIATRIC NEUROSCIENCE INSTITUTE
131 MADISON AVE 3RD FLOOR
MORRISTOWN NJ 07960-7360
a1558503672

NUCC Instruction Manual available at: www.nucc.org   PLEASE PRINT OR TYPE   APPROVED OMB-0938-1197 FORM 1500 (09-19)

**EXHIBIT G**

061UTOPPR1030002-00804-02



0B-1347*02*000003-PM-17061-120*C07ASOJPMCTOPS

United HealthCare Services, Inc.
GREENSBORO SERVICE CENTER
PO BOX 740800
ATLANTA GA 30374-0800
PHONE: 1-877-842-3210

STD - PRA

❀ Bristol-Myers Squibb Company

## PROVIDER
## REMITTANCE ADVICE

NEW JERSEY PEDIATRIC NEUROSCIE
CATHERINE A MAZZOLA MD
131 MADISON AVE FL 3
MORRISTOWN NJ 07960

*Kyle H_____*
*DOS 2/14/17*
*Dr. Mazzola*

| | |
|---|---|
| CHECK DATE: | 03/02/17 |
| TIN: | 202518910 |
| NPI: | 1558503672 |
| PAYEE NAME: | NEW JERSEY PEDIATRIC NEUROSCIE |
| CHECK NUMBER: | PH 19637754 |
| CHECK AMOUNT: | $10,251.01 |
| GROUP NUMBER: | 191698 |
| GROUP NAME: | BRISTOL MYERS SQUIBB |

## PATIENT: KYLE _____ (CH)

| | | | | |
|---|---|---|---|---|
| SUBSCRIBER ID: | A 809639558 | SUBSCRIBER NAME: | _____ | CLAIM NUMBER: | 6366655409 0079983797 |
| CLAIM DATE: | 02/14/17-02/14/17 | DATE RECEIVED: | 02/16/17 | | |
| REND PROV ID: | 1295792380 | REND PROV: | C. A MAZZOLA | PRODUCT: | CHOYC+ |

| PATIENT CONTROL NUMBER | PATIENT ID | AUTH/REF NUMBER | DRG | DRG WEIGHT | CLAIM CHARGE AMOUNT | CLM ADJ AMT | GRP CD | CLM ADJ RSN CD | CLAIM PAYMENT AMOUNT | PATIENT RESPONSIBILITY |
|---|---|---|---|---|---|---|---|---|---|---|
| 069676-01 | | | | | $53,867.00 | | | | $10,251.01 | $43,615.99 |

**SERVICE LINE DETAIL(S)**

| LINE CTRL# | DATES OF SERVICE | SUB PROD/ SVC/ MOD | ADJ PROD/ SVC | MOD | REV | UNITS | ADJ QTY | CHARGE | AMOUNT ALLOWED | ADJ AMOUNT | GRP CD | CLM ADJ RSN CD | PAYMENT AMOUNT | REMARK/ NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 107081 | 02/14/17 - 02/14/17 | 61154 | | 79 | | | 1 | $43,441.00 | $9,478.00 | $533.70 | PR | 1 | $6,261.01 | 29 |
| | | | | | | | | | | $2,683.29 | PR | 2 | | |
| | | | | | | | | | | $33,963.00 | PR | 45 | | |
| 107082 | 02/14/17 - 02/14/17 | 61781 | | | | | 1 | $10,426.00 | $5,700.00 | $1,710.00 | PR | 2 | $3,990.00 | 29 |
| | | | | | | | | | | $4,726.00 | PR | 45 | | |
| CLAIM# 6366655409 0079983797 | | | | | | | SUBTOTAL | $53,867.00 | $15,178.00 | $43,615.99 | | | $10,251.01 | UG |

PAYMENT OF BENEFITS HAS BEEN MADE IN ACCORDANCE WITH THE TERMS OF THE MANAGED CARE SYSTEM.

| | |
|---|---|
| TOTAL PAYABLE TO PROVIDER | $10,251.01 |

## NOTES

PR1    PATIENT RESPONSIBILITY - DEDUCTIBLE AMOUNT

PR2    PATIENT RESPONSIBILITY - COINSURANCE AMOUNT

PR45    PATIENT RESPONSIBILITY - CHARGE EXCEEDS FEE SCHEDULE/MAXIMUM ALLOWABLE OR CONTRACTED/LEGISLATED FEE ARRANGEMENT.

29    YOUR PLAN COVERS THE ELIGIBLE EXPENSE AMOUNT REIMBURSABLE UNDER YOUR PLAN FOR COVERED OUT-OF-NETWORK HEALTH SERVICES. THE ELIGIBLE AMOUNT IS BASED ON A DATABASE OF COMPETITIVE FEES FOR SIMILAR SERVICES OR SUPPLIES IN YOUR AREA. BENEFITS ARE NOT AVAILABLE FOR THAT PORTION OF THE CHARGE THAT EXCEEDS THE ELIGIBLE AMOUNT DETERMINED FOR THIS SERVICE.

UG    YOUR NETWORK PHYSICIAN OR HEALTH CARE PROVIDER HAS AGREED TO THE PLAN DISCOUNT. THE DISCOUNT SHOWN IS YOUR SAVINGS FOR USING A NETWORK PHYSICIAN OR HEALTH CARE PROVIDER. YOU HAVE NOT MET YOUR DEDUCTIBLE AND OWE THE AMOUNT SHOWN.

THE MEMBER, PROVIDER, OR AN AUTHORIZED REPRESENTATIVE MAY REQUEST RECONSIDERATION OR APPEAL THE DECISION BY SUBMITTING COMMENTS, DOCUMENTS OR OTHER INFORMATION TO UNITEDHEALTHCARE.  NETWORK PROVIDERS SHOULD REFER TO THE ADMINISTRATIVE GUIDE FOR CLAIM RECONSIDERATION OR APPEAL INFORMATION.  IF YOU ARE A NETWORK PROVIDER APPEALING A CLINICAL OR COVERAGE DETERMINATION ON BEHALF OF A MEMBER, OR A NON-NETWORK PROVIDER APPEALING A DECISION ON BEHALF OF A MEMBER, FOLLOW THE PROCESS FOR APPEALS IN THE MEMBER'S BENEFIT PLAN DOCUMENT.  DECISIONS ON APPEALS MADE ON BEHALF OF MEMBERS WILL BE COMPLETED IN 30 DAYS OF SUBMISSION OR WITHIN THE

STD - PRA-202518910-5400000000033888961

# EXHIBIT H

3C-14114*02*000009-PM-17096-120*C07ASOJPMCTOPS

United HealthCare Services, Inc.
GREENSBORO SERVICE CENTER
PO BOX 740800
ATLANTA GA 30374-0800
PHONE: 1-877-842-3210

STD - PRA

✦ Bristol-Myers Squibb Company

# PROVIDER
# REMITTANCE ADVICE

NEW JERSEY PEDIATRIC NEUROSCIE
CATHERINE A MAZZOLA MD
131 MADISON AVE FL 3
MORRISTOWN NJ 07960

*Handwritten:* Pt: Kyle Ha~~____~~
DOS: 2/14/2017
Prov: Sikorskyj

| | |
|---|---|
| CHECK DATE: | 04/06/17 |
| TIN: | 202518910 |
| NPI: | 1295792380 |
| PAYEE NAME: | NEW JERSEY PEDIATRIC NEUROSCIE |
| CHECK NUMBER: | PH 20514261 |
| CHECK AMOUNT: | $2,432.70 |
| GROUP NUMBER: | 191698 |
| GROUP NAME: | BRISTOL MYERS SQUIBB |

## PATIENT: KYLE ~~_____~~ (CH)

| SUBSCRIBER ID: | A 809639558 | SUBSCRIBER NAME: | ~~_____~~ | CLAIM NUMBER: | 6431697010 0080434071 |
|---|---|---|---|---|---|
| CLAIM DATE: | 01/04/17-01/04/17 | DATE RECEIVED: | 03/22/17 | PRODUCT: | CHOYC+ |
| REND PROV ID: | 1295792380 | REND PROV: | C. A MAZZOLA | | |

| PATIENT CONTROL NUMBER | PATIENT ID | AUTH/REF NUMBER | DRG | DRG WEIGHT | CLAIM CHARGE AMOUNT | CLM ADJ AMT | GRP CD | CLM ADJ RSN CD | CLAIM PAYMENT AMOUNT | PATIENT RESPONSIBILITY |
|---|---|---|---|---|---|---|---|---|---|---|
| ~~___~~ | | | | | | | | | | ~~____~~ |

### SERVICE LINE DETAIL(S)

| LINE CTRL# | DATES OF SERVICE | SUB PROD/ SVC/ MOD | ADJ PROD/ SVC | MOD | REV | UNITS | ADJ QTY | CHARGE | AMOUNT ALLOWED | ADJ AMOUNT | GRP CD | CLM ADJ RSN CD | PAYMENT AMOUNT | REMARK/ NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ~~_____~~ | | | | | | | 1 | ~~____~~ | | ~~_____~~ | | | | |
| CLAIM# 6431697010 0080434071 | | | | | | | SUBTOTAL | $54,562.00 | | | | | | |

PAYMENT OF BENEFITS HAS BEEN MADE IN ACCORDANCE WITH THE TERMS OF THE MANAGED CARE SYSTEM.

| SUBSCRIBER ID: | A 809639558 | SUBSCRIBER NAME: | ~~_____~~ | CLAIM NUMBER: | 6431697011 0080464302 |
|---|---|---|---|---|---|
| CLAIM DATE: | 02/14/17-02/14/17 | DATE RECEIVED: | 03/23/17 | PRODUCT: | CHOYC+ |
| REND PROV ID: | 1295792380 | REND PROV: | C. A MAZZOLA | | |

| PATIENT CONTROL NUMBER | PATIENT ID | AUTH/REF NUMBER | DRG | DRG WEIGHT | CLAIM CHARGE AMOUNT | CLM ADJ AMT | GRP CD | CLM ADJ RSN CD | CLAIM PAYMENT AMOUNT | PATIENT RESPONSIBILITY |
|---|---|---|---|---|---|---|---|---|---|---|
| 069676 | | | | | $43,441.00 | | | | $2,432.70 | $1,042.58 |

### SERVICE LINE DETAIL(S)

| LINE CTRL# | DATES OF SERVICE | SUB PROD/ SVC/ MOD | ADJ PROD/ SVC | MOD | REV | UNITS | ADJ QTY | CHARGE | AMOUNT ALLOWED | ADJ AMOUNT | GRP CD | CLM ADJ RSN CD | PAYMENT AMOUNT | REMARK/ NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 001 | 02/14/17 - 02/14/17 | | 61154 | 79/ AS | | 1 | | $43,441.00 | $3,475.28 | $39,965.72 | CO | 45 | $2,432.70 | IT |
| CLAIM# 6431697011 0080464302 | | | | | | | SUBTOTAL | $43,441.00 | $3,475.28 | $1,042.58 | PR | 2 | | |
| | | | | | | | | | | $41,008.30 | | | $2,432.70 | |

PAYMENT OF BENEFITS HAS BEEN MADE IN ACCORDANCE WITH THE TERMS OF THE MANAGED CARE SYSTEM.

| NOTES | | TOTAL PAYABLE TO PROVIDER | $2,432.70 |
|---|---|---|---|

CO45    CONTRACTUAL OBLIGATIONS - CHARGE EXCEEDS FEE SCHEDULE/MAXIMUM ALLOWABLE OR
        CONTRACTED/LEGISLATED FEE ARRANGEMENT.

# EXHIBIT I

Fax Server            7/4/2018 6:39:06 AM  PAGE   8/011   Fax Server

MORRISTOWN MEDICAL CENTER
Operative Report

Patient:              ████████ CONNOR
Med Rec No:           A01391704
Date of Birth:        ████████████

DATE:  06/12/2018

SURGEON: Luke D., Tomycz, MD

ASSISTANT:  None

ANESTHESIOLOGIST:

PREOPERATIVE DIAGNOSIS:
Large right frontal parietal hemorrhage.

POSTOPERATIVE DIAGNOSIS:
Large right frontal parietal hemorrhage.

PROCEDURE:
Diagnostic cerebral angiography.

ANESTHESIA:
General endotracheal.

POSITION:
Supine.

ESTIMATED BLOOD LOSS:
Minimal.

PREOPERATIVE MEDICATIONS:
None.

BRIEF HISTORY:
Connor is a 10-year-old who had a spontaneous right frontal parietal
hemorrhage which was decompressed urgently. We feel that this is most likely
due to an AVM rupture given his age, and the fact that the bleed was
spontaneous. MR, as well as CTA, however, did not reveal an obvious nidus.
Today we are taking him for cerebral angiogram to better characterize what we
think is likely an AVM.

OPERATIVE DETAIL:
Patient was brought to the angio suite. He was already intubated. He was
sedated by the anesthesiology team and paralyzed. Using a micropuncture kit,
after performing a time-out, after several attempts on the right side, I was
unable to gain access so I held some pressure and then made a small nick
incision on the left side using an x-ray for localization, and then gained
access with a 5-French micropuncture kit into the femoral artery using the
typical Seldinger technique with a microwire and a 5-French sheath. Once I
had my sheath in place, I then went up with an angled-tapered catheter and
angled Glidewire. I first catheterized the right side, and did selective
catheterization for right ICA. I could see the craniectomy defect. However,

CONFIDENTIAL DOCUMENT. THIS HARDCOPY IS NOT FOR DISTRIBUTION OR EDITING.

Fax Server             7/4/2018 6:39:06 AM   PAGE   9/011   Fax Server

MORRISTOWN MEDICAL CENTER
Operative Report

Patient:              CONNOR
Med Rec No:      A01391704
Date of Birth:



I did not see any clear obvious AVM nidus. There was perhaps 1 vein that
appeared to fill a little bit on the early side. There was no definitive
evidence at this time of a fistula or AVM. I also catheterized selectively
the right external carotid artery and did an angiogram looking at the head.
There is no evidence of AV fistula. I then did an angiogram of the left
common carotid artery. I did AP and lateral views of the head, as well as
oblique views. There is no evidence of AVM, aneurysm, or other malformation.
Finally, I catheterized the left vertebral artery and did AP and lateral views
of the head. There was no obvious early venous drainage or signs of fistula.
At this point, I removed the catheter and I also removed the sheath and held
pressure for 10 minutes, and the patient was transferred back to the ICU with
order to do neuro checks.

LOCATION:
Morristown Biplane Angiosuite.


DICTATED BY: LUKE D., TOMYCZ, MD


DD: 06/14/2018 10:52:15   DT: 06/14/2018 11:31:14
LDT/MedQUZ/Job#/Int# 413202/793678764   PHYS. ID: 23612

Signed, Luke D Tomycz, MD
07/03/2018 11:30:00

CONFIDENTIAL DOCUMENT. THIS HARDCOPY IS NOT FOR DISTRIBUTION OR EDITING.
Job pchart-2016.ahsys.orgprod0000000598965 (20180/04 08:01:46) · Page 8 Doc# 4
07/04/2018   6:44AM (GMT-04:00)

**EXHIBIT J**

UMR
PO BOX 450
PUEBLO, CO 81002

**CARRIER**

1

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 09/19

☐☐ PICA                                                                PICA ☐☐

| 1. | MEDICARE | MEDICAID | TRICARE | CHAMPVA | GROUP HEALTH PLAN | FECA BLKLUNG | OTHER | 1a. INSURED'S I.D. NUMBER | (For Program in Item 1) |
|---|---|---|---|---|---|---|---|---|---|
| | ☐ (Medicare#) | ☐ (Medicaid#) | ☐ (ID#/DoD#) | ☐ (Member ID#) | ☒ (ID#) | ☐ (ID#) | ☐ (ID#) | ✓18687163 | |

| 2. PATIENT'S NAME (Last Name, First Name, Middle Initial) | 3. PATIENT'S BIRTH DATE | SEX | 4. INSURED'S NAME (Last Name, First Name, Middle Initial) |
|---|---|---|---|
| CONNOR | MM DD YY | M☒ F☐ | SAME |

| 5. PATIENT'S ADDRESS (No., Street) | 6. PATIENT RELATIONSHIP TO INSURED | 7. INSURED'S ADDRESS (No., Street) |
|---|---|---|
| | Self☒ Spouse☐ Child☐ Other☐ | SAME |

| CITY | STATE | 8. RESERVED FOR NUCC USE | CITY | STATE |
|---|---|---|---|---|
| NJ | | | | |

| ZIP CODE | TELEPHONE (Include Area Code) | ZIP CODE | TELEPHONE (Include Area Code) |
|---|---|---|---|
| | | | ( ) |

| 9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial) | 10. IS PATIENT'S CONDITION RELATED TO: | 11. INSURED'S POLICY GROUP OR FECA NUMBER |
|---|---|---|
| | | |

| a. OTHER INSURED'S POLICY OR GROUP NUMBER | a. EMPLOYMENT? (Current or Previous) ☐YES ☒NO | a. INSURED'S DATE OF BIRTH    MM DD YY    SEX M☒ F☐ |
|---|---|---|

| b. RESERVED FOR NUCC USE | b. AUTO ACCIDENT?  ☐YES ☒NO  PLACE (State) | b. OTHER CLAIM ID (Designated by NUCC) |
|---|---|---|

| c. RESERVED FOR NUCC USE | c. OTHER ACCIDENT?  ☐YES ☒NO | c. INSURANCE PLAN NAME OR PROGRAM NAME  UMR |
|---|---|---|

| d. INSURANCE PLAN NAME OR PROGRAM NAME | 10d. CLAIM CODES (Designated by NUCC) | d. IS THERE ANOTHER HEALTH BENEFIT PLAN? ☐YES ☒NO  If yes, complete items 9, 9a, and 9d. |
|---|---|---|

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.
SIGNED  SIGNATURE ON FILE   DATE  06 12 2018

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize payment of medical benefits to the undersigned physician or supplier for services described below.
SIGNED  SIGNATURE ON FILE

| 14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)  MM DD YY  QUAL. | 15. OTHER DATE  QUAL.  MM DD YY | 16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION  FROM    TO |
|---|---|---|

| 17. NAME OF REFERRING PROVIDER OR OTHER SOURCE  DN GERARD FRITZ MD | 17b. NPI | 18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES  FROM 06 03 2018   TO |
|---|---|---|

| 19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC) | 20. OUTSIDE LAB?  ☐YES ☒NO   $ CHARGES |
|---|---|

| 21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY Relate A-L to service line below (24E)  ICD Ind. 0 | 22. RESUBMISSION CODE    ORIGINAL REF. NO. |
|---|---|
| A. R58    B. Q27 30    C.    D. | |
| E.    F.    G.    H. | 23. PRIOR AUTHORIZATION NUMBER |
| I.    J.    K.    L. | |

| 24. A. DATE(S) OF SERVICE From MM DD YY To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Fam Plan | I. ID. QUAL | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 06122018 06122018 | 21 | Y | 16223 | AB | 20000 00 | 1 | | NPI | 1134276959 |
| 2 | 06122018 06122018 | 21 | Y | 16226 | AB | 20000 00 | 1 | | NPI | 1134276959 |
| 3 | | | | | | | | | NPI | |
| 4 | | | | | | | | | NPI | |
| 5 | | | | | | | | | NPI | |
| 6 | | | | | | | | | NPI | |

| 25. FEDERAL TAX I.D. NUMBER  202518910  SSN ☐ EIN ☒ | 26. PATIENT'S ACCOUNT NO.  072893 | 27. ACCEPT ASSIGNMENT? ☒YES ☐NO | 28. TOTAL CHARGE  $ 40000 00 | 29. AMOUNT PAID  $ 0 00 | 30. Rsvd for NUCC Use |
|---|---|---|---|---|---|

| 31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)  LUKE TOMYCZ MD  SIGNED    04 17 2020  DATE | 32. SERVICE FACILITY LOCATION INFORMATION  MORRISTOWN MEMORIAL HOSPITAL  100 MADISON AVENUE  MORRISTOWN NJ 07960-7360  a1558503672 | 33. BILLING PROVIDER INFO & PH # 973 3269000  NJ PEDIATRIC NEUROSCIENCE INSTITUTE  131 MADISON AVE 3RD FLOOR  MORRISTOWN NJ 07960-7360  a1558503672 |
|---|---|---|

NUCC Instruction Manual available at: www.nucc.org   PLEASE PRINT OR TYPE   APPROVED OMB-0938-1197 FORM 1500 (09-19)

# EXHIBIT K

**Remittance Advice for Period Ending 09-12-18**

UHR
PO BOX 30541   SALT LAKE CITY   UT 84130
UNITEDHEALTHCARE CHOICE PLUS
FELLOWSHIP SENIOR LIVING, INC.

1-877-233-1800

Federal ID No. 20-2518910

Visit our web-site at
www.umr.com
to obtain eligibility, benefit, and
claim information on behalf of your
patients 24 hours/day, 7 days/week.

NJ PEDIATRIC NEUROSCIENCE INST
151 MADISON AVE STE 3
MORRISTOWN NJ 07960

| Dates From/To | Service Code | Charged Amount | Allowed Amount | Deductible | Copay | Coinsurance | Discount Managed Care Adjust | Ineligible | Withheld | OC | ANSI Code | Paid | Patient Responsibility |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | ALAINA | | PATIENT: | CONNOR | | ID# Y18687163 | | | | | | |
| EMPLOYEE: | | | | CLAIM NUMBER: 18213070076 | | | | | | | | | |
| ACCOUNT NUMBER: 072893 | | | | | | | | | | | | | |
| 061218 36223 | | 20000.00 | .00 | .00 | .00 | .00 | .00 | 20000.00- | .00 01 | | | .00 | .00 |
| | | | | | | | | CES EDITED CLAIM PROVIDER RESP | | | 234 | | |
| 061218 36226 | | 20000.00 | .00 | .00 | .00 | .00 | .00 | 20000.00- | .00 01 | | | .00 | .00 |
| | | | | | | | | CES EDITED CLAIM PROVIDER RESP | | | 234 | | |
| TOTAL | | 40000.00 | .00 | .00 | .00 | .00 | .00 | 40000.00- | .00 | | | .00 | .00 |
| SUB TOTAL | | 40000.00 | .00 | .00 | .00 | .00 | .00 | 40000.00- | .00 | | | .00 | .00 |
| PROVIDER TOTAL | | 40000.00 | | | | | | 40000.00- | | | | .00 | .00 |

Pt Connor N
Pr. Dr. Tomycz
Dos. 6/12/18

C8465   1203976697   8255049438



**EXHIBIT L**

⬛ Ethen (MR # A42443555) Printed by Tatiana O Huk Sikorskyj, APN [THUK0001] at 9/4/18 12...

| Catherine A Mazzola, MD | Physician | Addendum | Neurosurgery | Op Note | Date of Service: 8/31/2018 10:48 AM |

### OPERATIVE REPORT    Morristown Medical Center

Name: ⬛⬛
**ETHEN**
DOB: ⬛⬛⬛ M
Patient Type: O
Admission Date: 08/31/2018

CSN/Account #:  108250563

MRN:  A42443555
Location:  AOR

Attending Physician:
Catherine Mazzola, M.D.

DICTATED BY:  Catherine Mazzola, M.D.

Surgeon:  Catherine Mazzola, M.D.

Assistant:  Thomas J Sernas, PA

Anesthesiologist:  Cindy H Chen, MD

Date of Procedure:

PREOPERATIVE DIAGNOSES:
1.  Intraspinal, extradural lipoma.
2.  Syringomyelia.
3.  Scoliosis.

POSTOPERATIVE DIAGNOSES :
1.  Intraspinal, extradural lipoma.
2.  Syringomyelia.
3.  Scoliosis.

SURGERY :
1.  Osteoplastic laminotomies and resection of intraspinal, extradural lipoma.
2.  Intraoperative microscope.
3.  Thoracic laminar fusion with osteoplastic reconstruction at T6, T7 and T8
4.  Intraoperative spinal cord monitoring.

ANESTHESIA:  General.

INDICATIONS FOR SURGERY:  Ethan ⬛⬛ is a 12-year-old male who was diagnosed with scoliosis and syringomyelia.  He had a syrinx of the spinal cord which went from C5 all the way down to T5. Below the terminal aspect of the syrinx at T5 there was a large epidural lipoma measuring approximately 8–10 mm in greatest thickness in the canal.  The lipomatous changes over the dura

Ethen (MR # A42443555) Printed by Tatiana O Huk Sikorskyj, APN [THUK0001] at 9/4/18 12...

started at T5 and went all the way down to T8–T . Below T  there was a normal amount of epidural fat.

The MRI was reviewed with the neuroradiologist and the findings were discussed with the parents. Osteoplastic thoracic laminotomies and resection of the mass over the dura was recommended.   e also recommended microscope and intraoperative monitoring. An informed consent was o tained from Ethan s parents prior to surgery. All the risks of surgery were explained including wound infection, poor healing, CSF leak, CSF infection, paralysis, weakness,  owel and  ladder dysfunction, sensation changes. An informed consent was o tained from his parents prior to surgery. I saw them in my office and on the morning of the surgery.   e reviewed all the plans for surgery and risks of surgery at  oth times. Once we had gone over his H and P and consent, he was  rought to the room. A time–out was done and he did receive IV anti iotics prior to skin incision.

DESCRIPTION OF PROCEDURE :  Once he was orally intu ated and he had 2 large– ore peripheral IVs and a Foley, he was placed pron  e on the OR ta le with 2  elly rolls. All areas of pressure were well padded.

The thoracolum ar area was draped off with 4 plastic drapes. The spinous processes were marked from T1 to L5. An intraoperative x–ray was o tained to document L1. Once we w  ere happy with our levels as marked, the area was scru  ed 4 times with a Betadine scru . I dried in  etween each scru  and then painted 3 times with Betadine. Once the Betadine was dried Tom and I scru  ed.  e were gowned and gloved with sterile techni ue.

The operative area was draped off with  lue towels which were stapled to the skin. The incision was carefully marked. A down sheet and Io an sticky drape and 2 split sheets were used to drape the operative area. The incision was made with a 15  la  de scalpel, carried down through the skin and su cutaneous tissue with a needle–tip Bovie. The lamina of T5, T6, T7, T8 and T  were exposed. They were dissected out laterally using the flat tip on the Bovie. Retractors were put into the incision. Two cere ellar retractors and a Gelpi were used. Hemostasis was o tained using the Bovie, the  ipolar and Surgiflo application. Osteoplastic laminotomies were done at T5, T6, T7, T8 and T  using the Midas Rex, 1st with an M8 drill  it and then with a B1 drill  it with  a footplate. The laminae were elevated.

THE OPERATING MICROSCOPE  AS USED FOR THE RESECTION OF THE MASS. There was a large fatty mass which was in the spinal canal. A few specimens were o tained for permanent section. However, this did not appear to  e tumorous at all. This did not appear to  e cancerous, this mass appeared  red to  e lipomatosis. The lipomatous mass was evacuated using  ipolar electrocoagulation and the CUSA aspirator.

Once the mass was resected in its entirety the epidural lateral venous plexus was  ipolared. The exiting nerve roots on the left were identified.

Once hemostasis had  een o tained and the decompression was done, we checked the level a ove and  elow with a dental instrument and it seemed to  e free and under no pressure.

The lamina were put  ack down in place. An osteoplastic reconstruction of the posterior elements was done. Laminar plates were put down  at T6, T7 and T8 on the right and on the left in the following manner.  Dog  one–shaped Synthes titanium microplates were placed on either side of the lamina and anchored to the lamina with titanium microscrews. There were a total of 6 plates placed and   12 screws. Once the lamina had  een repositioned, a little  it of Gelfoam was put down over the empty space  elow the lamina of T8 and then some  one chips were put down over that. The area was then irrigated with  acitracin irrigation solution.

Hemosta sis was triple checked. 20 cc of lidocaine were in ected into the su cutaneous tissue for local anesthesia. The fascia was closed with multiple 2–0 Vicryl pop–offs dyed suture. Once the fascia was closed, the su cutaneous tissue was closed with 3–0 Vicr yl undyed pop–off sutures. The

**EXHIBIT M**

UNITED HEALTH CARE
PO BOX 740800
ATLANTA, GA 30374

**HEALTH INSURANCE CLAIM FORM**

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 09/19

PICA | | | | | | PICA

1. MEDICARE ☐ (Medicare#)  MEDICAID ☐ (Medicaid#)  TRICARE ☐ (ID#/DoD#)  CHAMPVA ☐ (Member ID#)  GROUP HEALTH PLAN ☒ (ID#)  FECA BLK LUNG ☐ (ID#)  OTHER ☐ (ID#)

1a. INSURED'S I.D. NUMBER (For Program in Item 1): 042288813

2. PATIENT'S NAME (Last Name, First Name, Middle Initial): ETHEN

3. PATIENT'S BIRTH DATE / SEX: M ☒ F ☐

4. INSURED'S NAME (Last Name, First Name, Middle Initial): SAME

5. PATIENT'S ADDRESS (No., Street)

CITY: NJ

6. PATIENT RELATIONSHIP TO INSURED: Self ☒ Spouse ☐ Child ☐ Other ☐

7. INSURED'S ADDRESS (No., Street): SAME

8. RESERVED FOR NUCC USE

ZIP CODE

TELEPHONE (Include Area Code)

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (Current or Previous) YES ☐ NO ☒

a. INSURED'S DATE OF BIRTH / SEX: M ☒ F ☐

b. RESERVED FOR NUCC USE

b. AUTO ACCIDENT? YES ☐ NO ☒  PLACE (State)

b. OTHER CLAIM ID (Designated by NUCC)

c. RESERVED FOR NUCC USE

c. OTHER ACCIDENT? YES ☐ NO ☒

c. INSURANCE PLAN NAME OR PROGRAM NAME: UNITED HEALTH CARE

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. CLAIM CODES (Designated by NUCC)

d. IS THERE ANOTHER HEALTH BENEFIT PLAN? YES ☐ NO ☒  If yes, complete items 9, 9a, and 9d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.
SIGNED  SIGNATURE ON FILE  DATE 08 31 2018

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.
SIGNED  SIGNATURE ON FILE

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)  QUAL.

15. OTHER DATE  QUAL.

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION  FROM  TO

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE: DN MARK RIEGER MD  17b. NPI

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES  FROM 08 31 2018  TO

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)

20. OUTSIDE LAB? YES ☐ NO ☒  $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY Relate A-L to service line below (24E)  ICD Ind.

A. D33 4  B. G95 0  C. M41 9  D.
E.  F.  G.  H.

22. RESUBMISSION CODE  ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE From MM DD YY To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 08 31 2018 08 31 2018 | 21 | 63276 | | ABC | 56000 00 | 1 | | NPI | 1295792380 |
| 2 | 08 31 2018 08 31 2018 | 21 | 63295 | 59 | ABC | 11151 00 | 1 | | NPI | 1295792380 |
| 3 | 08 31 2018 08 31 2018 | 21 | 69990 | | ABC | 4250 00 | 1 | | NPI | 1295792380 |
| 4 | | | | | | | | | NPI | |
| 5 | | | | | | | | | NPI | |
| 6 | | | | | | | | | NPI | |

25. FEDERAL TAX I.D. NUMBER: 202518910  SSN ☐ EIN ☐

26. PATIENT'S ACCOUNT NO.: 073383

27. ACCEPT ASSIGNMENT? YES ☒ NO ☐

28. TOTAL CHARGE: $ 71401 00

29. AMOUNT PAID: $ 0 00

30. Rsvd for NUCC Use

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
CATHERINE A MAZZOLA M  06 03 2021
SIGNED  DATE

32. SERVICE FACILITY LOCATION INFORMATION
MORRISTOWN MEMORIAL HOSPITAL
100 MADISON AVENUE
MORRISTOWN NJ 07960-7360
a. 1558503672

33. BILLING PROVIDER INFO & PH #: (973) 3269000
NJ PEDIATRIC NEUROSCIENCE INSTITUTE
131 MADISON AVE 3RD FLOOR
MORRISTOWN NJ 07960-7360
a. 1558503672

NUCC Instruction Manual available at: www.nucc.org   PLEASE PRINT OR TYPE   APPROVED OMB-0938 1197 FORM 1500 (09-19)

**EXHIBIT N**

313UTOPPR1005002-04868-02

6B-7067*02*000003-PM-1831S-120*C07ASOBOATOPS

UnitedHealthcare Service LLC
GREENSBORO SERVICE CENTER
P.O. BOX 740800
ATLANTA GA 30374-0800
PHONE: 1-877-842-3210

STD - PRA

 **UnitedHealthcare**

## PROVIDER
## REMITTANCE ADVICE

NEW JERSEY PEDIATRIC NEUROSCIE
CATHERINE MAZZOLA MD
131 MADISON AVE FL 3
MORRISTOWN NJ 07960

| | |
|---|---|
| CHECK DATE: | 11/09/18 |
| TIN: | 202518910 |
| PAYEE NAME: | NEW JERSEY PEDIATRIC NEUROSCIE |
| CHECK NUMBER: | PG 91747801 |
| CHECK AMOUNT: | $2,800.00 |
| GROUP NUMBER: | 197944 |
| GROUP NAME: | PORT AUTHORITY TRANS-HUDSON-PA |

*Pt. Ethan R~~███~~*
*Pr. Dr. Mazzola*
*Dos. 8/31/18*

## PATIENT: ETHEN ███(CH)

| | | |
|---|---|---|
| SUBSCRIBER ID: | A 942288818 | SUBSCRIBER NAME: ~~████~~ |
| CLAIM DATE: | 08/31/18-08/31/18 | DATE RECEIVED: 10/24/18 |
| REND PROV ID: | | REND PROV: C. MAZZOLA MD |

| | |
|---|---|
| CLAIM NUMBER: | 7435665134 0076189449 |
| PRODUCT: | CHOYC+ |

| PATIENT CONTROL NUMBER | PATIENT ID | AUTH/REF NUMBER | DRG | DRG WEIGHT | CLAIM CHARGE AMOUNT | CLM ADJ AMT | GRP CD | CLM ADJ RSN CD | CLAIM PAYMENT AMOUNT | PATIENT RESPONSIBILITY |
|---|---|---|---|---|---|---|---|---|---|---|
| 076663 | | | | | $71,401.00 | | | | $2,800.00 | $51,348.00 |

### SERVICE LINE DETAIL(S)

| LINE CTRL# | DATES OF SERVICE | SUB PROD/ SVC/ MOD | ADJ PROD/ SVC | MOD | REV | UNITS | ADJ QTY | CHARGE | AMOUNT ALLOWED | ADJ AMOUNT | GRP CD | CLM RSN CD | PAYMENT AMOUNT | REMARK/ NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 001 | 08/31/18 - 08/31/18 | | 63276 | | | 1 | | $56,000.00 | $13,453.00 | $42,547.00 | PR | 45 | $13,453.00 | 29 |
| 002 | 08/31/18 - 08/31/18 | | 63295 | 59 | | 1 | | $11,151.00 | $2,800.00 | $8,351.00 | PR | 45 | $2,800.00 | 29 |
| 003 | 08/31/18 - 08/31/18 | | 69990 | | | 1 | | $4,250.00 | $3,800.00 | $450.00 | PR | 45 | $3,800.00 | 29 |
| | 08/31/18 - 08/31/18 | | 632760 | | | -1 | | $0.00 | | | | | -$17,253.00 | E5 |
| CLAIM# 7435665134 0076189449 | | | | | | | | SUBTOTAL | $71,401.00 | $20,053.00 | $51,348.00 | | $2,800.00 | |

PAYMENT OF BENEFITS HAS BEEN MADE IN ACCORDANCE WITH THE TERMS OF THE MANAGED CARE SYSTEM.

| | |
|---|---|
| TOTAL PAYABLE TO PROVIDER | $2,800.00 |

NOTES

PR45    PATIENT RESPONSIBILITY - CHARGE EXCEEDS FEE SCHEDULE/MAXIMUM ALLOWABLE OR CONTRACTED/LEGISLATED FEE ARRANGEMENT.

29    YOUR PLAN COVERS THE ELIGIBLE EXPENSE AMOUNT REIMBURSABLE UNDER YOUR PLAN FOR COVERED OUT-OF-NETWORK HEALTH SERVICES. THE ELIGIBLE AMOUNT IS BASED ON A DATABASE OF COMPETITIVE FEES FOR SIMILAR SERVICES OR SUPPLIES IN YOUR AREA. BENEFITS ARE NOT AVAILABLE FOR THAT PORTION OF THE CHARGE THAT EXCEEDS THE ELIGIBLE AMOUNT DETERMINED FOR THIS SERVICE.

E5    ADDITIONAL CHARGES AND/OR CORRECTED BILLING HAS BEEN CONSIDERED.

THE MEMBER, PROVIDER, OR AN AUTHORIZED REPRESENTATIVE MAY REQUEST RECONSIDERATION OR APPEAL THE DECISION BY SUBMITTING COMMENTS, DOCUMENTS OR OTHER INFORMATION TO UNITEDHEALTHCARE. NETWORK PROVIDERS SHOULD REFER TO THE ADMINISTRATIVE GUIDE FOR CLAIM RECONSIDERATION OR APPEAL INFORMATION. IF YOU ARE A NETWORK PROVIDER APPEALING A CLINICAL OR COVERAGE DETERMINATION ON BEHALF OF A MEMBER, OR A NON-NETWORK PROVIDER APPEALING A DECISION ON BEHALF OF A MEMBER, FOLLOW THE PROCESS FOR APPEALS IN THE MEMBER'S BENEFIT PLAN DOCUMENT. DECISIONS ON APPEALS MADE ON BEHALF OF MEMBERS WILL BE COMPLETED IN 30 DAYS OF SUBMISSION OR WITHIN THE TIMEFRAME REQUIRED BY LAW.

UnitedHealthcare is improving service to you by adopting electronic payments & statements (EPS) as a standard way to pay claims. EPS will dramatically reduce the time and effort your organization spends on administering paper checks and explanation of benefits. Get a head start and enroll today by

